**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Nos. 12 CR 723; 13 CR 703; |
| | ) | 15 CR 487 |
| | ) | Judge Sharon Johnson Coleman |
| ADEL DAOUD, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>DEFENDANT ADEL DAOUD'S SENTENCING MEMORANDUM</u>**

**THOMAS ANTHONY DURKIN**
**DURKIN & ROBERTS**
2446 N. Clark Street
Chicago, IL 60614
(312) 913-9300

**JOSHUA G. HERMAN**
**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 457
Chicago, IL 60604
(312) 909-0434

**ANDREA D. LYON**
**LYON LAW**
53 W. Jackson, Blvd., Suite 1650
Chicago, IL 60604
(312) 622-0736

## TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................... 1

II. PROCEDURAL BACKGROUND .................................................................. 11

   A.  The Charges Against Daoud ....................................................................... 11

   B.  The Competency Proceedings, Which Resulted in Daoud Being
   Found Unfit To Stand Trial, Hospitalized in the BOP, and then Restored
   After Treatment, But Only While on Prescribed Medication. ................................. 13

      1.  The First Competency Report Dated September 26, 2015,
      Concluded That Daoud is Fit to Stand Trial. ....................................... 15

      2.  Daoud's Bizarre Behavior Continues to Raise Concerns About
      His Deteriorating Mental Health Condition and Results in the Court
      Continuing the Trial Date In Order to Complete Another Mental
      Health Evaluation Concerning Daoud's Competency. ......................... 16

      3.  Daoud's Counsel File an Emergency Motion for an
      Evidentiary Hearing to Determine Daoud's  Mental
      Competency on December 7, 2015. ..................................................... 17

      4.  The Court Grants Counsels' Emergency Motion for
      a Competency Hearing on December 10, 2015. ................................... 18

      5.  Following the Court's Ruling, Daoud Continues to
      Exhibit Signs of a Serious Mental Health Problem
      Through His Bizarre Letters to the Court. ........................................... 18

      6.  On January 20, 2016, Daoud is Committed to the Custody of the Attorney
      General to be Examined by Mental Health Professionals to Determine his
      Competency to Stand Trial and His Sanity at the Time of the MCC Assault,
      Yet He Continues Submitting Bizarre Letters to the Court. ................. 19

      7.  Daoud is Examined at FMC Springfield and is Found to be Fit
      to Stand Trial and Also Sane at the Time of the MCC Assault. ........... 21

      8.  Dr. Stephen Xenakis Concludes that Daoud Suffered From a
      Delusional Disorder that Rendered Him Not Competent to Stand Trial. ............. 21

      9.  Daoud Returns to the MCC For the Competency Hearing,
      And Continues to Manifest Bizarre and Illogical Thinking.................. 22

10. The Court Finds Daoud to be not Competent to Stand
Trial and Orders That he be Immediately Placed in a Secure
Psychiatric Treatment Facility for Treatment. ....................................................... 23

C. Daoud's Mental Health Treatment and Restoration to Competency for Trial. ................ 23

1. After Treatment at FMC Butner, Daoud is Diagnosed With
Other Specified Schizophrenia Spectrum and Other Psychotic Disorder,
Attenuated Psychosis Syndrome, and is Found Competent to Stand Trial,
But OnlyWhile on Medication. ............................................................................... 24

2. Dr. Xenakis Concurs with the Findings of FMC Butner, in That Daoud
was Restored to Competency and Required Medication and Treatment. ............................ 25

a. Consistent with the Findings of the Mental Health Professionals,
on March 12, 2018, the Court Finds Daoud to be Restored to
Competency with Medication. ......................................................................... 26

b. Daoud's Mental Health Status is Threatened When the MCC
Frustrates His Ability to Receive the Proper Dosage of His Medication. ........................ 26

D. Daoud Pleads Guilty to All Charges Pursuant to *North Carolina v. Alford*,
Pursuant to Which He Maintains His Innocence But Acknowledges
That the Evidence is Sufficient to Prove Him Guilty. .............................................. 28

E. New Discovery and *Brady* Disclosures After Daoud's *Alford* Plea,
Particularly Concerning the January 2013 Grand Jury Testimony of
William Paschal, the Jailhouse Informant from Case No. 13 CR 703.................................... 30

III. POSITION ON THE ADVISORY GUIDELINES.............................................................. 31

IV. SENTENCING MEMORANDUM....................................................................... 32

A. Legal Standards. ..................................................................... 32

B. Legal Principles Regarding the Imperfect Entrapment Doctrine
As a Sentencing Consideration Under 18 U.S.C. § 3553(a).......................................... 34

C. The Law of Entrapment, Insofar as it Informs the Imperfect Entrapment Analysis,
Which Is Highly Relevant Given the Government's Anticipated Sentencing
Arguments and the Court's Review of the § 3553(a) Factors. .................................. 38

1. A Defendant Must be Predisposed to Commit the Charged
Crime Before Contact with Law Enforcement Officers. ....................................... 39

a.   A Defendant Must Also Be in a Position to Commit
the Charged Offense Absent the Government's Help........................................................ 40

b.   A Defendant Must Be Predisposed to Commit the  Charged Crime,
Not Just any Criminal Offense........................................................................................... 41

c.   The Government Must Induce a Defendant Through Pleas for
Assistance, Persuasion, and a Variety of Other Means. .................................................... 43

D.   Nature and Circumstances of the Offense—§ 3553(a)(1) ................................................. 45

1.   Case No. 12 CR 723 ....................................................................................................... 45

a.   Daoud's Online Communications with the Mentally Ill Polish National
Began in Early 2012, Which Likely Caused  Him to Come to the Attention
of the FBI and Likely Influenced  the Controversial FISA Application.......................... 47

b.   The FBI Conducted a Pretextual Visit to Ahmed Daoud's Business
on June 29, 2012, But Did Not Tell Him About Adel's Online Communications,
Despite Assessing that Ahmed Would be Cooperative with Law Enforcement. ............. 52

c.   Consistent with the Imperfect Entrapment Doctrine That is Cited Here for §3553(a)
Purposes, Prior to Being Contacted by the FBI OCEs in May 2012, Daoud Arguably
Lacked the Predisposition to Commit the Charged Offenses of Attempting  to Detonate a
Weapon of Mass Destruction in a Domestic Attack, as Demonstrated in Recorded In-
Person Meetings................................................................................................................. 55

i.   During a July 17, 2012, The UCE Repeatedly Pressed Daoud for His Ideas for an
Attack, but Daoud Told the Agent He had No Ideas Until, When Further Pressed,
Daoud Said His Best Proposal was to use "Flying Cars." .............................................. 58

ii.   On August 6, 2012, the FBI's UCE First Proposed a  "car bomb" And Daoud Had
to Ask if He Would  Have to Stay Inside When it Detonated. ...................................... 61

iii.   Daoud Repeatedly told the OCEs and UCE that he
could not do anything on his own................................................................................... 62

iv.   Daoud's Reluctance to Commit the Charged Offense was Arguably Overcome to
Some Extent by the FBI's Persuasion and Manipulation of Daoud's Misguided and
Simplistic Misunderstanding of his Religion and its Obligations. ............................... 65

v.   On September 14, 2012, The FBI UCE Told Daoud That it Was Permissible Under
Islam to Kill Women After Daoud Questioned Him About That View, Which Was
Contrary to Daoud's Understanding of Islam.............................................................. 75

vi.   Even After Being Contacted by the Government in May 2012, Daoud Continued to Apply to Schools to Study his Religion, and Would Have Gone Had he Not Been Arrested. .................................................................................................................. 77

d.   The Government Arguably Induced Daoud to Commit the Charged Crimes By Isolating Him, Persuading Him Through Pleas to His Religion, By Inflating His Naïve Perception of Himself as a Budding Islamic Scholar, and Providing All the Necessary Equipment that Daoud Would Not Have Been Able to Obtain if Left to His Own Devices. ............................................................................................................................. 77

i.   The FBI Arguably Induced Daoud By Creating a Fake Islamic Imam Scholar, Which Impacted Daoud's Misunderstanding of His Religious Obligations. ................ 78

ii.   The FBI Arguably Induced Daoud Through Repeated Attempts at Communication Through Multiple Sources and Elevated Daoud to the Level of an Amir, or Commander-in-Chief. ..................................................................................................... 79

iii.   The FBI Arguably Induced Daoud By Providing Him With the Fake 1000-Pound Bomb as the Means to Commit the Charged Crime When He Had No Ability to Do So. ............................................................................. 80

2.   Case No. 13 CR 703 ........................................................................................ 83

a.   Paschal, the Seasoned Jailhouse Snitch, Calls His Handler the Cook County Sheriff's Office Soon After Being Housed With Daoud at the Kankakee Jail and Immediately Plots to Get Out of Jail. ................... 83

b.   Informatively, Daoud Never Mentioned a Single Word About Wanting to Kill the UCE or Anyone Else to Any of Six Cellmates Prior to Paschal's Arrival. ............................................................................... 86

c.   The Nonsensical Agreement to Pay Paschal for the "Hit" Shows that the Plot May More Fairly Be Seen as Paschal's Plot to Have the FBI Pay His Bond. ...................................................................... 86

d.   Paschal, an Intimidating Figure With an Extensive Criminal History, Threatened Teenage Daoud Who Had Been in Jail for Barely Two Months. ................. 89

3.   Case No. 15 CR 487 ........................................................................................ 92

E.   History and Characteristics of Defendant—§3553(a)(1) .................................................. 95

1.   Daoud's Childhood Involved a Loving and Supportive Family, but He Also Faced Physical and Mental Challenges, and Led a Relatively Sheltered Existence. ........................................................................... 96

2.   Daoud Demonstrated a Care for Others and a Willingness to Help Them. ................... 99

3.   Daoud Was Naïve, Immature, and Susceptible to
Influence Both Prior to and After His Incarceration. .......................................................... 101

4.   Daoud's Youth at the Time of the Offenses
Should be Seen as a Mitigating Factor ............................................................................. 103

5.   Daoud's Mental Health Problems Mitigate the Seriousness
of the Offenses and Also Deserve Meaningful Treatment. ................................................ 108

6.   Daoud has Spent Over Two Years of Pretrial Detention in the Harsh
Conditions of the Segregated Housing Units, Which Included Witnessing
the Suicide of a Cellmate at the MCC in January 2013. ................................................... 111

7.   Daoud Has Maintained Close Ties With His Family
During This Extraordinarily Difficult Period. .................................................................... 114

F.   A Sentence Well Below the Advisory Guidelines
Addresses the Factors Set Forth in § 3553(a)(2). ................................................................ 117

1.   General Deterrence. ...................................................................................................... 117

2.   Specific Deterrence /Protecting the Public ................................................................. 118

3.   Providing Educational or Vocational Training and Medical Care and
Correctional Treatment in the Most Effective Manner Militates in Favor of a
Sentence that Does not Unnecessarily Prolong Daoud's Release from Custody
and Focuses on Mental Health Treatment While on Strict Supervised Release. ................. 120

V.   CONCLUSION ............................................................................................................ 121

## TABLE OF AUTHORITIES

**Cases**

*Davis v. Ayala*, 135 S. Ct. 2187 (2015) ................................................................. 113

*In re Medley,* 134 U.S. 160 (1890) ....................................................................... 113

*Jacobson v. United States*, 503 U.S. 540 (1992) .......................................... 38, 40, 57

*Koon v. United States*, 518 U.S. 14. 81, 113 (1996) ............................................. 33

*Nelson v. United States*, 555 U.S. 350 (2009) ...................................................... 33

*North Carolina v. Alford*, 400 U.S. 25 (1970) ............................................... *passim*

*Paris Adult Theater I v. Slaton*, 413 U.S. 49 (1973) ............................................ 57

*People v. Paschal*, Case No. 10 CR 19744 (Cook County) ..................................... 85

*Pepper v. United States*, 131 S. Ct. 1229 (2011) ........................................... 32, 33

*Sherman v. United States*, 356 U.S. 369 (1958) ................................................. 44

*Sorrells v. United States*, 287 U.S. 435 (1932) ................................................... 38

*United States v. Alvarez*, 575 F. App'x 522, (5th Cir. 2014) ................................. 35

*United States v. Bala*, 236 F.3d 87 (2nd Cir. 2000) ...................................... 34, 35

*United States v. Bannister*, 786 F.Supp.2d 617 (E.D.N.Y. 2011) ......................... 121

*United States v. Basciano*, 369 F.Supp.2d 344 (E.D.N.Y. 2005) .......................... 113

*United States v. Blassingame*, 197 F.3d 271 (7th Cir. 1999) ................................ 39

*United States v. Blitch*, 773 F.3d 837 (7th Cir. 2014) .................................... 38, 39

*United States v. Booker*, 543 U.S. 220 (2005) ...................................................... 5

*United States v. Bout*, 860 F. Supp. 2d 303 (S.D.N.Y. 2012) .............................. 112

*United States v. Carrasco*, 887 F.2d 794 (7th Cir. 1989) ..................................... 43

*United States v. Conley*, Case No. 14-mj-01045-KLM (D. Colo) ............................. 54

*United States v. Conley*, 14 CR 163 (D. Colo) ..................................................... 53

*United States v. Cromitie*, 727 F.3d 194 (2d Cir. 2013) ....................................... 41

*United States v. Davis*, 36 F.3d 1424 (9th Cir. 1994) .......................................... 40

*United States v. Díaz-Maldonado*, 727 F.3d 130 (1st Cir. 2013) ........................... 37

*United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010) ................................... 118

*United States v. Evans*, 924 F.2d 714 (7th Cir. 1991) ......................................... 39

*United States v. Garza-Juarez*, 992 F.2d 896 (9th Cir. 1993) ............................... 35

*United States v. Giles*, 768 F. Supp. 101 (S.D.N.Y. 1991) ................................... 34

*United States v. Gonzalez-Lopez*, 2012 U.S. Dist. LEXIS 107852 (D.N.M. July 27, 2012) ...... 107

*United States v. Hall*, 608 F.3d 340 (7th Cir. 2010) ............................................................. 39, 43

*United States v. Henshaw*, No. 16-CR-30049-SMY,
    2018 WL 3240982 (S.D. Ill. July 3, 2018) ........................................................ 117

*United States v. Hill*, 645 F.3d 900 (7th Cir. 2011) ............................................................. 32

*United States v. Hollingsworth*, 27 F.3d 1196 (7th Cir. 1994) ........................................ 40, 41, 56

*United States v. Jackson*, 72 F.3d 1370 (9th Cir. 1995) ................................................... 40

*United States v. LaRizza*, 72 F.3d 775 (9th Cir. 1995) ..................................................... 40

*United States v. Lawrence*, 2017 U.S. Dist. LEXIS 86834 (E.D.N.Y. May 23, 2017) ............. 118

*United States v. Lewis*, 162 F. App'x 647 (7th Cir. 2006) ................................................... 36

*United States v. Lopez*, 634 F.3d 948 (7th Cir. 2011) ....................................................... 33

*United States v. Lopeztegui*, 230 F.3d 1000 (7th Cir. 2000) ............................................. 41

*United States v. Mandel*, 647 F.3d 710 (7th Cir. 2011) ..................................................... 43

*United States v. Martinez-Villegas*, 993 F. Supp. 766 (C.D. Cal. 1998) ............................. 35

*United States v. Mayfield*, 771 F.3d 417 (7th Cir. 2014) ............................................. 42, 43, 77

*United States v. McClelland*, 72 F.3d 717 (9th Cir. 1995) ................................................. 36

*United States v. McClelland*, 72 F.3d 717 (9th Cir. 1995) ................................................. 34

*United States v. McGill*, 754 F.3d 452 (7th Cir. 2014) ................................................. 38, 42, 44

*United States v. Medina*, 2017 U.S. Dist. LEXIS 79850 (E.D.N.Y. May 16, 2017) ................. 107

*United States v. Millet*, 510 F.3d 668 (7th Cir. 2007) ................................................... 39, 43

*United States v. Miranda*, 505 F.3d 785 (7th Cir.2007) ................................................... 118

*United States v. Musgraves*, 883 F.3d 709 (7th Cir. 2018) ............................................... 33

*United States v. Myers*, 503 F.3d 676 (8th Cir. 2007) ....................................................... 121

*United States v. Navarro*, 737 F.2d 625 (7th Cir. 1984) ................................................... 40

*United States v. Ogle*, 328 F.3d 182 (5th Cir. 2003) ......................................................... 41

*United States v. Orr*, 622 F.3d 864 (7th Cir. 2010) ........................................................... 43

*United States v. Osborne*, 935 F.2d 32 (4th Cir. 1991) ..................................................... 35

*United States v. Osborne*, 935 F.2d 32 (4th Cir. 1991) ..................................................... 40

*United States v. Pankow*, 884 F.3d 785 (7th Cir. 2018) ..................................................... 33

*United States v. Perez*, 571 F. App'x 495 (7th Cir. 2014) ................................................. 32

*United States v. Perez-Leon*, 757 F.2d 866 (7th Cir. 1985) ............................................... 43

*United States v. Pillado*, 656 F.3d 754 (7th Cir. 2011) ............................................. 38, 41, 43

*United States v. Plowman*, 700 F.3d 1052 (7th Cir. 2012) ............................................... 44

*United States v. Poehlman*, 217 F.3d 692 (9th Cir. 2000) ............................................... 40

vii

*United States v. Pressley*, 345 F.3d 1205 (11th Cir. 2003)........................................ 114

*United States v. Ramirez-Gutierrez*, 503 F.3d 643 (7th Cir. 2007) ........................... 114

*United States v. Sandoval-Mendoza* 472 F.3d 645 (9th Cir. 2006) ............................. 44

*United States v. Santoya*, 493 F. Supp. 2d 1075 (E.D. Wis. 2007)............................... 34

*United States v. Sokoya*, No. 05 CR 41,
 2007 U.S. Dist. LEXIS 86136 (N.D. Ill. Nov. 20, 2007)........................................ 37

*United States v. Squillacote*, 221 F.3d 542 (4th Cir. 2000) ........................................ 41

*United States v. Staufer*, 38 F.3d 1103 (9th Cir. 1999)............................................... 34

*United States v. Stephens*, 717 F.3d 440 (5th Cir. 2013) ............................................ 35

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) .................................................... 5

*United States v. Taylor*, 696 F.3d 628 (6th Cir. 2012)................................................ 34

*United States v. Thickstun*, 110 F.3d 1394 (9th Cir. 1997)......................................... 41

*United States v. Wachowiak*, 496 F.3d 744 (7th Cir. 2007)......................................... 33

*United States v. Way*, 103 F. App'x 716 (4th Cir. 2004) ............................................ 35

## Statutes

18 U.S.C. § 1512(a)(1)(A) ............................................................................................ 12

18 U.S.C. § 1791(a)(2)................................................................................................... 13

18 U.S.C. § 1958(a) ...................................................................................................... 12

18 U.S.C. § 2332a(a)(2)(D) .................................................................................... 11, 77

18 U.S.C. § 2339B(c)................................................................................................... 4, 6

18 U.S.C. § 3553 ...................................................................................................*passim*

18 U.S.C. § 373(a) ........................................................................................................ 12

18 U.S.C. § 844(i) ........................................................................................................ 12

18 U.S.C. § 4241 .......................................................................................................... 19

18 U.S.C. § 113(a)(1)..................................................................................................... 12

18 U.S.C. § 113(a)(3)..................................................................................................... 13

18 U.S.C. § 113(a)(4)..................................................................................................... 13

28 U.S.C. § 994(j) ....................................................................................................... 104

18 U.S.C. § 4242(a) ...................................................................................................... 19

18 U.S.C. § 4247(b) ...................................................................................................... 19

## Other Authorities

Appendix C—Volume III, November 1, 2010 (amendment 739) .............................................. 104

U.S.S.G. § 3A1.4(a) ................................................................................................................. 31

U.S.S.G. § 5H1.1 ............................................................................................................ 104, 107

U.S.S.G. § 5K2.12 ............................................................................................................. 35, 36

## Rules

Rule 32(c) of the Federal Rules of Criminal Procedure .................................................................. 1

## Articles and Other Sources

Alan Ellis and Mark Allenbaugh, *Mental Health Care in the Bureau of Prisons*,
   National Trial Lawyers, Apr. 13, 2017 ................................................................................. 120

*Alleged Islamic Terrorist Under Arrest in Poland*, Radio Poland, July 14, 2012 ....................... 48

Attorney General Loretta E. Lynch Delivers Opening Remarks at an Office of
   Justice Programs Panel Discussion on Justice-Involved Young Adults (Sept. 8, 2015) ........ 106

*Chicago teenager arrested by FBI in undercover car bomb plot, Federal
   prosecutors say 18-year-old Adel Daoud attempted to detonate a fake car
   bomb outside a downtown Chicago bar*, The Guardian, Sept. 16, 2012 ................................... 2

Chuck Goudie, *Terror suspect endorses Trump in phone
   call from federal prison*, Jul. 29, 2016 ..................................................................................... 22

Craig Haney & Mona Lynch, Regulating Prisons of the Future: A Psychological Analysis of
   Supermax and Solitary Confinement, 23 N.Y.U. Rev. L. & Soc. Change 477 (1997) .......... 113

*Feds: Chicago-area man charged over attempted terrorist attack*, CNN, Sept. 16, 2012............ 2

Gilles Kepel, *Jihad: The Trail of Political Islam* (2002)............................................................. 11

Hillside Man Arrested After FBI Undercover Investigation on Federal Charges for
   Attempting to Bomb Downtown Chicago Bar, FBI Press Release, Sept. 15, 2012 ................... 2

Meghan Keneally, *Teen 'In Love With ISIS Fighter' Met With Authorities 8 Times
   Before Being Arrested*, ABC News, June 3, 2014 .................................................................... 53

*Mental Health Problems of Prison and Jail Inmates*, Sept. 2006,
   Bureau of Justice Statistics Special Report........................................................................... 120

Peter Beinart, *Trump Shut Programs to Counter Violent Extremism,
   The administration has hobbled the infrastructure designed to
   prevent atrocities like Pittsburgh*, The Atlantic, Oct. 29, 2018................................................. 6

Testimony of Professor Craig Haney, Senate Judiciary Subcommittee on the Constitution,
   Civil Rights, and Human Rights Hearing on Solitary Confinement, June 19, 2012 ............. 113

Trevor Aaronson, *The Terror Factory: Inside the FBI's
   Manufactured War on Terrorism*, (2013) ................................................................................... 4

United States Sentencing Commission,
*Youthful Offenders in the Federal System* (May 2017) ........................................................ 105

Valerie Wright, Ph.D., *Deterrence in Criminal Justice:*
*Evaluating Certainty vs. Severity of Punishment*,
The Sentencing Project, Nov. 2010 ................................................................................... 118

Wojciech Czuchnowski, *Jihad in Polish – insane can not be answered in Court*,
Wyborcza.pl, Aug. 27, 2014 .............................................................................................. 50

## Law Review Articles

Dr. Stuart Grassian, *Prison Reform: Commission on Safety and Abuse in America's Prisons:*
*Psychiatric Effects of Solitary Confinemen*t, 22 Wash. U. J.L. & Pol'y 325, 327 (2006) .... 113

Joshua L. Dratel, *The Literal Third Way in Approaching "Material Support for Terrorism":*
*Whatever Happened to 18 U.S.C. §2339B(C) and the Civil Injunctive Option?,* 57 Wayne
L.Rev. 11 (Spring 2011) ................................................................................................... 4

Tamar R. Birckhead, *Children in Isolation:  The Solitary Confinement of Youth*, 50 Wake
Forest L. Rev. 1, 10 (2015) ................................................................................................. 113

Defendant, **ADEL DAOUD**, by and through his attorneys, **THOMAS ANTHONY DURKIN, JOSHUA G. HERMAN**, **and ANDREA D. LYON**, pursuant to the Due Process, Effective Assistance of Counsel, and Cruel and Unusual Punishment clauses of the Constitution of the United States, Rule 32(c) of the Federal Rules of Criminal Procedure and 18 U.S.C. § 3553(a), respectfully submits the following Sentencing Memorandum.

## I.    INTRODUCTION

One of two things has been true throughout the tortured history of this case, from the government's initial investigative decisions, charging decisions, and now its equally wrongheaded sentencing position.  That is, either the government set up an elaborate sting operation on a mentally unstable, immature, naïve, and religiously misguided young American-Muslim; or, it drove him to mental illness during his pre-trial detention insisting that he was too dangerous for pre-trial release even to obtain the mental health treatment he so obviously and desperately needed.

Put another way, in the binary world of our ubiquitous national security state, stumbling across a 17-year old in Hillside talking religious nonsense over the Internet with a certifiably mentally unstable Polish youth in 2012, something had to be done for fear there was a terrorist at loose in our community—and something certainly was done.  And what was done at every step of the way was for the FBI and the U.S. Attorney's Office to opt for the dire conclusion of terrorism; and rather than opt for any lesser alternative such as mental health treatment, Countering Violent Extremism ("CVE") or the like, the ante was upped at every step of the way, culminating in the creation of a fake 1000-pound fake bomb to blow up a quarter of a city block

1

in downtown Chicago, ironically, and probably not coincidentally, across the street from the Metropolitan Correctional Center.

Not satisfied with this sensational headline-grabbing prosecution,[1] just months later the FBI and the U.S. Attorney's Office again encountered a situation calling for judgment and discretion, but again opted for the binary option of terrorism and dangerousness. It accepted at face value the word of a murderous gang-banger jailhouse-snitch that said Daoud, on his own, came up with the idea to solicit the murder of its Undercover Employee. Again, another headline-grabbing charging decision was made notwithstanding the many logical inconsistencies in the theory of this prosecution as well.

Worse yet, despite the defense's repeated claims of entrapment from day one in the solicitation case, the U.S. Attorney's Office chose not to provide the grand jury testimony of the jail-house snitch, William Paschal, until it accidentally revealed its existence seven years later in preparation for this sentencing hearing. As mentioned in the proceedings and pleadings regarding discovery concerning the withheld Paschal testimony, counsel can unequivocally represent that had they been timely made aware of this testimony and discovery, a trial almost certainly would have taken place; and, perhaps, much of the further tortured history of this case could have been avoided.[2] Nevertheless, this Court now faces the almost unparalleled challenge

---

[1] *Chicago teenager arrested by FBI in undercover car bomb plot, Federal prosecutors say 18-year-old Adel Daoud attempted to detonate a fake car bomb outside a downtown Chicago bar*, The Guardian, Sept. 16, 2012, available at: https://bit.ly/2GAJ52y. (last visited Apr. 23, 2012); *Feds: Chicago-area man charged over attempted terrorist attack*, CNN, Sept. 16, 2012, available at: https://cnn.it/2GwaVNi. (last visited Apr. 23, 2012); Hillside Man Arrested After FBI Undercover Investigation on Federal Charges for Attempting to Bomb Downtown Chicago Bar, FBI Press Release, Sept. 15, 2012, available at: https://bit.ly/2T0H8jZ.

[2] Paschal testified before the grand jury on January 17, 2013. The Court's FISA ruling was on January 29, 2014. The Seventh Circuit reversed that decision on June 16, 2014. The stabbing of inmate Hancock at the MCC did not take place until May 23, 2015.

of imposing an individualized sentence that is sufficient, but not greater than necessary, for these truly unique circumstances.

But before analyzing the typical sentencing considerations required by the Federal Sentencing Guidelines and 18 U.S.C. § 3553(a), thoughtful consideration needs to be given to the political elephant in the room—that is, the impact of future dangerousness in the context of a federal domestic terrorism prosecution such as this, that is not the result of a violent act instituted solely by the Defendant. Actual entrapment,[3] imperfect entrapment, or whatever one chooses to conclude took place regarding the evidence of the bombing and the solicitation case, the fact remains that there were other, less draconian alternatives available to the government for the likes of Adel Daoud. As will be advanced in more detail herein, there were a number of steps along the way where the FBI and the U.S. Attorney's Office could have chosen to opt for a less binary alternative than "terrorist or no."

For example, it could have chosen to be truthful with Ahmed Daoud, his father, on June 29, 2012, and proposed mental health treatment, instead of meeting with him under the false pretenses of a neighborhood well-being check.[4] This choice is perhaps even better exemplified by the critical moment when in mid-August 2012 Daoud all but told the FBI that he had serious questions about going forward with the plot after talking to his own Imam, and the FBI decided to tell him *not* to talk to his Imam or anyone else, like his father, for religious guidance. Instead, it invented a fake Imam that provided the religious instruction that Daoud so desperately sought.[5]

---

[3] To be clear, in light of Daoud's plea pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970), counsel are *not* raising the issue of actual entrapment at this stage of the proceedings.

[4] *See infra* pp. 52-55. Instead the FBI went to Ahmed Daoud's used car dealership "utilizing a suitable pretext, in order to assess the father's overall behavior and cooperation level with law enforcement." (302_002-000015).

[5] *See infra*, pp. 65-75. Instead of encouraging Daoud to seek alternative views of his own faith leader or family about whether the type of jihad was religiously permissible, the FBI UCE told Daoud that this fake

3

As importantly, insofar as the elephant in the room is concerned, the FBI and the U.S. Attorney's Office should not be permitted to claim that this binary dilemma of the War on Terror leaves them with no other alternative to ensure the safety of the community other than to create these elaborate and catastrophic operations, and then be compelled to urge the warehousing of these ideologically misguided and driven American youth.[6] Congress has provided the law enforcement and intelligence community with a statutory remedy readily available to it. 18 U.S.C. § 2339B(c) expressly provides for the initiation of a civil injunctive action in a district court of the U.S. if it appears to the Attorney General a person is "engaged in or about to engage in" a violation of the material support statute.[7] To counsel's knowledge, this statute has never been used, which should not surprise anyone with more than a passing acquaintance with U.S. national security policy since 9/11. That policy, respectfully, can be described in shorthand as the Executive Branch making a political promise that there will not be another terrorist attack on U.S. soil.[8] That promise, coupled with the ubiquity of our massive national security apparatuses,

---

Imam located overseas implicitly disagreed and that he could go forward with a domestic attack if jihad "was in his heart."

[6] As if writing about Daoud's case in particular, Trevor Aaronson, who has written extensively on FBI terrorism sting operations, observes as follows:

> While the cases involve plots that sound dangerous—about skyscrapers and synagogues and crowded public squares—if you dig deeper, you see that many of the government's alleged terrorists seem hopeless; they are almost always young and down on their luck, penniless, without much promise in their lives, easily susceptible to a strong-willed informant's influence.

Trevor Aaronson, *The Terror Factory: Inside the FBI's Manufactured War on Terrorism*, pp. 54-55 (2013).

[7] 18 U.S.C. § 2339B(c) reads as follows: "Whenever it appears to the Secretary or the Attorney General that any person is engaged in, or is about to engage in, any act that constitutes, or would constitute a violation of this section, the Attorney General may initiate civil action in a district court of the United States to enjoin such violation." See, also, Joshua L. Dratel, *The Literal Third Way in Approaching "Material Support for Terrorism": Whatever Happened to 18 U.S.C. §2339B(C) and the Civil Injunctive Option?*, 57 WAYNE L.REV. 11 (Spring 2011).

[8] The fact that such a promise is not made to the denizens of the South and West Sides of Chicago should not escape anyone attention or obscure the idiocy of such a brazen and impossible political promise.

puts law enforcement in the very uncomfortable institutional position of having to do exactly what was done here. Rather than taking a chance that a less draconian alternative might be pursued, it is politically safer for the institutional bureaucracy to opt for the binary terrorist alternative: "terrorist or no." Put another way, it is politically safer for the institutional bureaucracy to err on the side of caution, than have something happen on the watch of those responsible after being informed of someone talking jihad on the Internet and appearing capable of creating a problem.

This same political problem and institutional thinking has also infected federal sentencing in terrorism cases. For starters, it should come as no surprise that rather than providing nuance and guidance to terrorism sentencing, the Sentencing Commission has opted for a one-size-fits-all warehousing approach to the guidelines. As the Court is aware, any defendant convicted of a terrorism offense automatically gets placed in Criminal History Category VI, even if, as here, the case is their first arrest—so much for anything close to a consideration of individualized sentencing. Thus, as we are facing here, and as will no doubt be stridently driven home by the government, the starting point for the guidelines is an off-the-charts Life sentence. But before the Court takes that bait, it should read the thoughtful concurring opinion of Judge Guido Calabresi of the Second Circuit in the controversial case of *United States v. Stewart*, 590 F.3d 93, 154 (2d Cir. 2009), in which he considers the potential draconian application of the terrorism enhancement and observes as follows: "When a Guidelines recommendation has such dramatic consequences and yet covers a multitude of sins, unusually broad sentencing discretion in the district court is essential. Indeed, it must be so to comply with the Supreme Court's remedial holding in *United States v. Booker*, 543 U.S. 220, 244 (2005)".

Even more important than not taking the bait of the guidelines, however, the Court should also not succumb to the imposition of equally wrongheaded warehousing sentences in many other cases that are obviously driven by the same "not on my watch" political problem. The politics of the Executive Branch need not, and should not, become the politics of the Judicial Branch. Simply because the Executive Branch has chosen to wage its War on Terror as it has done and to not provide any meaningful CVE Programs in this country,[9] nor chosen ever to use the civil injunctive provisions of § 2339B(c)—or any other alternatives short of warehousing— doesn't mean courts should to continue to feel boxed in by the Executive Branch's misguided fear-driven political choices. This case, therefore, counsel submit, is one of those exceptionally extraordinary and unique cases where wisdom should, and must, override emotion. Wisdom, in this case, requires creativity and, compassion, along with the capable resources of a probation system that, at least in this district, is becoming increasingly equipped to provide the mental health resources, guidance and monitoring systems available to it on carefully structured conditions of supervised release.[10]

In that sense, the Court possesses the unmatched experience and expertise that uniquely equips it for the challenge of imposing a sentence in this case. District courts have broad discretion in sentencing, and there is no other body that is better suited for exercising that discretion. Indeed, the Court has presided over the case for nearly seven years. During that extended time period, the Court has learned of the many complex factual and legal arguments

---

[9] *See* Peter Beinart, *Trump Shut Programs to Counter Violent Extremism, The administration has hobbled the infrastructure designed to prevent atrocities like Pittsburgh*, The Atlantic, Oct. 29, 2018, available at: https://www.theatlantic.com/ideas/archive/2018/10/trump-shut-countering-violent-extremism-program/574237/ (last visited Apr. 22, 2019).

[10] Counsel commend the Probation Department for its unique and thoughtful suggestion of the in its supplemental report where it recommends that the Court retain jurisdiction by agreement of the parties that a status hearing be held within one year of Daoud's release date so as to accommodate a mental health and CVE treatment plan for Daoud.

involved in Daoud's cases. It has also become intimately familiar with Daoud himself, having effectively watched him grow up in Court. More importantly, the Court has personally observed the dramatic transformation that Daoud has undergone as a result of the competency and restoration proceedings. The Court will no doubt concur with undersigned counsel and Dr. Xenakis, who has provided a supplemental report dated April 23, 2019,[11] that Daoud is virtually a different person since having been prescribed mental health medication for the first time in his life. Perhaps most importantly, and as observed in Dr. Xenakis' report, Daoud's improvements while on medication include not only self-reflection and regret about his prior conduct, but also forward-looking planning for the future which includes going to school and even starting a family. (Exhibit A, p. 2). Dr. Xenakis further notes how Daoud has commented that he realizes how he must comply with mental health treatment and any conditions of supervised release imposed by the Court. (*Id*.).

Thus, in addition to the overarching political concerns outlined above, the core sentencing question is how to sentence *that* person who now stands before the Court for offenses that occurred years ago when Daoud was experiencing the onset of his mental health problems and was no doubt immature, naïve, and susceptible to the influence and suggestion of others, specifically the FBI agents and employees who devised the fake bomb plot, as well as the Paschal who self-servingly used Daoud for his own purposes in the solicitation plot.

For the reasons discussed in more detail below, undersigned counsel respectfully submit, that this is one of the unique cases where the sentence that is best for Daoud is also best for the public—not only in terms of protecting the public, but also with regard to reflecting the public's confidence in the judicial system as a whole. That sentence is one that focuses on the critical

---

[11] A copy of this report is attached as Exhibit A.

mental health concerns in this case, and imposes an additional short period of incarceration that is no longer than necessary for the experienced Probation department, along with any necessary mental health experts within the BOP, to create a concrete treatment plan, which along with the strictest possible conditions of supervised release that will not only ensure the safety of the public but also the continuation of Daoud's ongoing improvement.

Counsel do not, of course, make this sentencing recommendation lightly. Indeed, counsel acknowledge, as Daoud did when he entered his guilty pleas, that the evidence is sufficient to convict him in all three cases of very serious offense. The arguments in this memorandum and at the sentencing hearing necessarily start from that premise. Moreover, counsel readily acknowledge that many of Daoud's online comments both before, and especially after, the FBI initiated contact with him in May 2012 were very concerning, discussed matters of violence, and warranted inquiry, investigation, and even intervention. In other words, it would have been reckless to simply ignore Daoud.

But, as discussed in more detail below, several points must be made regarding how much of a threat Daoud's *words* really posed. First, at the time he made those online comments, Daoud was 17 and 18 years old, when his immaturity, naiveté, religious confusion, and even ignorance were quite obvious in his writings and interactions with others. Second, the issues Daoud discussed that clearly caught the attention of the FBI were those involving extreme interpretations of Islam, which Daoud clearly misunderstood.[12] Third, there is a huge gulf between words and action. As discussed in detail below, *Daoud was simply incapable of creating a car bomb without the assistance and direction of the FBI*. He clearly admitted as

---

[12] Education and countervailing opinions—such as the one Daoud received from his imam in August 2012 that made him question the plot—would have made a significant difference. Instead, Daoud, both by his own doing and because he was introduced to the FBI agents and employees who only reinforced his misguided views, continued down the rabbit hole of the twisted version of his religion.

much to the FBI when the UCE asked him what he would do if the UCE were not present to help. Daoud did not say he would do an attack on his own. He did not say that he would find someone else to help him. Rather, he said he would stick with his plans to go overseas for school, and he in fact continued to apply to schools during the entire sting operation. In similar respects, Daoud would have never been able to concoct a murder-for-hire plan to kill the FBI UCE but for the intervention of Paschal, who saw Daoud as prey and used him to get the FBI to pay him $15,000.00 that he used to pay his bond. All the tape recordings in the world between Paschal and Daoud will never answer the initial and fundamental question of who brought up the plot to begin with when there were no recording devices at the ready.[13]

The government will, of course, argue that Daoud deserves a lengthy warehouse sentence that could keep him incarcerated into his 40s or even 50s. The government will contend that such a draconian sentence is necessary because Daoud is dangerous, as evidenced by the charges to which he has pled guilty, albeit under the auspices of *North Carolina v. Alford*, 400 U.S. 25 (1970). But, of course, *Alford* admits guilt while maintaining innocence. For that reason, and in anticipation of the government's arguments regarding Daoud's dangerousness as well as the anticipated evidentiary hearing and testimony that the government insists on presenting, counsel are compelled to present below the evidence demonstrating that the true danger here—that of conduct, not words—was in many respects, arguably created by the FBI. The FBI could have encouraged a less serious offense, such as sending money overseas to a terrorist group, which would, of course, result in an entirely different debate about dangerousness. Thus, and as set forth below, the nature and circumstances of the offense are explored through the lens of the "imperfect entrapment" doctrine.

---

[13] This question could have been answered readily for investigative purposes had the FBI and the USAO required Paschal to take a polygraph examination—which they chose not to do.

To be clear, counsel do not seek a final ruling on whether or not Daoud was "imperfectly entrapped," much less actually entrapped, which counsel do not, of course, argue following Daoud's *Alford* plea. Rather, counsel offer the facts and analysis of "imperfect entrapment" vis-à-vis 18 U.S.C. § 3553(a). Moreover, counsel make these points not to try the cases on paper, or even at sentencing, for that matter; but to counter the government's anticipated fear-driven sentencing arguments and recommendation, which appears to rest on little more than the following premises: since the prosecutors do not believe Daoud was entrapped, and because their investigative decision making was entirely appropriate and not flawed, Daoud is therefore too dangerous to be released—now or forever, one supposes.

This, counsel submit, ignores reality and will readily be discredited at the sentencing hearing which will unequivocally demonstrate, if nothing else, that Daoud's immaturity, naiveté, and mental health issues made him susceptible to the suggestion and influence of the FBI and jailhouse informant; and, for that matter, also contributed directly to the assault on the MCC inmate. Thus, after viewing this evidence, counsel will also submit that the Court will conclude that what both the public and Daoud need most to safeguard against any recidivist conduct is ongoing mental health treatment, group therapy, and pro-social interactions with peers rather than prisoners. Which leads to the ultimate question that must be asked, being what purpose is served short of warehousing by any further term of imprisonment, much less than the decades more behind bars the FBI, U.S. Attorney's Office and the DOJ National Security Division must request or otherwise be forced to concede it made mistakes in this case.

The wrongheadedness of such a position is all the more particularly so when it should be clear that further lengthy imprisonment will not provide the mental health treatment that Daoud requires; will expose him to anti-social, rather than pro-social influences; and will, unfortunately,

run the risk of subjecting Daoud to further negative influences. Indeed, in many respects, if radicalization is the issue, it will be easier to supervise Daoud under strict conditions of supervised release than while he is in prison.[14] And the fact of the matter is, which we all must recognize, is that Daoud will be released at some time, unless life is a realistic option. If there is any hope of him becoming a productive and healthy member of society—which undersigned counsel, his family, and, we must believe, the Court all think he can be—then an unnecessarily long prison sentence is not only counterproductive, it is quite damaging to Daoud and contrary to the very purposes of federal sentencing.

For these reasons, counsel do not necessarily quarrel with the Probation Officer that a sentence that is well-below the advisory guideline range is appropriate. But counsel further believe that even a sentence of 180 months that Probation recommended is far greater than necessary to accomplish the goals of federal sentencing in this case. Counsel would respectfully propose, therefore, that Daoud—who has already served one-quarter of his life in prison—be released after the professionals with the Probation Department and any other mental health service providers, can establish a treatment program that will support and accompany the strictest possible conditions of supervised release. One would hope that this sentence would allow Daoud to have the option of entering college in the Fall of 2021.

## II.    PROCEDURAL BACKGROUND

### A.  The Charges Against Daoud

On September 20, 2012, Daoud was indicted in Case No. 12 CR 723. The indictment charges Daoud with attempting to use a weapon of mass destruction in violation of 18 U.S.C. § 2332a(a)(2)(D) (Count One); and attempting to destroy a building used in an activity affecting

---

[14] The radicalization of the original devotees of political Islam such as in Egyptian prisons should not go unappreciated. *See*, *e.g.*, Gilles Kepel, *Jihad: The Trail of Political Islam*, pp. 63-65 (2002).

interstate commerce in violation of 18 U.S.C. § 844(i) (Count Two). These charges arise out of an FBI undercover sting operation that began around May 10, 2012, and culminated on September 14, 2012, when Daoud attempted to detonate a fake car bomb outside of a bar in downtown Chicago. Daoud was ordered detained and has remained in custody for the past six-and-a-half years.

On August 29, 2013, Daoud was indicted in Case No. 13 CR 703, in which he is charged with solicitation of murder from on or about October 26, 2012 to on or about November 28, 2012, in violation of 18 U.S.C. § 373(a) (Count One); murder for hire in violation of 18 U.S.C. § 1958(a) (Count Two); and witness tampering in violation of 18 U.S.C. § 1512(a)(1)(A) (Count Three). These charges arise from the government's use of a jailhouse informant while Daoud was housed at the Jerome Combs Detention Center in Kankakee, Illinois ("Kankakee Jail") on pretrial detention for the charges filed in Case No. 12 CR 723. The alleged victim of the purported solicitation was the undercover FBI agent involved in the fake bomb sting operation. The case was initially assigned to Judge Robert W. Gettleman.

On December 8, 2013, undersigned counsel moved to reassign Case No. 13 CR 703 with Case No. 12 CR 723 on the basis of relatedness so that both cases could proceed before this Court. (Case No. 12 CR 723, Dkt. #79). In that motion, counsel argued that procedural, factual, and constitutional reasons warranted the reassignment of the two cases. Both the government and the defense agreed that the cases could be tried together. (*See* Dkt. #79, ¶¶ 6-7). On December 11, 2013, the Court granted the motion to reassign. (Dkt. #81). *See also* Case No. 13 CR 703, Dkt. #18, December 12, 2013, Executive Committee Order for Reassignment.

On August 13, 2015, Defendant was indicted in the third case, No. 15 CR 487 and charged with assault with the intent to commit murder in violation of 18 U.S.C. §113(a)(1)

12

(Count One); assault with a dangerous weapon with intent to do bodily harm in violation 18 U.S.C. §113(a)(3) (Count Two); assault resulting in serious bodily injury in violation of 18 U.S.C. §113(a)(6) (Count Three); possessing a prohibited object while in federal custody in violation of 18 U.S.C. § 1791(a)(2) (Count Four); and assault in violation of 18 U.S.C. §113(a)(4). These charges relate to a May 23, 2015, assault upon another inmate at the Metropolitan Correctional Center of Chicago. The case was initially assigned to Judge Samuel Der-Yeghiayan; and, upon his retirement, reassigned to Judge M. Dow Jr. after the retirement of Judge Der-Yeghiayan.

**B. The Competency Proceedings, Which Resulted in Daoud Being Found Unfit To Stand Trial, Hospitalized in the BOP, and then <u>Restored After Treatment, But Only While on Prescribed Medication.</u>**

The May 23, 2015, stabbing incident, which would later result in the filing of a third case against Defendant, compelled counsel to present their concerns regarding Daoud's mental health to the Court for intervention. At a June 23, 2015, hearing, which was scheduled as a final pretrial conference, counsel requested a continuance of the July 23, 2015 trial date due to the May 23 incident, and the concerns for Daoud's competency. The government indicated that it was not "in a position to oppose the motion given the circumstances that, that we face here." (Tr. 6.23.15, p. 6).[15] After defense counsel showed the Court several reports related to the May 23 incident, Daoud spoke directly to the Court and stated as follows: "I'm charged with a lot of things that I don't, I don't agree with. And I mean, if -- I would with the following condition be willing to plead guilty to like whatever the hell you want to charge me for if you all admit that you're part of Illuminati and that you arrested me because I'm Muslim, right. And you don't want me to go in the [Medina] University --…. And that there's plans to kill Muslims in this country.

---

[15] A copy of this transcript was filed as Exhibit A to Dkt. #188.

…   But I'm not crazy because I had a psychologist, and they say I'm not crazy…. And -- that's something -- but that's something and a lot of Muslims know that, you know, because, because it happens in – it's happened -- it happened in Bosnia and it's happened in Burma. And they are killing Muslims and they're burning them alive."  (Tr., 6.23.15, pp. 11-12).  The Court then ordered Daoud to stop talking.

After reviewing the reports provided by counsel, the Court observed that while it is not unusual for defendants to act out before trial, "the Court has noticed a difference in affect of the defendant just being here in court and also a few of the comments concern the Court that are listed in the document."  (Tr., 6.23.15, p. 14).  The Court then granted the motion to continue the trial date "for further exploration of [Daoud's] mental state."  (Tr., 6.23.15, p. 15).  The Court granted the oral request of counsel for a psychiatric examination and testing of defendant by either Dr. Emily Keram or Stephen Xenakis (Dkt. #170).  At a status hearing on July 29, 2015, after Dr. Xenakis saw Daoud, counsel expressed their ongoing concerns regarding Daoud's competency to stand trial.    Then on July 31, 2015, the Court issued an order pursuant to 18 U.S.C. § 4241 requiring Daoud to be examined by Isaac Ray Forensic Group for the purposes of determining his competency.  (Dkt. #175).

Before Daoud was evaluated pursuant to that Order, the Court held a status conference on August 18, 2015.  During that status conference, Daoud again provided a lengthy statement in open court.[16]  During this rambling statement, Daoud again reiterated what he perceived to be a world "united in a war against Islam," which included Muslims being burned alive in Myanmar; Muslims not being allowed to fast during Ramadan in China; and people being killed when the went to mosques in Egypt.   (Tr., 8.18.15, p. 12).   He then said, "you know, but as Malcolm X

---

[16] A copy of this transcript was filed as Exhibit B to Dkt. #188.

14

said, you have foxes and wolves. America is playing the fox. Despite the fact they kill millions of Muslims, they still say that they are in a war with terrorism. They don't keep changing the name, but it is the same war. It's against -- it's a war against Muslims who have a strong faith in God and are ruled by his rules." (*Id.*).

Daoud then returned to the theme of the Illuminati:

> My opinion is that who would be the plotters of such a conspiracy except for devil worshipers. I mean, the Illuminati, the Illuminati seeks to -- okay. The Illuminati seeks to destroy Islam. It seeks to destroy all religions, especially Islam. To establish a new world order and ruled under democracy in preparation for the Messiah, who we Muslims call Dajjal, who the Christians call the Anti-Christ. They seek to, uhm, they seek to, uhm -- and they think that they are gods and that they are guided by divine spirits, but they are human beings, and they are being guided or misguided by devils. They seek to destroy Islam, the same way they destroy Christianity and Judaism.

(Tr., 8.18.15, pp. 12-13).   Daoud then summed up as follows:

> They already made preparations towards this by brainwashing the people for over 20 years, locking Muslims up on terrorism charges, and -- locking Muslims up on terrorism charges and even banning sharia in some places. So I already know that my -- and all the government, all the members -- all the government are members of Illuminati. I won't get into who the Illuminati is. So I know that my case is a hoax. My trial is a hoax. No offense. But I think the jury is Freemasons hired by the judge, you know. And, you know, all the -- all the judges and the prosecutors who represent them, the lawyers who represent me they're all members of the government who know each other, believe in the same thing and work together, and they're conspiring against me.

(Tr., 8.18.15, pp. 15-16).

### 1. The First Competency Report Dated September 26, 2015, Concluded That Daoud is Fit to Stand Trial.

Daoud was first evaluated by Diana S. Goldstein, Ph.D., ABPP of Isaac Ray Forensic Group, LLC, who conducted a psychological and neurocognitive evaluation of Daoud on August 26, 2015, and September 3, 2015, to determine the presence and extent of any cognitive deficits

and/or psychopathology related to his charged; and specific to determine whether he was competent to stand trial or otherwise proceed.  In a reported dated September 26, 2015, Dr. Goldstein concluded as follows:  "Mr. Daoud's psychiatric status is sufficiently stable, and his intellectual/cognitive capabilities sufficiently intact, for him to follow, understand, interpret and participate meaningfully in upcoming proceedings, and to aid his attorney meaningfully in a legal defense: he is competent to stand trial or otherwise proceed."  At an October 5, 2015, status hearing, counsel for Daoud informed the Court that they disagreed with that conclusion and were considering requesting an evidentiary hearing.

> **2. Daoud's Bizarre Behavior Continues to Raise Concerns About His Deteriorating Mental Health Condition and Results in the Court Continuing the Trial Date In Order to Complete Another Mental Health Evaluation Concerning Daoud's Competency.**

In spite of Dr. Goldstein's opinion that Daoud was competent to stand trial, Daoud continued to act in an increasingly bizarre manner that demonstrated to his lawyers the contrary to be true.  For instance, on November 12, 2015, and without any warning to his lawyers, Daoud sent a letter directly to the Court in which he said, "I do not understand why I am in jail."[17]  In addition to expressing his hope that the Court would read the Koran and possibly even become a Muslim, Daoud proposed that his trial be moved to a foreign country that was not as Islamophobic as America.[18]  Undersigned counsels' first-hand observations of Daoud increased their concern regarding his mental health status.

---

[17] A copy of this transcript was filed as Exhibit C to Dkt. #188.

[18] Specifically, Daoud proposed the following trial procedure for his case:

> I propose that you let me pick someone I know, who is not part of my family, accompanied b one of your lawyers, or you wish from the government, to go to a foreign country and pick 12 random people.  Your lawyer or whoever you choose would be there to assure that only random people are being selected.  I would agree to any of the following countries:  Egypt, Saudi Arabia, Kuwait, Iran, Lebanon, Pakistan, Indonesia, Malaysia, Singapore, Moroco [sic], Algeria, Touinisia [sic], or Mexico.  This way we can

16

### 3. Daoud's Counsel File an Emergency Motion for an Evidentiary Hearing to Determine Daoud's Mental Competency on December 7, 2015.

Due to these mounting concerns, on December 7, 2015, undersigned counsel filed a pleading captioned, "Counsels' Emergency Motion for an Evidentiary Hearing to Determine the Mental Competency of the Defendant." (Case No. 12 CR 723, Dkt. #188). This motion was supported by exhibits that supported counsels' concerns for Daoud's competency, including Daoud's November 12, 2015, letter to the Court, as well as the declaration of Dr. Xenakis. In his declaration, Dr. Xenakis expressed the following opinion, based on his interviews with Daoud at the MCC, review of material related to the case, and discussions with undersigned counsel and Daoud's parents: "It is my professional opinion that Mr. Daoud demonstrates indications that he may presently suffer from a mental disease or defect that renders him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." (Dkt. #188, Ex. E, ¶ 5). Dr. Xenakis further opined that Daoud's conditions of confinement in the SHU were exacerbating his tenuous mental health condition:

> Mr. Daoud has consistently demonstrated fragmented and illogical thinking that affects his capacity to function. Evidence of disordered thinking appears in review of psychological testing. That Mr. Daoud drafted a letter to the Court, and conversations with both his parents and counsel, raise worrisome suspicion that he is mentally decompensating and suffering recurrent psychotic ideation and despair. His expression of despair points to heightened suffering from stress and current living conditions in the Special Housing Unit. Specifically, Mr. Daoud has been distressed by the "separateness" imposed by his incarceration, current isolated living conditions in the Special Housing Unit at the MCC, lack of communication and contact with others, particularly his family, and that he expresses extreme distress that has aggravated his mood and thinking.

---

agree on a country and we can assure fairness on both sides. I hope and ask that you forgive me if I said <u>any</u> [sic] that hurt or offended you in any way.

Dkt. #188, Ex. C.

(Dkt. #188, Ex. E, ¶7).

Counsel also sought to reassign Case No. 15 CR 487 for the purposes of the competency proceedings entitled, "Defendant's Motion to Reassign Based Upon Relatedness." (Case No. Dkt. #192). In that motion to reassign, counsel submitted that reassignment of Case No. 15 CR 487 was proper "particularly insofar as the common mental health issues are so inextricably intertwined," and how, due to the overlapping mental health issues, consolidating the cases would avoid the risk of "inconsistent findings" resulting from separate determinations regarding Defendant's mental health. (Case No. 12 CR 723, Dkt. #192, ¶¶ 6-7).

### 4. The Court Grants Counsels' Emergency Motion for a Competency Hearing on December 10, 2015.

On December 10, 2015, the Court granted Daoud's emergency motion to determine competency. (Dkt. #197). It further granted Daoud's motion to reassign Case No. 15 CR 487, but for the limited purpose of determining Defendant's competency. The Court's Minute Entry Order read as follows:

> The Court also grants the Motion to Reassign, but only for the limited purpose of determining defendant's competency. The Court finds it is in the interest of judicial economy to address defendant's mental competency in this case as well as case No. 15 CR 487, currently assigned to Judge Samuel Der-Yeghiayan, in one proceeding rather than having the matter arise separately in each case. Case No. 15 CR 487 would then return to Judge Der-Yeghiayan for all remaining purposes.

(Dkt. #197).

### 5. Following the Court's Ruling, Daoud Continues to Exhibit Signs of a Serious Mental Health Problem Through His Bizarre Letters to the Court.

Confirming the soundness of that decision, Daoud continued to manifest illogical and bizarre thoughts after the Court's order. These are most plainly seen in two letters that he submitted to the Court, notwithstanding both the Court and undersigned counsel instructing him

not to do so. First, on December 29, 2015, Daoud sent a letter to the Court that was filed at Dkt. #200. In that letter Daoud complained about being in the SHU for 7 months and having problems corresponding with this family. He then wrote that his "other problem is that when I got arrested I thought I was only going to be in jail for a few days." He described how he thought that when the FBI also arrested his friend, Abdella Tounisi, it did so because it "actually felt bad and thought I was lonely in jail so they locked up my friend to keep me company." He then asked the Court to lift the separatee order that kept him from Tounisi. Later in the letter, Daoud wrote about a "Jinn," a supernatural creature in Islamic mythology and theology. Specifically, Daoud wrote as follows:

> It's crazy what lengths were taken against me. I had a jinni in my room for about the last year and a half before I got arrested. I've been aware of your organizations not just worship, but the dealings you make with the jinn. I realized in here that you were the ones who sent it there. I know without any doubt whatsoever that the jinni never caught me doing any illegal activity similar to what I'm accused of. All I did was pray, read books, hang out, play playstation, and surf the web. Unless the jinni was feeding you lies, there's no way you can honestly think I was plotting a terrorist attack.

(Dkt. #200). Daoud continued to rail against the Illuminati and express paranoid thoughts. Addressing the Court, he wrote: "I know you are part of something much bigger than you. I want you and every member of the Illuminati to know that you can't destroy Islam."

> **6. On January 20, 2016, Daoud is Committed to the Custody of the Attorney General to be Examined by Mental Health Professionals to Determine his Competency to Stand Trial and His Sanity at the Time of the MCC Assault, Yet He Continues Submitting Bizarre Letters to the Court.**

One January 20, 2016, the Court issued an order pursuant to 18 U.S.C. §§ 4241(a), 4242(a) and 4247(b) committing Daoud to the custody of the Attorney General to be placed in a suitable facility to be examined by psychiatrists or psychologists in order to determine whether

he was insane at the time of the offenses charged in Case No. 15 CR 487, and also whether he was competent to stand trial.  (Dkt. #201).

During a status hearing on February 24, 2016, Daoud had prepared a statement to read. On the advice of counsel, rather than have the statement read in Court, it was submitted as an exhibit and filed on the docket.  (Dkt. #206).  In the rambling and incoherent statement, Daoud complained about devil-worshippers, "lizards with make-up," and the Illuminati among other things.  He also directly addressed the Court, and stated, "you killed my cellee for saying hi for me don't you think that's crazy?"  (Dkt. #206-A).   Defending his mental state, Daoud wrote as follows:



13. i don't see anything or hear anything that isn't here. As far as ~~crazy~~ paranoia is concerned how is that a problem? I think I'm not paranoid enough especially when i' dealing with devil worshipers who want to see hear and contro everything. ~~~~

(Dkt. #206-A, emphasis in original).

The very next day, on February 25, 2016, Daoud sent another letter to the Court.  (Dkt. #207).  We can only assume that he did so because he distrusted his lawyer's promise that the statement would be filed, or that he was so obsessed with his statement that he needed to submit it twice.  He began that letter as follows:  "You keep ignoring me; my lawyers are calling me crazy and your lawyers are laughing at me.  You put me in jail because I am Muslim and you are the Illuminati."  Consistent with his earlier statement, in the letter Daoud wrote, "Tyrants and Pharaohs are your friends because birds of a feather flock together.  People believe that you are not even human but reptiles.  Literally reptiles!  Lizards with make-up!  Mrs. Coleman you killed my cellee for saying hi for me don't' you think that's crazy?  You want to say I'm a voice-

hearing, paranoid maniac with a strong case of Fundamental Islamism disease!" He concluded, "You can't trick me into thinking I'm crazy. You are the ones who are confused and you are the ones who are crazy." (Dkt. #207).

Within several weeks, Daoud was transferred from the MCC to the BOP's Federal Medical Center in Springfield, Missouri for further evaluations.

### 7. Daoud is Examined at FMC Springfield and is Found to be Fit to Stand Trial and Also Sane at the Time of the MCC Assault.

On May 13, 2016, Dr. Richart L. DeMier, Ph.D., a clinical psychologist at FMC Springfield, issued reports regarding Daoud's competency and sanity at the time of the MCC assault. In his competency report, Dr. DeMier described Daoud's beliefs as "peculiar" but "not delusional in nature." He concluded with the opinion that "Mr. Daoud does not have a mental illness that adversely affects his competency-related abilities. It is anticipated that he will remain competent for the foreseeable future." Dr. DeMier also concluded that Daoud was not insane at the time of the MCC assault because there was "no evidence that Mr. Daoud experienced any symptoms of mental illness that would have compromised his ability to understand the nature, quality, and wrongfulness of his behavior at the time of the alleged offense conduct. Rather, there is evidence from interviews and investigative materials that he did, in fact, appreciate those matters."

### 8. Dr. Stephen Xenakis Concludes that Daoud Suffered From a Delusional Disorder that Rendered Him Not Competent to Stand Trial.

In contrast, in a report dated July 26, 2017, defense expert Dr. Stephen Xenakis opined that Daoud was not competent to stand trial. Dr. Xenakis wrote as follows:

> Mr. Daoud has consistently demonstrated fragmented and illogical thinking that affects his capacity to function and his competence to assist his attorneys in his defense. Mr. Daoud has repeatedly failed to comprehend and appreciate the seriousness and consequences of the

> charges against him. He essentially disregards the facts of his case and its
> consequences with delusional explanations. The rigidity of his thought
> disorder renders him incapable of knowing, understanding, and
> appreciating reality-based options for resolving his case, and thus renders
> Mr. Daoud unable to understand the nature and consequences of the
> proceedings against him. He has been incapable of engaging in
> constructive and thoughtful conversations with his attorneys.

Xenakis Report, 7.27.16, pp. 7-8. Based on his evaluation, Dr. Xenakis concluded that Daoud

suffers from a delusional disorder because he "unwaveringly holds to delusional ideas of reptiles

holding positions of authority in the United States Government, the Illuminati dominating the

proceedings in the Courtroom, and robots operating the prison. In contrast to the psychological

reports of the court-appointed experts, the diagnosis of Delusional Disorder does not require

bizarre and odd behavior or evidence of hallucinations and illusions. The persistence of fixed

bizarre delusional thinking, exhibited by Daoud, satisfies the criteria for diagnosing the psychotic

condition of Delusional Disorder." Xenakis Report 7.27.16, p. 8.

### 9. Daoud Returns to the MCC For the Competency Hearing, And Continues to Manifest Bizarre and Illogical Thinking.

Daoud was then returned to the MCC for a competency hearing. His behavior, however,

remained bizarre and demonstrated the same delusional thinking that he exhibited prior to his

transfer to Springfield. For instance, on July 29, 2016, Daoud took it upon himself to call into

ABC 7 news and, rather presciently, told Chuck Goudie and the "I-Team" that he endorsed

Donald Trump for President.[19] And to the great concern of counsel, on August 6, 2016, Daoud

prepared a "Will." This Will, which was submitted to the Court in the context of the competency

hearing, began as follows:

---

[19] Chuck Goudie, *Terror suspect endorses Trump in phone call from federal prison*, Jul. 29, 2016, available at: https://abc7.ws/2ZprToZ. The article quotes Daoud as saying: "I have an announcement. I want to endorse Donald Trump for president. I like him, he's outspoken. He says whatever the hell he wants and he will admit that this country is at war against Islam."

This is Adel Daoud and as the authentic hadith states if you have a will you shouldn't wait even 3 days before writing it down. I have more reason to write because my life is under threat by the Illuminati, their machines/robots that run the Mcc, and Sharon Johnson Coleman who recently killed my 49th celle [sic] most probably by placing a drug in his food that made him want to kill himself. (I am not nor will I ever be Insha'Allah suicidal. No drugs Insha'Allah can change that and I'm careful about what I eat. I do think they will however call me to a different floor and chop my head off as part of a Satanic ritual.) I am afraid that any night between 12-3am they will come to my cell, probably for a piss test, and I will never return because they killed me. I am a hostage and a prisoner of war and therefore there is more urgency to write this…

> ### 10. The Court Finds Daoud to be not Competent to Stand Trial and Orders That he be Immediately Placed in a Secure Psychiatric Treatment Facility for Treatment.

With the reports of Dr. DeMier and Dr. Xenakis submitted, and other materials provided by counsel for the Daoud, the matter then proceeded to a competency hearing on August 18-19, 2016. One week later, on August 25, 2016, the Court found that Defendant was not competent to proceed to trial and ordered that he be placed in a secure psychiatric treatment facility:

> Because competency is not static, the Court believes it is in the best interest of the defendant to be immediately placed in a secure psychiatric treatment facility where persistent treatment for an initial period of three months may assist in a finding of competency, which hopefully will allow for the trial to go forward as scheduled in February. Accordingly, the government has not shown by a preponderance of the evidence that the defendant is competent to stand trial.

(Dkt. #216, p. 4). Daoud was subsequently transferred to the U.S. Medical Center for Federal Prisoners at Springfield, Missouri ("FMC Springfield").

### C. Daoud's Mental Health Treatment and Restoration to Competency for Trial.

On or about February 16, 2017, the Court ordered that Defendant be transferred from FMC Springfield to the Federal Medical Center in Butner, North Carolina ("FMC Butner") based upon Daoud's agreement that he would voluntarily take medication at Butner, rather than be forcibly medicated. Daoud's mental health treatment at FMC Butner be extended for a period of 120 days. As he said he would do, at FMC Butner Daoud agreed to take medication and also

23

received treatment and therapy. On September 26, 2017—nearly a year to the date of the Court's order finding Defendant not competent to proceed—medical staff at FMC Butner concluded that Defendant was restored to competency and could proceed with the case. ("Butner Report"). That conclusion was based on the September 22, 2017, report of Dr. Gillespie Wadsworth, a forensic psychologist at FMC Butner.

### 1. After Treatment at FMC Butner, Daoud is Diagnosed With Other Specified Schizophrenia Spectrum and Other Psychotic Disorder, Attenuated Psychosis Syndrome, and is Found Competent to Stand Trial, But OnlyWhile on Medication.

In her report, Dr. Wadsworth diagnosed Mr. Daoud with "Other Specified Schizophrenia Spectrum and Other Psychotic Disorder, attenuated psychosis syndrome." (Butner Report, p. 15). Noting Mr. Daoud's family history as well as his treatment at FMC Butner, Dr. Wadsworth noted as follows:

> Due to Mr. Daoud's age and family history of mental illness, the possibility of Schizophrenia in the prodromal phase must be considered. He has been treated throughout his placement at FMC Butner, and this likely contributed to increased flexibility in thinking and decreased focus on his beliefs regarding the illuminati. The prodromal phase is the first stage of Schizophrenia and characterized by symptoms being vague and easy to miss. It is possible that symptoms may become more prominent with age and if Mr. Daoud discontinues treatment.

(Butner Report, p. 16). Notably, while at Butner, Daoud was prescribed mental health medication for the first time in his life. (Butner Report, p. 8 "On 04/11/17, Dr. Herbel filed a nonformulary request for aripriprazole (antipsychotic)."). Additionally, Daoud participated in Competency Restoration Groups, which he attended all scheduled groups and "appear[ed] to benefit from group participation" and made satisfactory progress in group sessions. (Butner Report, p. 16).

Based on his progress and compliance with the prescribed medication, Dr. Wadsworth concluded that Daoud was "medically stable and ready to be returned to court for further

proceedings." (Butner Report, p. 23). Dr. Wadsworth opined that Daoud "possesses a rational and factual understanding of the proceedings against him, appreciates his situation in reference to those proceedings, is able to maintain appropriate courtroom behavior, and is able to assist in his defense in a reasonable, rational manner. Mr. Daoud suffers from Other Specified Schizophrenia Spectrum and Other Psychotic Disorder, attenuated psychosis syndrome; however, his symptoms are largely in remission following sustained treatment with psychotropic medication." (Butner Report, p. 16).

Significantly, Dr. Wadsworth asserted that Daoud's competency "can be attributed to psychotropic medication *and he may decompensate if treatment is discontinued* or if mental health symptoms worsen over time." (Butner Report, p. 23) (emphasis added). Therefore, Dr. Wadsworth observed, Daoud's prognosis "regarding competency with continued treatment is considered guarded." (*Id.*). In addition to Dr. Wadsworth's report, on September 26, 2017, the Acting Warden of FMC Butner, M.K. Lewis, provided a certification of restoration of Daoud's competency and forensic evaluation to the Court. After receiving this report, on August 8, 2017, the Court ordered that Daoud remain at FMC Butner for ongoing mental health treatment under the least restrictive conditions permissible under the facility's guidelines. (Dkt. #233).

### 2. Dr. Xenakis Concurs with the Findings of FMC Butner, in That Daoud was Restored to Competency and Required Medication and Treatment.

Dr. Xenakis ultimately concurred with Dr. Wadsworth's conclusions in a report he provided on November 28, 2017. Dr. Xenakis evaluated Daoud at FMC Butner on November 7, 2017 and opined that he "continues to manifest signs and symptoms of a serious mental illness (SMI) despite receiving treatment over the preceding months." (Xenakis 11.28.17 Report, p. 1). Dr. Xenakis further concurred with Dr. Wadsworth's diagnosis. ("The signs and symptoms that Mr. Daoud demonstrates are consistent with both the diagnosis provided by Dr. Wadsworth and

25

my prior judgment." (*Id.*, p. 3). Ultimately, Dr. Xenakis "recommend[ed] that Mr. Daoud receive intense and continuing treatment and therapy for the serious mental illness he suffers. *He requires psychotropic medication, therapy, supportive counseling, and educational and employment guidance.*" (*Id.*, p. 3) (emphasis added).

> **a. Consistent with the Findings of the Mental Health Professionals, on March 12, 2018, the Court Finds Daoud to be Restored to Competency with Medication.**

After receiving these reports, the Court scheduled a hearing on Daoud's competency on March 12, 2018. At that hearing the prosecution argued that Daoud was competent to stand trial and relied on the Butner Report and Dr. Wadsworth's conclusion, as reflected in the Court's order following the hearing, that Defendant's "competency has been restored by consistent treatment with psychotropic medication." (Minute Entry, Dkt. #246). In not opposing the restoration to competency finding, counsel for Daoud relied on the testimony of Dr. Xenakis, who concurred with the Butner Report that Defendant's competency depended on his continued medication. (Dkt. #246). Based on that evidence, the Court concluded that the "Government had met their burden by a preponderance of the evidence to show that Adel Daoud is competent to stand trial." (Dkt. #246). The case was again set for trial, set to commence on November 26, 2018. (Dkt. #247).

> **b. Daoud's Mental Health Status is Threatened When the MCC Frustrates His Ability to Receive the Proper Dosage of His Medication.**

While Daoud made marked progress on medication at FMC Butner, this improvement was threatened after he returned to the MCC. As detailed in a pleading filed on June 10, 2018, and entitled, "Defendant's Emergency Motion to Modify the Conditions of Pretrial Detention to Permit His Temporary Release to the Custody of the United States Marshal for Psychiatric

Treatment," "Daoud's course of treatment unraveled after he arrived at the MCC from FMC Butner" because it was "abundantly clear that the MCC medical staff disagree with the Court's competency rulings, as well as the findings and course of treatment urged by both Dr. Wadsworth at FMC Butner and Dr. Xenakis." (Dkt. #249, p. 5).

Specifically, staff at the MCC simply disagreed that Daoud suffered from a delusional disorder. Daoud soon began to refuse to take his psychotropic medication, not only because of the side effects of the prescribed dosage, but also due to confusion regarding the availability of medication to counter those side effects. MCC staff conveyed to the prosecutor that they would not reduce the medication because they did not believe that Daoud suffered from a delusional disorder in the first place, which would make prescribing medication unethical in the first place. (Dkt. #249, pp. 6-7).

Due to the MCC's refusal to reduce the dosage of Daoud's medication, on July 24, 2018, the Court held a hearing with a doctor from FMC Butner and Dr. Xenakis available on the phone. (Dkt. #254). As a result of that hearing, Daoud's dosage of Abilify was reduced from 300 mg to 200 mg. (*See id*. "Status hearing held on 7/24/2018. Dr. Cutillar from the FMC Butner and defense expert Dr. Xenakis were made available by phone to be questioned by court and counsel. Dr. Cutillar will prescribe a lower dose of Abilify to defendant so that his next dosage on or about August 18 will be a 200 mg injection instead of the previously prescribed 300 mg."). These absurd procedural hoops that the parties and Court had to jump through to get a modicum of mental health treatment from the BOP are ominous signs regarding Daoud's ongoing ability to receive consistent and meaningful treatment in the BOP, including the extreme measures that had to be taken simply to reduce the dosage of his medication. Daoud has since remained fully compliant with this new dosage of his psychotropic medication.

**D. Daoud Pleads Guilty to All Charges Pursuant to *North Carolina v. Alford*, Pursuant to Which He Maintains His Innocence But Acknowledges That the Evidence is Sufficient to Prove Him Guilty.**

After that unnecessarily difficult and eye-opening process of dealing with the MCC simply to *reduce* Daoud's dosage, counsel for Daoud began preparing for his November trial, while continuing to monitor Daoud's mental health. At the November 13, 2018, pretrial conference, counsel for Daoud presented Daoud's request to plead guilty to all pending charges pursuant to *Alford*, contingent upon the Court reassigning Case No. 15 CR 487, which was still pending before Judge Dow, so that all cases could be resolved in a single proceeding.

On November 14, 2018, counsel presented this request in a written pleading entitled, "Defendant's Motion for Leave to Enter Guilty Pleas Pursuant to *North Carolina v. Alford* Following the Court's Order Reassigning Case No. 15 CR 487 as Related and Request for Same." (Dkt. #295). In that pleading, counsel (and Daoud) acknowledged the strength of the prosecution's evidence; but also maintained that Daoud had "credible *bona fide* defenses, particularly with respect to the entrapment defense." (*Id.*, p. 10). Counsel also emphasized how Daoud could potentially assert "credible mental health defense to the charges in Case No. 15 CR 487," but that advancing those defenses would not be in Daoud's long-term interests, particularly given his dramatic improvement while on medication. (*Id.*, p. 10). Counsel also asserted as a basis for the *Alford* plea Daoud's desire to resolve all pending matters, but not disavow meritorious defenses that also serve as significant factors in mitigation at sentencing under 18 U.S.C. § 3553(a). (*Id.*). Perhaps most importantly, and entirely unique to this case, counsel voiced concern about how the stress of a multi-week trial "could adversely affect the medical progress Defendant has made since his treatment at FMC Butner." (*Id.*, p. 11). The prosecution

objected to Daoud entering an *Alford* plea, consistent with the Department of Justice policy concerning *Alford* pleas.  (Dkt. #297).

On November 16, 2018, the Court granted Daoud's motion for leave to enter guilty pleas pursuant to *Alford*.  (Dkt. #299).  In its written Order, the Court specifically acknowledged counsel's concern regarding the impact of trial on Daoud's mental health status:

> The defendant, however, has made clear that he does not believe that a lengthy trial would be in his best interest in light of the stress that would result from relitigating the beliefs, statements, and conduct that resulted in his having spent a quarter of his life incarcerated. Although the defendant maintains his innocence, he seeks leave to plead guilty in order to avoid that experience; precisely the sort of decision that Alford contemplates.

(Dkt. #299, p. 3).  Also on November 16, 2018, Case No. 15 CR 487 was reassigned from Judge Dow to Judge Coleman pursuant to Executive Committee Order.  (Case No. 15 CR 487, Dkt. #35).  A change of plea hearing for all three cases was set for November 26, 2018.

Daoud's change of plea proceeded on November 26, 2018.  (Dkt. #303).  During that proceeding, Daoud pled guilty pursuant to *Alford* to all charges in the three pending cases after an extended colloquy with the Court, which involved Daoud representing as follows:  "I can say that the government's factual basis supports a conviction on each count, but I deny culpability and persist in my innocence. And I wish to plead guilty."  (Tr., 11.26.18, p. 59).  *Id*. at p. 63 ("THE COURT: And you also are again maintaining your innocence despite the fact that you agree that that is the evidence that would be presented, and that evidence supports a finding of guilty, is that correct? DEFENDANT DAOUD: Yes, ma'am.").  The Court's reasons for accepting Daoud's *Alford* plea over the objection of the prosecution, included the following:

> That he's had the competent advice of the defense counsel in this matter, and that there is a basis to believe, first of all, that it is to his benefit to enter a guilty plea pursuant to Alford despite the fact that he himself feels that he is not -- is innocent of the charges overall. And he's based that -- based that pronouncement on the fact that he has a history, long history of mental illness that seems to be under

29

control, and he does not wish along with his family to go through a three-week
trial that would bring up for the first time fully and in a courtroom with actual
witnesses the events that brought him here today. They do not believe that would
be good for his mental health, which is definitely on the mend.

(Tr., 11.26.19, p. 64).  Sentencing was then scheduled to start on April 29, 2019, with several

days set aside based on the prosecution's desire to put on evidence that would "go on for a few

days." (Tr., 11.26.19, p. 66).[20]

### E.  New Discovery and *Brady* Disclosures After Daoud's *Alford* Plea, Particularly Concerning the January 2013 Grand Jury Testimony of William Paschal, the Jailhouse Informant from Case No. 13 CR 703.

On February 15, 2019—almost three months after Daoud changed his plea—the

government produced additional discovery material that primarily consisted of grand jury

testimony of witnesses related to the MCC assault case.   The index of documents provided in the

production included the following entry:  "Grand Jury Transcript of Barbara Harner on January

17, 2013 and August 29, 2013 and William Paschal on January 17, 2013."  The production did

not, however, include those grand jury transcripts.  The prosecution initially refused to produce

Paschal's transcript.  When it acquiesced, counsel for Daoud were shocked to see Paschal's

testimony.  Counsel were even more disturbed to learn that there were numerous recordings

between Paschal and a special investigator from the Cook County Sheriff's Office named Drake

Carpenter.

As counsel described during court hearings on March 21, 2019 (Dkt. #312), March 25,

2019 (Dkt. #316), and April 3, 2019 (Dkt. 318), as well as Daoud's discovery motion that was

filed under seal on April 5, 2019 (Dkt. #319), had counsel knew about Paschal's grand jury

---

[20] It is not exactly clear why the government feels the need to convince the Court in a sentencing hearing
that it did not entrap Daoud—especially since the government would not consent to a bench trial in the
first instance.  Apparently, it is the logic of the government that if Daoud was predisposed to commit this
crime, he is an extremely dangerous threat to the public.  Based on this logic, one could expect life to be
the only justifiable sentence.

testimony and the recorded calls in 2013, it is very likely that this case would have been tried years ago.[21]  In counsel's view, that evidence not only strongly supports Daoud's entrapment theory, but it also corroborates counsels' strong view that there is something deeply wrong with the solicitation case—yet the FBI and prosecutors pursued it nevertheless.  Indeed, counsel only learned shortly before the November 2018 trial that it was the FBI who paid the $15,000 Paschal needed to bond out of custody (and that he initially asked Daoud to pay).  And this information was only disclosed after the defense confronted the prosecution with the documentary evidence that counsel obtained from the Markham courthouse.   Counsel does not mean to re-litigate these discovery issues in the sentencing memorandum, but they are essential to understanding the torturous procedural history and background of this case.  It also visibly demonstrates why the lack of entrapment hardly settles what an appropriate sentence is for Daoud.

### III.    POSITION ON THE ADVISORY GUIDELINES

Counsel do not object in any formal sense to the total calculation of the advisory guidelines set forth in the PSR for the three cases, based upon the judicially sanctioned one-size-fits-all nature of the infamous "Terrorism Enhancement."   Counsel are forced to concede the legions of cases accepting the enhancement and must recognize, therefore, that from a practical perspective, the application of the "terrorism enhancement" from U.S.S.G. § 3A1.4(a) effectively moots any objections.  (PSR, p. 14, ¶47).  Pursuant to that enhancement, 12 offense levels are added, which results in a base offense level of 45 for Count One.  Moreover, the enhancement moves Daoud into the highest criminal history level of VI, despite the fact that his arrest on September 14, 2012, was not only his first arrest, but one of the first times he got into trouble of

---

[21] Counsel's serious concerns regarding the late and controversial production of Paschal's January 17, 2013, grand jury transcript are perhaps best encapsulated in the March 11, 2019, discovery letter that counsel sent to the prosecution.  A copy of that letter is found at Dkt. #319, Exhibit A, which was filed under seal.

any kind. Therefore, at a level 45 and criminal history VI, Daoud is already "off the charts" with an advisory sentence of life for the first case. In the same breath—no one could truly suggest that such a guideline sentence is necessary under the extraordinarily unique circumstances of this case. Thus, counsel recognize the Court's duty to calculate properly the guidelines as a first step; but the task is largely symbolic here.

As for clarifications to the PSR, counsel do take issue with the government's version of the offenses, as well as inferences that should be drawn from the evidence, as reflected in the PSR. Counsel's positions are set forth not only in Daoud's Version of the Offenses, which was submitted to the Probation Office and attached to the PSR, but also below in much greater detail.

Accordingly, at this point counsel offer no objections or clarifications to the PSR.

IV.     **SENTENCING MEMORANDUM**

        A.  **Legal Standards.**

The Federal Sentencing Guidelines serve as a "starting point" and "initial benchmark" in the determination of a just and appropriate sentence. *See Gall v. United States*, 552 U.S. 38, 49-51 (2007); *Pepper v. United States*, 131 S. Ct. 1229, 1241 (2011); *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (quoting *Gall*, 552 U.S. at 49); *United States v. Hill*, 645 F.3d 900, 905 (7th Cir. 2011). *Gall* directs sentencing judges to "consider all of the 3553(a) factors" to arrive at a just sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing. 18 U.S.C. § 3553(a).

Thus, under *Gall*, district courts must "consider all of the 3553(a) factors" to arrive at a just sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing. 18 U.S.C. § 3553(a). A district court cannot simply presume the guideline range to be reasonable. *United States v. Perez*, 571 F. App'x 495, 497 (7th Cir. 2014) (citing *Nelson v.*

*United States*, 555 U.S. 350, 352 (2009) ("A district court cannot presume that a sentence within the guidelines range would be reasonable."). As the Seventh Circuit has emphasized, "the Guidelines are, after all, guidelines [that] must be considered seriously and applied carefully…. In the end, however, the defendant's sentence is the responsibility of the district judge, after careful consideration of all the relevant factors under 18 U.S.C. § 3553(a)." *United States v. Lopez*, 634 F.3d 948, 953-954 (7th Cir. 2011) (internal citations omitted); *United States v. Musgraves*, 883 F.3d 709, 715 (7th Cir. 2018) (the "Guidelines are an advisory starting point for a judge, but after correctly calculating a guideline range, the judge has discretion to select an appropriate sentence for the individual defendant and the surrounding circumstances.").

Adequate consideration of the § 3553(a) sentencing factors helps ensure that the sentencing decision is individualized, as it must be. Indeed, "[w]hen determining a sentence, the court 'must make an individualized assessment based on the facts presented.'" *United States v. Pankow*, 884 F.3d 785, 793 (7th Cir. 2018) (quoting *Gall*, 552 U.S. at 50)); *see United States v. Wachowiak*, 496 F.3d 744, 748 (7th Cir. 2007) (internal citations omitted) ("the § 3553(a) factors are broad, vague, and open-ended ... and review for reasonableness is deferential … so the sentencing judge has considerable discretion to individualize the sentence to the offense and offender as long as the judge's reasoning is consistent with § 3553(a)."). The Supreme Court has emphasized that the punishment imposed "should fit the offender and not merely the crime." *Pepper*, 131 S.Ct. at 1240 (citations omitted) (emphasis added). *See also Gall*, 522 U.S. at 52, *quoting Koon v. United States*, 518 U.S. 14. 81, 113 (1996).

The "sufficient but not greater than necessary" standard—also known as the "parsimony" clause—is the "overarching provision" of § 3553(a). *Kimbrough*, 552 U.S. at 101. By its terms that provision instructs the Court to consider a sentence that is the least severe, *i.e.*, not greater

than necessary. *See United States v. Santoya*, 493 F. Supp. 2d 1075, 1077 (E.D. Wis. 2007) ("This is the so-called 'parsimony provision,' which requires district courts to impose the minimum punishment needed to satisfy the purposes of sentencing—just punishment, deterrence, protection of the public and rehabilitation of the defendant.").

### B. Legal Principles Regarding the Imperfect Entrapment Doctrine As a Sentencing Consideration Under 18 U.S.C. § 3553(a).

Prior to discussing the § 3553(a) factors, it is necessary to discuss the legal issues regarding what has become known as "imperfect entrapment." Issues of entrapment are essential to understanding the nature and circumstances of the fake bombing case, as well as the solicitation case, and are also necessary to address the prosecution's anticipated fear-mongering regarding future dangerousness and the need to impose a sentence under 3553(a)(2)(C) that protects the public.

The doctrine of "imperfect entrapment" is a legitimate basis for a sentencing variance and—as discussed in more detail below—is entirely applicable based on the facts of this case. Because the doctrine is not frequently cited, some background is appropriate. Before the Supreme Court decided *Booker*, courts cited imperfect entrapment as a basis for departing under the then-mandatory guidelines. *See United States v. Bala*, 236 F.3d 87 (2nd Cir. 2000); *United States v. Giles*, 768 F. Supp. 101, 103-04 (S.D.N.Y. 1991); *United States v. Staufer*, 38 F.3d 1103, 1107 (9th Cir. 1999); *United States v. McClelland*, 72 F.3d 717, 726 (9th Cir. 1995) (affirming downward departure based on imperfect entrapment, discussing scope of imperfect entrapment defense, in that it can apply when the defendant first proposes the offense (for if it did not, and the defendant was not predisposed, then it would be grounds for acquittal); *United States v. Taylor*, 696 F.3d 628, 633-34 (6th Cir. 2012) (recognizing the doctrine of "imperfect entrapment," "the notion that undue government encouragement to commit an offense can

34

mitigate punishment even if it cannot wholly defeat criminal liability," but affirming sentence finding that court considered arguments even though it did not mention imperfect entrapment directly); *United States v. Osborne*, 935 F.2d 32, 35 n.3 (4th Cir. 1991); *United States v. Way*, 103 F. App'x 716, 718 (4th Cir. 2004) (recognizing that district court has authority to consider imperfect entrapment argument and affirming court's decision to reject the theory); *but see* (*United States v. Alvarez*, 575 F. App'x 522, 528 (5th Cir. 2014) ("Furthermore, this court does not recognize "imperfect entrapment" or "sentencing entrapment" in any context, including for sentencing variance purposes. *See United States v. Stephens*, 717 F.3d 440, 446 (5th Cir. 2013) ("We have never recognized sentencing entrapment as a defense...").  We decline to do so here.").

These pre-*Booker* cases typically viewed the imperfect entrapment defense through the lens of U.S.S.G. §5K2.12, which is entitled "Coercion and Duress (Policy Statement)." *See Bala*, 236 F.3d at 91-92 ("Some circuits have determined that "imperfect entrapment," described as "aggressive encouragement of wrongdoing, although not amounting to a complete defense," is a proper ground for downward departure at sentencing pursuant to U.S.S.G. § 5K2.12"); *United States v. Garza-Juarez*, 992 F.2d 896, 912 (9th Cir. 1993)  ("The district court in the present case was faced with a similar situation. Agent Murillo did not threaten the defendants, but it was he who initially proposed the illegal activity and persistently contacted Joe Juarez by telephone and in person over several months until the scheme was completed. This sort of aggressive encouragement of wrongdoing, although not amounting to a complete defense, may be used as a basis for departure under section 5K2.12.").

*United States v. Martinez-Villegas*, 993 F. Supp. 766, 777 (C.D. Cal. 1998) illustrates the application of the imperfect entrapment defense.  There, the district court recognized that a

downward departure under U.S.S.G. §5K2.12 was appropriate "if a defendant committed the offense due to serious coercion, blackmail, or duress under circumstances not amounting to a complete defense of entrapment." It further held that such a departure was appropriate because "the government's conduct, although not rising to the level of entrapment, is sufficient to constitute 'aggressive encouragement' to support a finding of imperfect entrapment." *Id.* at 777. That conduct involved the government first proposing the illegal activity; initiating contact through a confidential informant, and then introducing an undercover agent who posed as "a Latin American drug lord." *Id.* The Ninth Circuit, which has apparently had the most occasion to consider the doctrine, affirmed a departure based on imperfect entrapment even when a defendant first proposed an illegal scheme. *See United States v. McClelland*, 72 F.3d 717, 725-26 (9th Cir. 1995) ("A district court could properly determine that a defendant who first proposed an illegal scheme, but who later expressed serious reservations and acted only after strong and repeated inducements by the government is less morally blameworthy and less likely to commit crimes in the future than a defendant who eagerly participated in an illegal scheme with no inducement other than the initial suggestion by a government agent. Thus, if a district court departs downward on the ground of imperfect entrapment in a case in which the defendant first approached the government, the departure may still be completely consistent with at least two important factors relevant to sentencing - protection of the public, and characteristics particular to the defendant's culpability."). Thus, the doctrine is properly applied even if a defendant is found to be predisposed to commit a crime.

In a pre-*Booker* decision, the Seventh Circuit affirmed the district court's refusal to depart from mandatory guidelines based on the defendant's imperfect entrapment theory. *United States v. Lewis*, 162 F. App'x 647, 650 (7th Cir. 2006). It observed how the district court

"examin[ed] the recorded telephone conversations with the informant, the court explained that it discerned no 'backing off' by Lewis and therefore rejected the 'imperfect entrapment' argument." *Id*. at 650. That holding strongly implies that the Seventh Circuit would accept the imperfect entrapment defense as grounds for departure under the proper facts. *Id*. at 652 ("As mentioned above, the court considered the nature and circumstances of the crime, expressly rejecting her 'imperfect entrapment' arguments."). Likewise, few district courts in this district have addressed imperfect entrapment in reported and unreported decisions. In *United States v. Sokoya*, No. 05 CR 41, 2007 U.S. Dist. LEXIS 86136, at *15-16 (N.D. Ill. Nov. 20, 2007), Judge Manning rejected arguments for a lower sentence based on imperfect entrapment and coercion based on the particular facts presented. The lack of definitive case law in the Circuit most certainly does not preclude the argument here—particularly when the arguments for entrapment are strong and additional because Daoud has pled guilty pursuant to *Alford* and has thus maintained his innocence in large part because of the meritorious entrapment defenses. Additionally, considering an imperfect entrapment defense is entirely consistent with this Court's broad discretion under 18 U.S.C. § 3553(a) to consider the nature and circumstances of the offense, which necessarily includes the conduct of the government, as well as the history and characteristics of Daoud, which necessarily involves his mental health status, age, susceptibility, and vulnerability—all factors that dovetail with the entrapment analysis.

Indeed, because "departures" from the mandatory guidelines are no longer operative following *Booker*, the doctrine of incomplete entrapment is now best understood as grounds for a variance under 18 U.S.C. § 3553(a), and particularly under nature and circumstances of the offense. *See United States v. Díaz-Maldonado*, 727 F.3d 130, 140-41 (1st Cir. 2013) ("Díaz asserts that by not considering the issue of "imperfect entrapment," the district court did not

give proper heed to the section 3553 factors. "Imperfect entrapment" has sometimes been used by other courts as the basis for a downward departure at sentencing when a defendant demonstrated that he was 'pressured unduly by the government to go forward with [an] offense . . . .' *United States v. McClelland*, 72 F.3d 717, 725 (9th Cir. 1995). Where, as here, a defendant seeks a downward variance on that basis, the claim of imperfect entrapment can be thought of as fairly encompassed in the analysis of the 'nature and circumstances of the offense' under § 3553(a).").

   **C.  The Law of Entrapment, Insofar as it Informs the Imperfect Entrapment Analysis, Which Is Highly Relevant Given the Government's Anticipated Sentencing Arguments and the Court's Review of the § 3553(a) Factors.**

   To inform the discussion of "Imperfect Entrapment" for sentencing purposes, some analysis of the law of entrapment is necessary.  Entrapment "involves 'the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law.'"  *United States v. Blitch*, 773 F.3d 837, 843 (7th Cir. 2014) (citing *Jacobson v. United States*, 503 U.S. 540, 553-54, 112 S. Ct. 1535, 118 L. Ed. 2d 174 (1992)); *United States v. McGill*, 754 F.3d 452, 457 (7th Cir. 2014) (entrapment occurs "when the government coerces a defendant into committing an illegal act he was not otherwise predisposed to commit.").  "Law enforcement officials go too far when they 'implant in the mind of an innocent person the *disposition* to commit the alleged offense and induce its commission in order that they may prosecute.'" *Jacobson*, 503 U.S. at 553 (emphasis in original) (citing *Sorrells v. United States*, 287 U.S. 435 (1932)).  Thus, the entrapment doctrine "ensure[s] that people who are not predisposed to commit a crime are not transformed into criminals by the government." *United States v. Pillado*, 656 F.3d 754, 765 (7th Cir. 2011). "The defense of entrapment recognizes that a goal of law enforcement is to prevent crime, not to tempt citizens to engage in criminal

38

activity." *Id*. Entrapment consists of two elements: "government inducement of the crime and a lack of disposition on the part of the defendant." *Blitch*, 773 F.3d at 843 (citing *Pillado*, 656 F.3d at 763).

### 1. A Defendant Must be Predisposed to Commit the Charged Crime Before Contact with Law Enforcement Officers.

The issue of predisposition is central to any entrapment analysis, and will accordingly be relevant to the "imperfect entrapment" analysis. *United States v. Evans*, 924 F.2d 714, 717 (7th Cir. 1991) ("The centrality of predisposition can be seen by considering the purpose of the doctrine of entrapment. It is to prevent the police from turning a law-abiding person into a criminal."). To determine whether a defendant was predisposed to commit the charged crime, the Seventh Circuit has identified the following five factors for courts to consider: "(1) the defendant's character or reputation; (2) whether the government initially suggested the criminal activity; (3) whether the defendant engaged in the criminal activity for profit; (4) whether the defendant evidenced a reluctance to commit the offense that was overcome by government persuasion; and, (5) the nature of the inducement or persuasion by the government." *United States v. Hall*, 608 F.3d 340, 343 (7th Cir. 2010). (*quoting United States v. Blassingame*, 197 F.3d 271, 281 (7th Cir. 1999)); *see also See United States v. Millet*, 510 F.3d 668, 675-76 (7th Cir. 2007). While no single factor controls, "the most important factor is whether the defendant was reluctant to commit the offense." *Hall*, 608 F.3d at 343.[22]

A defendant must be predisposed to commit the charged crime *before* contact with law enforcement officers or their agents. *United States v. Poehlman*, 217 F.3d 692, 703 (9th Cir.

---

[22] Additionally, 7th Circuit Patten Criminal Jury Instructions permit the jury to consider 6) whether the Government merely invited or solicited the defendant to commit the offense; 7) whether the government offered the defendant an ordinary opportunity to commit a crime or instead offered the defendant exceptional profits or persuasion; and 8) the defendant's ability to commit the crime without the assistance of the Government's agents.

2000). *See also United States v. Navarro*, 737 F.2d 625, 635 (7th Cir. 1984) (predisposition must be analyzed as "the defendant's state of mind and inclinations before his initial exposure to government agents."). The question of whether a defendant was predisposed before law enforcement contact was at issue in *Jacobson v. United States*, 503 U.S. 540, 553 (1992). There, the government was in contact with the defendant for 2 ½ years before the suggestion of criminal behavior. The majority held that the issue is whether the prosecution can "establish beyond a reasonable doubt hat he was predisposed, prior to Government acts intended to create predisposition… . The evidence [of disposition] … came only after the Government had devoted 2 ½ years to convincing him." *Id.*[23]

### a. A Defendant Must Also Be in a Position to Commit the Charged Offense Absent the Government's Help.

Significantly, an individual's willingness to commit the charged crime is insufficient on its own to show that the individual was predisposed to commit that crime. *United States v. Hollingsworth*, 27 F.3d 1196, 1198 (7th Cir. 1994) (en banc). *Hollingsworth* is a significant entrapment case, as it discussed the concept of "positional" predisposition. That section of the *en banc* opinion, written by Judge Posner, as if speaking to this very case, warned as follows:

> *Predisposition is not a purely mental state, the state of being willing to swallow the government's bait. It has positional as well as dispositional force.* The dictionary definitions of the word include "tendency" as well as "inclination." *The defendant must be so situated by reason of previous training or experience or occupation or acquaintances that it is likely that if the government had not induced him to commit the crime some criminal would have done so; only then does a sting or other arranged crime take a dangerous person out of circulation.* A public official is in a position to take bribes; a drug addict to deal drugs; a gun dealer to engage in illegal gun sales. For these and other traditional targets of stings all that must be

---

[23] *See also United States v. Jackson*, 72 F.3d 1370, 1378 (9th Cir. 1995); *United States v. LaRizza*, 72 F.3d 775, 779 (9th Cir. 1995); *United States v. Davis*, 36 F.3d 1424, 1431-1432 (9th Cir. 1994); *United States v. Osborne*, 935 F.2d 32, 37 (4th Cir. 1991).

> shown to establish predisposition and thus defeat the defense of entrapment is willingness to violate the law without extraordinary inducements; ability can be presumed. *It is different when the defendant is not in a position without the government's help to become involved in illegal activity. The government "may not provoke or create a crime, and then punish the criminal, its creature." Casey v. United States*, 276 U.S. 413, 423 (1928) (Brandeis, J., dissenting).

*Hollingsworth*, 27 F.3d at 1200 (emphasis added).[24] Following *Hollingsworth*, the Seventh Circuit clarified that its decision did not establish a "but for" test, whereby a defendant's lack of present means to commit the charged crime was sufficient in and of itself to establish lack of predisposition. *See United States v. Lopeztegui*, 230 F.3d 1000, 1003 (7th Cir. 2000).

### b. A Defendant Must Be Predisposed to Commit the Charged Crime, Not Just any Criminal Offense.

Critically, a defendant must be predisposed to commit the charged crime, not just any criminal offense. The Seventh Circuit pattern jury instructions make this point clear when they define predisposition in terms of the "charged crime." *See* 7th Cir. Jury Instruction 6.05 (emphasis added) ("A defendant is 'predisposed' to commit the charged crime if, before he was approached by [a] [government agent[s]…"; "Predisposition requires more than a mere desire, urge, or inclination to engage in the *charged* crime."). The Committee Comment makes this

---

[24] *Hollingsworth* has accurately been described as an expansion of the entrapment doctrine, and has been rejected by the Second Circuit in *Cromitie*, a terrorism sting-operation case. *See United States v. Cromitie*, 727 F.3d 194, 217(2d Cir. 2013) ("We reject the Seventh Circuit's expansion of the entrapment defense to permit an induced defendant, predisposed under existing standards to commit a crime, to establish the defense of entrapment simply because, prior to the unfolding of a government sting, he was not in a position where it was likely that he would have figured out how to commit the offense and how to acquire necessary devices…. A person who has a pre-existing design to commit terrorist acts against United States interests or who promptly agrees to play a part in such activity should not escape punishment just because he was not in a position to obtain Stinger missiles and launch them at United States airplanes. The Government need not leave him at large until a real terrorist suggests such action and supplies real missiles."). *See also United States v. Pillado*, 656 F.3d 754, 763 (7th Cir. 2011) ("We recognize that other circuits have either rejected or expressed skepticism about that distinction. *See, e.g., United States v. Ogle*, 328 F.3d 182, 188-89 (5th Cir. 2003); *United States v. Squillacote*, 221 F.3d 542, 567 (4th Cir. 2000); *United States v. Thickstun*, 110 F.3d 1394, 1398 (9th Cir. 1997).")

point explicit: "Regarding predisposition, the *en banc* court emphasized in *Mayfield* that the relevant inquiry is the defendant's predisposition to commit the charged crime, not just any crime. *Mayfield*, 771 F.3d at 438." (7th Cir. Jury Instruction 6.05, Committee Comment).

*United States v. McGill*, 754 F.3d 452 (7th Cir. 2014) illustrates how the government must prove that the defendant was predisposed to commit the charged offense, not merely express a desire to commit general criminal conduct, much less a crime that is even similar to the charged offense. In *McGill* the defendant was charged with distribution of child pornography in addition to possession. The defendant attempted to raise the defense of entrapment to the distribution count. The government objected, and the judge refused to instruct the jury. The Seventh Circuit reversed, in an opinion written by Judge Rovner. The Court observed that the district court did not find anything in the record that suggested the defendant was predisposed to distribute child pornography. The government still contended that an entrapment instruction on the distribution charge would have been improper because the defendant "never shied away from situations in which child pornography was distributed, and that his very possession of child pornography is evidence of a predisposition to distribute." *McGill*, 754 F.3d at 457. The Court specifically rejected the government's argument that the defendant's use of file sharing equipment to acquire child pornography was evidence of distribution to distribute child pornography. Likewise, the Court rejected the government's argument that the fact that the defendant attended a party where others distributed child pornography was evidence of predisposition because the defendant took nothing to that party.

Perhaps most relevant to our arguments, in *McGill*, the government contended that the defendant's "possession of child pornography is evidence of a predisposition to distribute." *McGill*, 754 F.3d at 458. The Court stated that this argument "proves too much," as

"[p]ossession and distribution are very different crimes." *Id*. The Court then analogized how the case to a drug case, and observed how the government is not entitled to present evidence of the more serious drug distribution crime merely because the defendant committed the less serious drug possession crime. *Id*.[25]

### c. The Government Must Induce a Defendant Through Pleas for Assistance, Persuasion, and a Variety of Other Means.

Inducement involves government solicitation of the crime plus other government conduct "that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts." *United States v. Mayfield*, 771 F.3d 417, 434-35 (7th Cir. 2014). That additional government conduct may include "repeated attempts at persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward beyond that inherent in the customary execution of the crime, pleas based on need, sympathy, or friendship, or any other conduct by government agents that creates a risk that a person who otherwise would not commit the crime if left alone will do so in response to the government's efforts." *Id*. Inducement is not a fixed concept, as it "can occur through a variety of methods"

---

[25] A number of other Seventh Circuit cases discussed predisposition in terms of the "charged offense," implying that evidence that a defendant was predisposed to commit some offense generally is insufficient to preclude an entrapment defense. *See United States v. Orr*, 622 F.3d 864, 870 (7th Cir. 2010) (emphasis added) ("We consider several factors in assessing whether a defendant was predisposed to commit the *charged offense*…all factors indicate that Orr was predisposed to commit the *charged offense*."); *United States v. Millet*, 510 F.3d 668, 676 (7th Cir. 2007) (emphasis added) (predisposition analysis assesses whether "a defendant was predisposed to commit the *charged offense*."); *United States v. Hall*, 608 F.3d 340, 343 (7th Cir. 2010) ("The evidence presented in this trial showed beyond dispute that Hall was predisposed to commit the crimes of which he was convicted."); *Pillado*, 656 F.3d at 766 (emphasis added) ("we begin by asking whether Lara was predisposed to the crime charged: possession with the intent to distribute about one ton of marijuana…. It is not surprising that the government spends no time arguing that Lara was predisposed to commit the crime charged, since even a cursory review of the record shows no hint of such a predisposition.") *United States v. Carrasco*, 887 F.2d 794, 814 (7th Cir. 1989) (quoting *United States v. Perez-Leon*, 757 F.2d 866, 871 (7th Cir. 1985) (emphasis added) ("Predisposition 'refers to whether the defendant has a readiness or willingness to commit the *offenses charged* or whether the government 'implant[ed] in the mind of an innocent person' the disposition to commit the offense.'"); *United States v. Mandel*, 647 F.3d 710, 718 (7th Cir. 2011) (emphasis added) ("Whether the defendant is predisposed to *commit the charged crime* depends on a number of factors").

such as "extraordinary promises—the sorts of promises that would blind the ordinary person to his legal duties." *United States v. Plowman*, 700 F.3d 1052, 1057-1058 (7th Cir. 2012). The government's persistence may be a form of inducement. *Id.* at 1059. Inducement can also "occur when a government agent preys on a defendant's emotional weaknesses." *Plowman*, 700 F.3d at 1059 (*citing Sherman v. United States*, 356 U.S. 369, 373-75 (1958). Inducement need not be "extraordinary" unless the defendant was predisposed to commit the crime charged. *Pillado*, 656 F.3d at 766.

When the record reveals that a defendant was predisposed to commit the crimes charged, he is not entitled to an entrapment instruction unless he can show that the government provided an opportunity to commit the crime that was out of the ordinary. *Pillado*, 656 F.3d at 765. "But if the evidence is thin that a defendant was predisposed to commit a crime, even minor government inducements should entitle the defendant to present his defense to the jury." *Id*. The defendant need not show "extraordinary inducement" as a threshold for obtaining an entrapment instruction defense in every case. *Pillado*, at 765-66.

The issue of one's susceptibility to government inducement—a strong factor here, especially in light of the FBI's use of Daoud's religious beliefs—may also factor into the question of predisposition. In *Sandoval-Mendoza*, a Ninth Circuit case, the court found that the trial court erred when it barred the defendant from introducing expert medical testimony that the defendant's medical condition rendered him unusually susceptible to "inducement." *United States v. Sandoval-Mendoza* 472 F.3d 645 (9th Cir. 2006). *See also McGill*, 754 F.3d at 459 (internal citations omitted) ("Assessing an entrapment defense involves a subjective inquiry, meaning that a defendant is entitled to argue that he was particularly susceptible to inducement.").

44

### D. Nature and Circumstances of the Offense—§ 3553(a)(1)

In determining the sentence to be imposed, the Court must consider the "nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1).

### 1. Case No. 12 CR 723

While the substantive evidence against Daoud is best viewed through what counsel will discuss below as an "imperfect entrapment" defense, prior to consider those issues, counsel submit that it is important to contextualize Daoud's online communications and how he likely came to the attention of the FBI. Notwithstanding numerous requests by undersigned counsel, the prosecutors have never disclosed exactly how and when law enforcement or intelligence agencies first encountered or learned of Daoud and why they decided to subject him to a full international terrorism investigation—which would be the most basic facts for any criminal prosecution, and which were here also subject of the FISA litigation. Based on the discovery tendered, an FBI report dated May 15, 2012, represents that the FBI purportedly opened the "Full Field Investigation" on May 10, 2012 based on the following information:

> ██████████████ Chicago opened captioned Full Field Investigation based on unsolicited information ██████████ that Adel David, believed to be an 18 year old male of Egyptian and Palestinian descent living in the greater Chicago area, has stated on web forum that he has read an article on bomb making in Inspire Magazine and would make the bomb if he could find the required materials. In addition, David had made statements on the web forum that he wanted to be a "mujahid" and sought martyrdom.

(302_002-000002).[26] The report concludes as follows:

> ██████ Through the deployment of OCEs, Chicago will work to more fully assess David's intentions as they pertain to violent jihad and martyrdom as well as his association with like-minded individuals ██████████.

---

[26] A copy of this report will be filed under seal as Exhibit C.

Consistent with the excerpts set forth above, the remainder of the document is heavily redacted. (*Id.*). Perhaps most importantly, to this date, counsel do not know precisely the source of the "unsolicited information" came from; nor do counsel even know the identity of the web forum where Daoud supposedly made the comment about bomb making. Counsel have not even seen Daoud's statement that is referenced in the FD-302 report, and which supposedly precipitated the Full Field Investigation. Notably, in any other case, this "statement by the defendant" would have been immediately produced without debate under Rule 16(B). Not so here.

The precise reasons why the FBI began investigating Daoud and when the government, through its agents or employees, first contacted Daoud are of course essential facts, and are all the more critical in the predisposition analysis. While undersigned counsel can review the redacted reports and guess why the FBI began investigating Daoud, the likely reality is that the FBI learned about Daoud through his online communications in early 2012 with a Polish national named Artur Letowski, who first invited Daoud onto various internet forums, provided Daoud with "nasheeds," and, perhaps most importantly, sent Daoud links to *Inspire* magazine. As discussed below, in June 2012 Letowski was charged with terrorism-related offenses under Polish law. However, those charges were subsequently dismissed after Letowski himself was found to be mentally ill. That fact—which counsel must presume that the FBI and other intelligence agencies knew—should have given the FBI every reason to question treating Daoud as a "terrorist." But instead, the FBI embarked on a self-fulfilling sting operation that identified and then weaponized its target.

Moreover, even after the FBI began its investigation to "more fully assess David's [sic] intentions as they peratain [sic] to violent jihad and martyrdom," there were numerous

46

opportunities when it could have chosen another route rather than continue its sting operation. That is particularly so when there were ample reasons to question Daoud's mental health status simply based on his online interactions with the OCEs and the UCE. Even after those communications, on June 29, 2012, the FBI used a pretext to visit Daoud's father, Ahmed. Clearly, the FBI and prosecutors could have simply told Ahmed that his son was talking nonsense online with two FBI OCEs. Yet, it chose not to, apparently because it had already decided that Daoud was a terrorist and the sting operation would move forward to its foregone conclusion. Thus, prior to discussing "imperfect entrapment" defense, counsel believe it is helpful to frame that analysis with background regarding Daoud's communications with Letowski as well as the June 29, 2012 pretext interview with Daoud's father.

### a. Daoud's Online Communications with the Mentally Ill Polish National Began in Early 2012, Which Likely Caused Him to Come to the Attention of the FBI and Likely Influenced the Controversial FISA Application.

Based on discovery tendered in this case, as well as the inferences that can be reasonably drawn from holes in the government's evidence, undersigned counsel believe that law enforcement and intelligence agencies knew of Daoud or were monitoring communications he was involved in long before May 14, 2012, which is the date that the FBI represents in its reports that it actually opened its investigation into Daoud. Specifically, counsel believe that the FBI and other domestic and international intelligence agencies were monitoring communications involving Daoud and Artur Letowski, who appears to be the individual who provided Daoud with material that is central to the prosecution's most important allegations regarding Daoud's purported predisposition, including his alleged access to a "jihadi-related internet forum" (Crim. Compl., ¶ 11(c)), and also the links to *Inspire* magazine.

While—as noted above—counsel can understand why such communications could give law enforcement reason to inquire further regarding Daoud, the fact of the matter is that they could hardly warrant opening a full terrorism investigation and sting operation against Daoud. That is especially so because, at least by the time that the UCE met with Daoud, law enforcement must have known that Letowski was no hardcore jihadi, but rather a seriously mentally ill schizophrenic in his early 20s. Worse yet, it appears to be the case that the Polish intelligence agency ABW was well aware of Letowski's serious mental disorder prior to having him arrested on terrorism charges immediately preceding a major international soccer tournament being held in Warsaw and other locations in Poland in June of 2012. These Polish charges were subsequently dropped based upon Letowski's mental illness, and he has since been released. These facts show that the prosecution's key predisposition evidence, particularly Daoud's access to *Inspire* (which was sent by Letowski) was really no more than Defendant's online babbling with a paranoid schizophrenic in Poland.[27]

As further background, on June 6, 2012, Letowski was arrested by Polish intelligence authorities and charged with terrorism-related offenses. *Alleged Islamic Terrorist Under Arrest in Poland*, Radio Poland, July 14, 2012 (*available at* http://www.thenews.pl/1/9/Artykul/105903,Alleged-Islamicterrorist-under-arrest-in-Poland) ("Artur L. (full name withheld under Polish law), is understood to have adopted the pseudonym of Ahmed Yassin, and is currently being detained for a three month period. He has been given the status of a "dangerous prisoner.") (last visited Apr. 25, 2019).

---

[27] While counsel do not wish to re-litigate the FISA application and its accessibility to defense counsel, it is respectfully suggested that the Court should check the FISA application to see whether it lists Letowski and any communications involving him in Poland and Daoud, and whether it also admits that Letowski's charges were dismissed based upon his mental condition. If it does not so admit, this should be held against the government.

Discovery produced in this case includes a single FBI report regarding the arrest of Letowski, who was also known as "Ahmed Yassin 23." That reported is dated August 9, 2012, and noted that Letowski was "arrested by Polish authorities and ordered detained for 90 days." (302_002-000059-60). [28] Notably, Defendant's name is specifically listed in the case identification section, along with Letowski's and what appears to be five other names that have been redacted. This FBI report also indicates that the "Full investigation" was initiated on October 20, 2011. The report notes that Letowski was charged with the following offenses under the Polish Penal Code:

> Article 255a: individual publicly incited to the commission of a terrorist offence via website by publishing links to websites that contain guides to construction of improvised explosives devices and improvised ammunition, in addition he committed this offence in intent to enable whoever to commit a terrorist offence.

> Article 126a: individual publicly praised the terrorist attacks conducted by Osama bin Laden and his organization Al-Qaeda via website.

(*Id*.). The report concludes by noting that on August 7, 2012, there were discussions to arrange a meeting between Polish intelligence that arrested AL and "Legat Warsaw," an FBI foreign office, for updates regarding the case.

While the discovery contains no other FBI reports regarding the arrest and prosecution of Letowski, counsel's independent investigation from 2014, revealed that after over nine months of detention, Letowski was released from custody based on the fact that he was determined to be mentally ill and suffering from paranoid schizophrenia. Counsel's investigation also revealed that Polish authorities knew as early as May 18, 2012, and most certainly by May 24, 2012, that Letowski had a lengthy and documented history of psychiatric treatment. News reports

---

[28] A copy of this report will be submitted under seal as Exhibit D.

translated from Polish press confirm that Letowski was released after his insanity was confirmed. *See* Wojciech Czuchnowski, *Jihad in Polish – insane can not be answered in Court*, Wyborcza.pl, Aug. 27, 2014, translated web page available at https://bit.ly/2DzEVHb (last visited Apr. 26, 2019).[29]

Daoud's online communications with Letowski are central to the issue of predisposition. Many of these communications have been produced in discovery; but there are also many other that, counsel believe, were likely collected through some surveillance program but never produced in this criminal case.[30] Discovery produced shows that Daoud's online communications with Letowski began on or about January 17, 2012, when Daoud sent a YouTube message to Letowski, asking: "can you send me some jihad nasheeds? Really catchy and crazy please thanks asalamu alaykum." (2625675D, p. 96). After several additional exchanges on YouTube, on January 20, 2012, Letowski sent Defendant a YouTube message with links for Defendant to find more nasheeds. (2625675D, p. 40). In the same message, Letowski

---

[29] *See Polish terrorist*, translated web page *available at* https://bit.ly/2GCBQag (last visited Apr. 26, 2019) ("Artur Łętowski lives in Warsaw with his parents and older brother. Skinny, with diagnosed mental disorders (so-called "social phobia"), closes in his room. Computer is the whole world for him - he feels stronger in online reality. The family turns a blind eye to the fact that it is fascinated by the Arab world, Islam and the actions of militants - at least it has some sort of occupation. Meanwhile, before Euro 2012, the ABW family is coming to the Łętowski house: Artur is accused of disseminating terrorist content on websites and planning a coup during the tournament.").

[30] As far back as August 2014, counsel for Daoud specifically requested additional information related to Letowski. Specifically, in discovery correspondence to the persecution dated August 26, 2014, counsel requested as follows: "Were there any references or averments to Artur Letowski aka Ahmed Yassin 23 (see 302_002-000059), and specifically to his arrest on terrorism charges, in any application submitted by the government for a FISA warrant or any other judicial process? Related to this, does the government, including the FBI, possess any additional records, documents, or memoranda concerning Mr. Letowski? If so, we would request production of such material pursuant to Brady." In a written response dated August 29, 2014, the prosecution asserted that it could not respond "with specificity in an unclassified letter." It further represented that "any discoverable materials, if they have not been declassified and tendered to the defense, have been or will be addressed to the court pursuant to CIPA."

added the following comment: "---btw I recommend [sic] these jihadi-websites: www.ansar1.info http://shahamat-english.com/http://www.dinhaqq.info/"). (*Id.*) These web forums, described in the Criminal Complaint as where forum members "discuss violent jihad and distribute jihadist propaganda and related instructional materials" (Crim. Compl., ¶7, footnote 5), would no doubt be closely monitored by intelligence agencies and law enforcement. Indeed, the ansar1 website sent by Letowski is for Ansar al-Mujahideen (AMEF), which has been described as the "primary English-language jihadi forum, disseminating the majority of Al-Qaeda's propaganda for the English-speaking West."

Daoud registered as a member for AMEF on February 6, 2012, using a link that Letowski sent to him. Daoud's joining AMEF at Letowski's invitation is no doubt a significant event. Indeed, the Criminal Complaint specifically highlights Defendant's registration on AMEF: "Daoud receives an email to Daoud Account 1 regarding his registration to an online jihadi-related internet forum." (Crim. Compl. ¶ 11(c)). However, the Criminal Complaint conveniently omits Letowski's responsibility for sending Daoud the email and invitation to register.

In addition to forwarding Daoud an invitation to a web forum that is specifically reference in the Criminal Complaint, Letowski forwarded Daoud links to *Inspire* magazine. Specifically, on May 4, 2012, Letowski sent a YouTube message to Defendant containing the links to issues 8 and 9 of *Inspire* magazine. (262567D, p. 11). Notably, Letowski sent Daoud these links to *Inspire* just one day prior to Defendant's posting of the video on Yahoo! Answers that is referenced in the May 15, 2012, FD-302 regarding the deployment of the OCEs, and that is cited as the purported reason for initiating the full international terrorism investigation against Daoud.

Counsel anticipate that the prosecutors will certainly cite to Daoud's participation in the

AMEF forum and receipt of *Inspire* as evidence of his predisposition to commit the charged offenses. However, in light of Letowski's mental illness, the exact opposite conclusion is equally logical and reasonable, if not more so. Indeed, and to put it bluntly, in early May 2012, both Polish and U.S. intelligence agencies—including the FBI—knew full well or should have known that young and impressionable and likely mentally ill Daoud was talking online about "jihad" with another mentally ill person, not a real jihadi associated with any organization. Thus, this key predisposition evidence is really little more than Daoud's online babbling with a schizophrenic located across the world in Poland. Despite that fact, and for whatever its reasons, the FBI saw fit to engage in the elaborate sting operation that now forms the basis of these charges, going so far as to create a fake bomb some four months later, and to lure Daoud into detonating it along with undercover agents posing as terrorists with a radical and equally fictional Imam located in Saudi Arabia.

> **b. The FBI Conducted a Pretextual Visit to Ahmed Daoud's Business on June 29, 2012, But Did Not Tell Him About Adel's Online Communications, Despite Assessing that Ahmed Would be <u>Cooperative with Law Enforcement.</u>**

On June 29, 2012, FBI agents, "utilizing a suitable pretext" interviewed Ahmed Daoud at the used car dealership that he used to own at the corner of Chicago Avenue and Austin on the West Side of Chicago. According to the FD-302 report, the purpose of the interview was "to assess the father's overall behavior and cooperation level with law enforcement"—an interesting law enforcement purpose to begin with. (302_002-000015).[31] Believing that this was actually an honest inquiry, Ahmed Daoud lamented how he had seen the "neighborhood around his business continue to get progressively worse over the years," and how there used to be "a very good police officer assigned to the area around his business who cleaned up the streets during his

---

[31] A copy of this report will be submitted under seal as Exhibit E.

shift, but he is no longer on the beat and the neighborhood has suffered because of it." (*Id*.). Ahmed told the officers about his own children, and also said that he feels for kids in the neighborhood who end up getting involved in drug dealing and prostitution, which made him "want to cry sometimes." Ahmed also said that "would not want to see his kids end up like the kids he sees around his business." (*Id*.). Ahmed then "expressed his willingness to assist law enforcement in whatever way he can." (*Id*.).

The FBI FD-302 concludes with an investigative note that assessed Ahmed to have "provided honest responses to questioning by law enforcement and is genuinely concerned about crime." (302_002-000016). It further concluded, "AHMAD may not know what his son ADEL [REDACTED] is doing online, even though AHMAD claims to oversee his children's computer use. AHMAD would likely be open to future contact with the FBI and *might even encourage his son to cooperate with the FBI if he felt his son was in trouble with the law*." (*Id*., emphasis added).

The case of Shannon Conley provides an important point of contrast. In June 2014, Conley, a nineteen-year old Caucasian woman from Colorado was arrested for attempting to provide material support to ISIS when she tried to board a plane to meet a male ISIS fighter who she met online and wanted to marry. Conley was charged in the Federal District Court for the District of Colorado. (*United States v. Shannon Conley*, 14 CR 163 (D. Colo.)). After entering into a plea agreement, Conley was sentenced to four years in prison. Significantly, before she was charged, the FBI and police met with Conley *eight* times before charging her, and also met with her parents. Meghan Keneally, *Teen 'In Love With ISIS Fighter' Met With Authorities 8 Times Before Being Arrested*, ABC News, June 3, 2014, available at (https://abcn.ws/2IYirU7) (last visited Apr. 23, 2019). According to the Criminal Complaint, on the *seventh* meeting, the

agents—who were not disguised as pretend terrorists—made an "overt attempt to dissuade Conley from violent criminal activity and give her the opportunity to turn away from her intention to participate in supporting terrorist activities." Criminal Complaint, ¶ 11, *United States v. Conley*, Case No. 14-mj-01045-KLM (D. Colo). The agents twice warned Conley that "travel with intent to wage Jihad may be illegal and result in her arrest. Conley told SA Khomssi said she would rather be in prison than do nothing." *Id.* Apparently, the FBI views some people like Shannon Conley from Colorado as deserving of multiple interventions, both personally and in with her family, and even when she told agents to their faces that she would rather go to prison rather than listen to them. But Ahmed Daoud could only be visited under a suitable pretext and his son given no warning whatsoever.

Given Ahmed Daoud's genuine concern for crime and willingness to assist law enforcement, it is stunning and quite informative that that there was absolutely no follow up or effort of any kind to share the FBI's obvious concern about his son. No doubt, Ahmed would have immediately assisted with any intervention, if given the chance. It cannot escape the Court's attention that the FBI[32] clearly had the capacity to intervene and speak to Daoud's parents, and even Daoud himself but chose not to for its own investigative and prosecutive purposes. Significantly, this June 29, 2012 meeting with Ahmed Daoud occurred over two weeks before Daoud met with the UCE. Counsel submit that this meeting with Daoud's father— and the FBI's decision to not warn him about his son—is an essential factor in understanding the nature and circumstances of the offense, as well as the almost predetermined nature of the sting

---

[32] It would be quite unlikely that the U.S. Attorney's Office was not involved in this decision making as well, since the U.S. Attorney's Office works carefully with the investigative agents in cases of this sensitivity.

operation.  In other words, when a clear opportunity to intervene to avoid the binary "terrorist or no" outcome presented itself, the FBI forged forward with the sting operation.

> ### c. Consistent with the Imperfect Entrapment Doctrine That is Cited Here for §3553(a) Purposes, Prior to Being Contacted by the FBI OCEs in May 2012, Daoud Arguably Lacked the Predisposition to Commit the Charged Offenses of Attempting to Detonate a Weapon of Mass Destruction in a Domestic Attack, as Demonstrated in Recorded In-Person Meetings.

The entrapment analysis begins with the question of predisposition, which in turn begins with when the government agents first contacted Daoud.  Based on the discovery, it appears that the day of first contact was May 14, 2012, which is when "Salah al-Hani" (OCE2) sent an email to Daoud and wrote: "Al salamu alaikum wa rahmatu Allahi wa barakatuhu Brother, I saw a nasheed you had posted on yahoo answers and I was wondering if you have it any audio format for downloading.  Please continue to post nasheeds on yahoo.  They are a great Daawa and propaganda tool and they probably last longer than they do on youtube.  The kuffar are very active on youtube to discredit jihad and Islamic clips.  Wa jazaka Allahu khairan."[33] Salah al-Hani claimed to be a seventeen-year old from Australia "with a recently-developed interest in violent jihad."  (Complaint, ¶ 14).

Daoud and Salah al-Hani then proceeded to exchange emails and continued communicating on YouTube private chats. (Email_001-017063-Email_001-017066).  (Crim. Compl. ¶14).  On May 18, 2012, the government used another online cover employee to contact Daoud.  Specifically, on that date "Iyad Hasan" (OCE1) made a comment on Daoud's YouTube channel ("Thank you, brother! I like your channel. amazing world how everything is upside

---

[33] The OCE's reference to nasheeds brings us back to Letowski.  Daoud first "met" Letowski online by encountering his posting of nasheeds, and the two began communicating by praising them, even though it is likely that neither of them could understand the words that were being sung.  One can only suspect that the FBI directed the OCE to reference nasheeds posted by Daoud, because he previously demonstrated a willingness to discuss them with strangers online, as he did with Letowski.

down! by the way, do you speak Arabic? keep in touch Fi Aman Allah.")  (Crim. Compl. ¶13).
This OCE posed as in individual who lived in Saudi Arabia and, during the online discussions
with Defendant, claimed to have joined rebel forces fighting in Syria or Yemen.

According to the earliest FBI report that noted how Daoud was the "subject of full FBI
international terrorism investigation," the FBI determined that "Group I UCO will be used to
fully explore DAVID's links to terrorism, terrorism financing, and other threats to national
security."  (302_002-000002).

Thus, for the purposes of the predisposition, which is again raised under the "imperfect
entrapment" doctrine for the purposes of the Court's §3553(a) analysis, the question is whether
Daoud was predisposed to committing the charged offenses—using a weapon of mass
destruction and destroying a building by means of explosive—before May 14, 2012.  Thus, by
that date, Daoud must have been ready and willing to commit those charged offenses, and must
have also been in a position to do so without the government's help.  *Hollingsworth*, 27 F.3d at
1200.  The evidence strongly suggests that he was not

Again, as noted above, the predisposition analysis requires consideration of the
following: the defendant's background; whether the government initially suggested the criminal
activity; whether the defendant was reluctant to commit the offense but was overcome by
government persuasion or pressure; the nature of the persuasion or pressure by the government;
and, the defendant's conduct after he encountered law enforcement officers and their agents.

 First, with respect to Daoud's background, at the time the government initiated contact
with Daoud on May 14, 2012, he was only months out of Islamic Foundation School, having
graduated early in January 2012.  Daoud graduated early so that he could focus on improving his
Arabic language skills prior to seeking admission into an overseas religious school program.   At

the time, Daoud had no prior criminal history.  He did not even have disciplinary problems at school.  There was no indication in that background that he would commit any criminal conduct whatsoever prior to the government contacting him.

Second, it can arguably be said that the government, through the UCE, first suggested the charged criminal conduct that is charged in the indictment.  Again, the law requires that one be predisposed to commit the charged offense—not just general criminal conduct at issue.  The government has previously argued and will likely contend at sentencing that Daoud was predisposed to commit "jihad" based on his online communications and other conduct, such as downloaded copies of *Inspire* magazine, or even calling himself a "terrorist" online.  While, as noted above, counsel acknowledge that this conduct and Daoud's comments justified further inquiry; put simply, they do not in and of themselves establish that he was predisposed to detonate a car bomb in downtown Chicago.  In fact, the opposite inferences are more likely.

Moreover, the prosecution cannot show predisposition based on the fact that Defendant expressed sympathy with views, even if they could be characterized as Islamic extremism: "evidence that merely indicates a generic inclination to act within a broad range, not all of which is criminal, is of little probative value in establishing predisposition." *Jacobson*, 503 U.S. at 550. Further, "a person's inclinations and fantasies—in sex, politics, and religion—are his own and beyond the reach of the government."  *Id*. at 551-52 (*quoting Paris Adult Theater I v. Slaton*, 413 U.S. 49, 67 (1973)).  Simply because Defendant held or expressed unpopular opinions, without more, is not sufficient to prove predisposition.  *See Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").  Rather, the focus should be on Daoud's predisposition to commit the charged offenses.  Daoud's interactions with the UCEs demonstrate that he had no

such predisposition—and certainly did not have "positional" predisposition—and also show that it was the UCE who first came up with the idea of a car bomb, before the FBI would go on to actually acquire the car, construct the fake bomb, and essentially do everything for Daoud.

> **i.  During a July 17, 2012, The UCE Repeatedly Pressed Daoud for His Ideas for an Attack, but Daoud Told the Agent He had No Ideas Until, When Further Pressed, Daoud Said His Best Proposal was to use "Flying Cars."**

Because Daoud did not present the UCE with a plan, the UCE instructed him on numerous occasions on July 17, 2012 to "write down" his ideas. One may legitimately ask why Daoud had to "write down" ideas that he could not even articulate in the first place during the meeting with the UCE or any of the online conversations during the prior two months with the OCEs. Indeed, it was the agent who continuously pushed Daoud to even come up with ideas for some type of attack or activity. For instance, in the first in-person meeting on July 17, 2012, the UCE repeatedly directed Daoud to "write down" his ideas despite the fact that Daoud did not have any. (7.17.12 Tr., pp. 100, 101, 102, 106, 107, 109). This not only indicates that Daoud did *not* have any plans, but that the UCE instructed him to come up with ideas and then give them to him—presumably for evidentiary purposes because the wheels for a prosecution had already been put in motion. (*Id.*, p. 101 "No, no, no. Write it down on paper, and then you can give me your ideas"; *id.*, p. 106 "And, if you have any other ideas, just think about 'em, write down. Don't tell anybody else."). Still, Daoud honestly told the UCE, "If you need ideas, I'm, I, I, I think about ideas, I don't like have anything, like you know what I mean?" (7.17.12 Tr., p. 100).

Indeed, it should have been apparent from this first meeting with the UCE—if not from the two months of online communications with the OCEs—that Daoud had no plans. That is, unless one considers Daoud's proposal for "flying cars" to have been a remotely legitimate plan.

The full exchange is worth reading, but cannot be fully appreciated without hearing the audio, which reveals a level of idiocy in the conversation that would be comedic if it were not so tragic:

| | |
|---|---|
| UCE | So, whatever ideas you have, write 'em down. |
| DAOUD | Write 'em down. |
| UCE | Give 'em to me. |
| DAOUD | Yeah. |
| UCE | And, even during the month Ramadan, when you have ideas start writing 'em down in a note pad… |
| DAOUD | Yeah. |
| UCE | …you know? And, then when I come see you, just show me your ideas. We can talk about 'em. |
| DAOUD | *You know...there's such thing now, as flying car.* |
| UCE | A flying car? |
| DAOUD | Yeah... |
| DAOUD | ...They don't have a lot of 'em, but they have websites where you can buy it and they have uh...they have, they have two kinds. One has like, looks like a plane car, you know what I'm saying, it goes just like that. |
| UCE | Right. |
| DAOUD | *Ok, and my friend uh, my teacher he said he even saw one (laughing). I was like that's crazy as a mother cracker, I'm like no one talk about it.* |
| UCE | Right. |
| DAOUD | (UI) Flying car...and they're like mmm-hmm, mmm-hmm. I'm like why is nobody like... |
| UCE | Talking about it? |
| DAOUD | ...Helllooo. |
| UCE | (laughs). |
| DAOUD | It's like...but I guess it's not like that popular yet, right? |
| UCE | It's very expensive... |

| | |
|---|---|
| DAOUD | Yeah. |
| UCE | ...I'm sure, like there's probably one or two in the whole world. |
| DAOUD | Right. Well not one or two...more than that...but, there's two kinds. One, looks like a plane, like that. |
| UCE | Right. |
| DAOUD | And one, uh...I don't know if it's real. It looked real, but then I'm like... |
| UCE | It could be fake if it's the Internet. |
| DAOUD | ...Yeah, but I...it looked like, that looked like, like amazing, one, one has like, little like blue things that come out like that and it's like...it like air and (UI), like that and like that...you know, kinda like a video came where you put like... |
| UCE | Ooh. |
| DAOUD | ...Like, flying car (UI) okay. |
| UCE | Oh wow. |

(7.17.17, Tr, p. 102-104). Later during this absurd conversation, the UCE would so stoop so low as to tell Daoud that the flying car proposal was a "good idea" that could "inspire other brothers." (*Id*. at p. 6). Only someone as naïve, immature, and susceptible to influence as Daoud would say "Yeah" and agree with that assessment—or perhaps someone already suffering from a delusional disorder. And of course, the UCE concluded this conversation by again telling Daoud to "write down" any other ideas. (*Id*.). Significantly, the UCE also instructed Daoud, "Don't tell anybody else," (*id*.), which highlights how, in what could only be seen as an intentional tactic presumably at the direction of the FBI and prosecutors, the UCE deliberately and repeatedly tried to isolate Daoud from others who could intervene and provide real guidance. The UCE most disturbingly employed this tactic in late August 2012 when Daoud expressed doubts about going forward with the plot based on the advice of his religious leaders, and the UCE responded by

telling him not to listen to them because they are lost. This incident is discussed in more detail below.

### ii. On August 6, 2012, the FBI's UCE First Proposed a "car bomb" And Daoud Had to Ask if He Would Have to Stay Inside When it Detonated.

The first direct reference to a car bomb came, not surprisingly, from the UCE during an in-person meeting on August 6, 2012, not Daoud. This absurd snippet of the conversation is informative:

> UCE: No, no...if you could help with the materials I have to, I mean, because some of the materials I have to, you know, see exactly what materials I have and what materials I need. If you could help with getting some of the materials and then if we do for example, we could see if you want to help. If we do like a car bomb.
>
> DAOUD Uh, okay.
>
> UCE Car bomb, right?
>
> DAOUD But could you do that without like, staying inside it?
>
> UCE Yes, cause we would...

(8.6.12 Tr., p. 93). Daoud's ridiculous and utterly naïve response not only reveals his cluelessness, but it also shows that he could not have thought a car bomb could be created without blowing himself up. His surprise and confusion also shows that he had not proposed the car bomb before the UCE did himself. If he had done so, then we must presume that he would not have had to ask the ridiculous, and ultimately sad, point of clarification. It is also noteworthy that this meeting occurred over one month after Daoud had ongoing conversations

61

with the OCEs, during which he never once mentioned a plot to detonate a car bomb, and almost *three* months after his ongoing online conversations with the two OCEs.

### iii. Daoud Repeatedly told the OCEs and UCE that he could not do anything on his own.

But more significant to the issue of "positional predisposition," on August 23, 2012, the UCE asked Daoud on several occasions what Daoud would do if the UCE were not around. Daoud expressly told the UCE that he would likely just go overseas to try and join some amorphous "fight," as illustrated in this exchange when the UCE makes up the fact that his "sheikh" was concerned what Daoud would do if the UCE was caught:

| UCE | I know and he said brother, what if, for example, something happens to me, right. What if for example they stop me at the airport, or something happens, or and then you're by yourself. Right. He says what 28 can, what can the brother do by himself? Like what would you do... |
| --- | --- |
| DAOUD | ***I can't really do anything by myself. 'Cuz I don't have any like training or anything.*** |
| UCE | Right. |
| DAOUD | ***You know what I'm saying? Like the only thing I could do is like you know get ready, go overseas.*** |
| UCE | Right. |
| DAOUD | ***You know I mean like I don't know how to make a bomb. I, I've seen instructions.*** |
| UCE | How else, how else would you help Jihad? Our brothers with Jihad. Like if I, if I wasn't here, how else would you help the brothers in Jihad? |
| DAOUD | I'd just prepare to go overseas. See what I mean like, 'cuz that disappointing 'cuz I was thinking before you came, you |

62

know I wanna do something here, I wanna go overseas. But I had no idea how to do anything here. So I was disappointed. I'm like okay, maybe I'll just go overseas. You know what I mean? Uh, so you can, you actually came at a convenience. 'Cuz I wanna do something here and there before.

UCE   Right.

DAOUD  **But I had like no, like no idea how.** I'm like how can you do that (mumbles) So that's, that, that's the reason why. Right. So I mean otherwise if you weren't here I'd probably just be planning to go overseas.

Daoud could not be more clear in this exchange that he did not have the ability, skill, training or wherewithal to commit the car bombing plot proposed and enabled by the UCE. Moments later during the same conversation, the UCE again pressed Daoud on what he would do without the UCE. And again Daoud responded that he would probably go overseas, and not commit a domestic attack:

UCE   So you, so, so your goal, your dream, if like for example, if like my sheikh asked me what if you and brother never met. What if you, what if, you know, what if I was in Afghanistan, how can your brother help with the Jihad? How can he help with the cause of Jihad?

DAOUD  **I would just, no, I just told you I would tell, I would help him, try to get them overseas.** Right. And we, we would fight overseas, that's it. You know what I mean? And we're already coming up with plans how to get there and how to fight there, and so on so forth. You know what I mean? Um, like for me it was like going to Medina, okay, Medina (laughs) You know and obviously you don't get someone over there. Actually um, it's kinda like convenience and uh, subanallah like at the right time you know I met brothers from uh, you know, like overseas and like telling me about things like that. Actually, actually the way I knew them is 'cuz I made a friend and my friend had leaks so I'm like it's

'cuz he's in jail right now so I don't what exactly he's in jail for, but uh, make dua that he can tell us.

UCE          Inshallah.

DAOUD        'Cuz he's, he's, he's a good brother mashallah. He's more good with like the media and the videos and things like that.

UCE          Okay.

DAOUD        You know he, he didn't fight yet. He has a love for it, but he's not...he's at his mother's takin' care of his mom.

UCE          He's in jail though right now?

DAOUD        Yeah, man, 'cuz he's like, you know what I mean? Because of (UI) putting like uh, putting things like on line, things like that. I don't know exactly why he's in jail, but you know he's kinda like me, but worse. (laughs)....

Significantly, the "brother" that Daoud mentioned in this exchange was none other than Artur Letowski, aka Ahmed Yassin. Letowski was the Polish national who sent Daoud copies of *Inspire* in early May 2012. Letowski was also arrested by Polish authorities for terrorism-related offenses (as alluded to in the above-exchange). However, those charges were eventually dropped or reduced significantly due to the fact that Letowski was found to be mentally ill. It is, of course, not so ironic that the only "brothers" that took Daoud seriously online were government agents and this Polish national whose mental illness precluded his conviction. During this same meeting, Daoud confirmed that the best he had were "fantasies," which the UCE ridiculously applauded:

DEFENDANT:      'Cuz I wanna do things overseas and a good desire that I had, but I don't have the capacity or anything to do it. So I don't have anything up here. I don't

64

have anything like…I'm not like a, I'm not like a genius. I don't know how to make a bomb. I don't know how to do like basic things, you know. ***All I have is ideas and crazy fantasies. That's all I have.***

UCE:    ***Ideas and your fantasies are not crazy, brother. Your fantasies, your, your ideas are good.***

(8.23.12 Tr., p. 118) (emphasis added). Regardless, these exchanges—made months *after* Daoud's initial contact with government agents—aptly describe how the evidence strongly suggests that Daoud did not have the "positional" predisposition to commit the charged offenses.

### iv. Daoud's Reluctance to Commit the Charged Offense was Arguably Overcome to Some Extent by the FBI's Persuasion and Manipulation of Daoud's Misguided and Simplistic Misunderstanding of his Religion and its Obligations.

The next issues of the predisposition analysis is whether Daoud was reluctant to commit the offense but was overcome by government persuasion or pressure, and also the nature of that government's persuasion. The Seventh Circuit has noted that, on balance, a defendant's reluctance is one of the most important factors to the predisposition analysis. Daoud's writings and his communications with the government agents demonstrate that he expressed doubt about a domestic attack both before and after the UCE specifically proposed the use of a car bomb. For instance, in a June 2, 2012 post on a forum called Din Haqq, Daoud voiced his doubts about committing a domestic attack:

I read in an Inspire magazine of it encouraging attacks in America. Very briefly they suggested attacking in Markets, crowded places, planes, trains, etc.

They also talked about burning houses, forests, and things like 9/11. I am convinced that these things are halal. Because they had a Quran verse about burning hosues and talked about it, they had a story of the prophet (may Allah's peace and blessings be upon him) about burning

65

trees, and the things like 9/11 (as in buildings that are helping the Kuffaar but have a mix of women and men and children) because of the example of the sahaba going to peoples houses at night.

Still I am not convinced (completely) that attacking even people in America, in Markets (or crowded), Planes, and Trains.

To convince me this is halal the sahaba going to peoples' houses (like mentioned by Awlaki) is not enough. I mean there were markets at the time of the prophet 9May Allah's peace and blessings be upon him), was there a time where a sahaba killed pagans in a market? And Planes and trains, is there a hadith or Quran verse that says kill the residents of the kuffaar who are in war with you while they are travelling?

*I am not trying to insult anyone I really just want to understand the Deen. And if these things are halal then what's the difference between killing them and killing someone(like a kaafir) who is haraam to kill?*

Also a brother mentioned to me that there is hadith I think Bukhari where it says we shouldn't kill someone who is unarmed?

(Crim. Compl. ¶ 16). This post, made after the OCEs contacted Daoud online, strongly indicates that he was struggling with and undecided about a domestic attack. It is also notable how Daoud phrases this issue as one of religion—"I really just want to understand the Deen." The post demonstrates Daoud's deep confusion and desperate request for guidance. These concerns remained even after Daoud met with the UCE and after the UCE proposed the use of a car bomb on August 6, 2012.

As noted above, in one of the most critical moments in the case, during Ramadan 2012, several people, including two imams, confronted Daoud and several others in the mosque after they were overheard talking about jihad. One imam "yelled" at Daoud and his friends and essentially told them to stop talking about jihad. The other imam, named Amir Saeed, took more time to speak with Daoud. In a matter of minutes, this imam was able to convince Daoud to seriously question the plot that the UCE had discussed with him and that the OCEs encouraged him to pursue during nearly three months of online conversations.

Mr. Saeed himself recalls this brief encounter with Daoud at the mosque. As set forth on his video recorded character statement, which will be submitted to the Court, at the time in 2012 Mr. Saeed was visiting the mosque during Ramadan with his family. He did not know Daoud before that night. Mr. Saeed recalls how he spoke with Daoud and his friend (who happened to be Abdella Tounisi) about jihad and fighting. Mr. Saeed specifically remembers how something appeared to be off with Daoud, but that Daoud also listened and engaged with Mr. Saeed, which was unlike someone who had their mind made up and was not open to alternative viewpoints. Mr. Saeed was with his family and could not speak with Daoud for longer, but felt that had he more time, then he would have been able to further reach Daoud.

An individual named Ali Fiaz recounted this incident in an interview with the FBI on October 3, 2012. (302_002-000330). Fiaz's nearly contemporaneous statements corroborate Mr. Saeed's During this interview, Fiaz recalled how Mr. Saeed told Daoud that he could be more active with jihad by helping people who were struggling in different areas of their lives. Mr. Saeed also told Daoud that there will not be jihad in the sense of war. Fiaz remembered how Mr. Saeed used classic texts to make his points, which surprised both Daoud and his friend Tounisi.

Tounisi himself recalled this August 2012 incident during an interview with the FBI on February 25, 2016. As reflected in that interview report, Tounisi referred to an encounter with a scholar, who is Amir Saeed:

> Despite the scholar's impatience, Tounisi was able to convince him to wait for Daoud to emerge from the restroom. The scholar then met with Tounisi and Daoud in private in the basement of IFVP; Jaafer was not present. Tounisi told the scholar about Daoud's views and justifications for conducting terrorist attacks in the United States. Tounisi did not tell the scholar about Tounisi's desire to travel overseas. In response to Daoud's views, the scholar responded that, as a United States citizen, Daoud had a contract with America and its citizens not to harm them. He

further told Daoud and Tounisi they should be tolerant and have mercy. The scholar then departed IFVP.

> ***After this meeting with the scholar, Daoud looked confused. Tounisi believed Daoud had doubts.*** Tounisi then told Daoud he should think about his family, because if he followed through with an attack, Daoud might go to prison. ***Daoud promised Tounisi he would not do an attack, but would instead just go to school at the University of Medina.***

(302_012-000008) (emphasis added).

In addition to Tounisi's recollection of these events, we know that this brief encounter with Amir Saeed had a serious impact on Daoud because, shortly afterwards, Daoud expressed his doubts to one of the OCEs, and requested further guidance. In fact, on August 16, 2012, Daoud wrote to Iyad Hasan (OCE1) in a private message on the Din Haqq forum:

> I hope Allah lessens [OCE1's] fears, and that you have a lot of fun killing the enemies of Allah and saving the Muslims from them. I talk a lot so people overheard me you know what im saying? Homeland security is like a government service that makes sure the place is secure and it can basically send me to prison or something Allah alim. I'll pray for your safety insha'Allah. Yes I have someone that can help me do work here but now I don't think I can don't think I can for now because I think now im on the homeland list or at least now in people's watch more than before so maybe I should stay low. May Allah except your siam and your prayers and your jihad too…..***Btw, one brother here even got a shaykh to change m[sic] views. So do you know any shayookh with you that can answer my questions? I would like to talk to shaykh that isn't censored by the U.S. government or any government. Jazak Allahu khair.***

(DCa_001-000309) (emphasis added). Certainly, the FBI was informed of Daoud's comment that his views had been changed by his own religious leader, as well as his request for further religious guidance. Given that this message was made well into the investigation, we suspect that the prosecutors were also aware that Daoud said that his views were changed. However, Daoud's comment and his request for information received no response from the FBI's OCE.

On August 19, 2012—three days after he asked the OCE1 for religious guidance, only to be ignored—Daoud asked the UCE for guidance and mentioned how the imam at his mosque "yelled at" him. These communications occurred over Skype, which were saved by the government. Daoud was explicit in expressing his doubts and his request for additional guidance, specifically from a religious authority after his own imam convinced him that the UCE's plot was wrong.

Daoud asked the UCE: "do any sheiks or anyone who studied in madinah or azhar go for the Cause?" "like do you know anyone who studied for maybe 11 years or more?" The UCE responded, "yes I know my sheikh knows them." Daoud then replied, "*cuz I need someone to tell me why the americans are ok to donate to*. The sheikh gave some arguments. So I sat I thought about it and I came up with good comebacks. But to hear from a sheikh similar to him or better wud make me feel better." The UCE then replied, "I would not argue with the sheikh or talk about his with him. He may get suspicious." Daoud later asks the UCE: "but can you get a sheikh who studied just as much or longer dan the sheikh who talked to us telling us the real fatwah? Or me the real fatwah." The UCE replies, "our sheik Usam bin Laden gave his fatwah and he knows more about jihad than any sheikh in america. my sheikh studied more than 11 years and he has seen what jihad is and how the kufars fight." During this conversation, the UCE shockingly told Daoud not to talk to his imams or anyone else about jihad.

On August 23, 2012, four days after this Skype exchange, Daoud and the UCE met in person. During this conversation, the UCE carefully conveyed the message from his fake sheikh in order to allay Daoud's reluctance and concerns:

> UCE:    You know what happened with uh, with the sheikh at the masjid, you know, when they heard you talking about Jihad.

DAOUD      Yeah.

UCE        And they got just a little upset. They're telling you no you can't do Jihad and all this stuff they told you.

DAOUD      No.

UCE        I don't know, did your parents talk to you about that too? Did they...

DAOUD      Uh, you know my parents kinda like half know my views so it wasn't like...

UCE        Okay.

DAOUD      But my dad just called. He's like don't talk about bin Laden. I was like, I said his name like one, two times, it had nothing to do with it. It just has to do with (UI). Obviously his name kinda like in the context, but it had nothing to do with it.

UCE        I know, the, the only problem is when, because people know now or the sheikh knows you're talking about it, and it, it kind of makes it like a security issue, security problem for me. Because my sheikh now he's like okay. 'Cuz I explained to him, sheikh this is what happened, you know. Uh, our brother said something in the masjid and they were talking to him about no, you can't do Jihad. No you can't...

DAOUD      Yeah, they said don't talk about it.

UCE        Yeah.

DAOUD      Don't talk about goin' somewhere else.

UCE        And your sheikh said that no Jihad is not, is not justifiable in Islam, that you can't do, and you can't kill people.

DAOUD      Why do they say don't talk about it, you know...

70

UCE            Yeah.

DAOUD       ...put this whole foundation in risk.

UCE            I know. When I asked my sheikh, I said you asked me, you said is there, is there any fatwahs (ph) or anything that you know that my sheikh uses to support Jihad?

DAOUD       ***Well not just Jihad. I mean uh, you know, umm, killing Americans.***

UCE            Right, killing Americans, fighting in America and even though I talked to him about this before and I've talked to him many times, many years. And the first thing he said to me, he said, uh, brother we...'cuz I told him that one of your sahaba's is young. You know that he can't even drive. He's young. And...

DAOUD       He's sixteen.

UCE            Sixteen. And even you're, to me you're kind of, you know I mean you're not sixteen, you're like you know a little older obviously. And he says well are you, are you putting any pressure on him to do this? He asked me this and I said no, no sheikh, I don't, you know, I don't want, I'm not putting any pressure on him. I don't think I'm putting pressure on, on my brother to help me with this or to, to uh, to do this. And he, he wants to make sure that he, the sheikh is not pressuring you, that I'm not pressuring you. 'Cuz you know in Islam you can't force anybody.

DAOUD       Right.

UCE            This has to be in your heart, especially Jihad. You know it's in your heart. It's something you believe in. It's something you either believe in it or you don't.

DAOUD       Right.

| | |
|---|---|
| UCE | You can't like convince somebody. You know this 'cuz you talk to people all the time at the masjid. |
| DAOUD | Yeah. |
| UCE | They're either brainwashed and they say no, no, no, no, and you can never change their mind. |
| DAOUD | That's true. Some people like, you give 'em a dose everyday they won't (UI). |
| UCE | Right. And my sheikh wanted to make, wanted to make sure that you were not pressured by anybody in the masjid. |
| DAOUD | Tell him that... |
| UCE | That I'm not pressuring you to do this, or my sheikh says well he doesn't wanna give you a fatwah or uh, verses from the Quran, or from the hadith. |
| DAOUD | I'm convinced... |
| UCE | Describing Jihad because he… |
| DAOUD | But I want… |
| UCE | …feels like he might put pressure on you to do it then. He says this is somethin' that has to… |
| DAOUD | Okay. |
| UCE | …come from your heart. |
| DAOUD | Okay. It does come from my heart. 'Cuz I, you know, he said a bunch a things, like... |
| UCE | Yes. |
| DAOUD | The sheikh is trying to brain us basically, right. But I, I |

72

actually sat and thought about it, then refuted it, but I couldn't, I couldn't tell him any of my refutations. I didn't wanna tell him because you know he might come over with some other stupid argument and I'd have to think about that. I don't wanna do that. You know what I'm sayin'?

UCE         Okay.

DAOUD     So I mean I'm, I'm completely fine with this. You tell him that the first time we wanted to do something, you know how upset I was.

UCE         Right.

DAOUD     You tell him things like that?

UCE         I did tell him. I said he was upset. And 11 he says he understands that you're upset, but since you know your sheikh found about it at the Majid. Other people found about it, found about it at the Majid. He wants to make sure there's no security problems for me. Like he wants to make sure like you know nobody, nobody sees us together. That's why I didn't want to meet at the Majid 'cuz people are thinking oh, you know, brothers always talk about Jihad, all of a sudden here's his friend, they might think maybe we're working together.

DAOUD     Yeah.

UCE         And then that could get me in trouble, right?

DAOUD     Yeah.

UCE         Even if we don't do anything they'd be like oh, who was that brother, who was that brother? And my sheikh is gonna get very upset. He's gonna get mad at me for, you know...

DAOUD     Yeah.

73

| | |
|---|---|
| UCE | ...not being smart. So that's why since that happened he wants to make sure this is something you believe in, number one, that you're not doing it for somebody else. |
| DAOUD | No. |
| UCE | That I'm not pressuring you. |
| DAOUD | Listen, who can, who else can I do it for. If everyone else is brainwashed, just me and some other brothers, I'm the top of the brainwashing crew. You know what I mean? |
| UCE | I know. I know. And I explained that to him and I said I know. So he wants to make sure you're not being pressured by anybody. |
| DAOUD | So how's he gonna make sure about that? |
| UCE | That…He says, okay, brother. |
| DAOUD | I'm thinking of the place. |
| UCE | I know… |
| DAOUD | You know what I mean? |

Critical in this exchange is Daoud's clarification that he questions not the concept of jihad, but rather the specific issue of "killing Americans." In a very deliberate manner, the UCE circumvents that question directly, and instead says that his sheikh told him that jihad "has to be in your heart" and is "something you either believe in it or you don't." Jihad is, of course, a central tenant of Islam. By forcing Daoud to respond whether he believed in jihad, the UCE was essentially asking him to confirm whether or not he was a Muslim.

These excerpts also demonstrate what can arguably be described as the outrageous nature of the government's persuasion, and particularly how the government brazenly exploited

Daoud's naïve understanding of religion and obviously mistaken interpretation of "jihad" and religious obligations—*particularly after Daoud said that his views had been changed and asked not one, but two government agents for religious guidance*. Rather than encourage or even allow Daoud to seek alternative views from his own religious leaders—including the imam who convinced Daoud that it was against Islam to kill random people—the UCE and the government instructed Daoud *not to talk* to people who might counsel him in a direction away from their headline-grabbing bomb plot, including his own imam and father. Isolating Daoud from others was, of course, a central and repeated tactic in the investigation.

> **v.** **On September 14, 2012, The FBI UCE Told Daoud That it Was Permissible Under Islam to Kill Women After Daoud Questioned Him About That View, Which Was Contrary to Daoud's Understanding of Islam.**

Daoud also questioned the validity of killing Americans mere moments before he pressed the button with the UCE. Specifically, on September 14, 2012, Daoud and the UCE were sitting in downtown Chicago and the following exchange occurred:

| | |
|---|---|
| DAOUD: | Freakin' whores. Every time I get...I think I'm gonna get sick every time I see a freakin' prostitute. They should die, man. I swear to God, man. Oh yeah, but was asking, like um, are women allowed to be shot here like in Palestine? |
| UCE | Are women allowed to be shot where? |
| DAOUD | Like you know, like women directly ought to be killed here? |
| UCE | In America? |
| DAOUD | Yeah. |
| UCE | ***Yes.*** |
| DAOUD | ***They are?*** |

UCE          **Yes.** …

(TR., 9.14.12, pp. 39-40).   In this disturbing exchange, Daoud expresses his reluctance to go forward with the plot moments before its predetermined conclusion.  He asks the UCE if it were permissible to do so under Islam.  Shockingly, the UCE tells him "yes."  Quite significant to the question of predisposition, prior to the government contacting Daoud in May 2012, he expressly wrote, "It is against Islam to kill women and children."  Indeed, in a comment Daoud posted to a YouTube video on April 19, 2011, he stated as follows (with emphasis added):

> **It is against Islam to kill women and children.**  Islam orders the people in power to be kind to their subjects be them believers or not.  Depending on the Caliph though and the time will determine how much poor people there are.  But ill tell you there were leads who when they ruled (because they followed Islam, knew that they were doing, and were pious, patient) there was barely or sometimes not even one poor person left to give money to.  One Such leaders are like Umar bin Abdul Aziz.

One year later, on April 23, 2012—just weeks before OCE2 emailed him—Daoud expressed similar sentiments in the following private YouTube message (with emphasis added):

> yeah I read the bible.  The bible went through many fabrications, changes, and alterations.  **So I know based from Islam you cannot kill women or children and I think it's always been that way**, livestock was probably killed because for them they weren't allowed to have war spoils, and in certain situations in war you could kill the men.  But im not trying to justify the bible.  Lol funny video!

Thus, the UCE's blunt instruction to Daoud on September 14, 2012 that it was acceptable to kill women was directly contrary to Daoud's personal religious beliefs prior to the government contacting him in May 2012.  Thus, while many of Daoud's beliefs were stupid, misinformed, and even extreme, at this point after speaking with the FBI's agents for months, the evidence is quite clear that he still harbored doubts about the violence that the government proposed.  But, it was the FBI who played upon Daoud's stupidity and naiveté.  The FBI elevated Daoud to a

religious status he never had before, but could only fantasize about, when it told him that he was wrong to be reluctant and express those concerns.

> **vi.    Even After Being Contacted by the Government in May 2012, Daoud Continued to Apply to Schools to Study his Religion, and Would Have Gone Had he Not Been Arrested.**

With regard to Daoud's conduct after he encountered law enforcement, the excerpts cited above indicate that he continued to question the central premise of the UCE's plot and the §2332a(a)(2)(D) charge, which involved the killing of Americans. While engaged with the undercover, Daoud notably continued to plan to try and go to school, including overseas—an odd choice for a committed domestic terrorist. He actively submitted applications to the University of Medinah, which the government knew in the very early stages of the investigation. Indeed, an FBI report dated May 20, 2012, includes the following note: "Chicago believes that DAOUD is currently in the process of enrolling in the Islamic University of Madinah and intends to travel to Saudi Arabia. Most likely, DAOUD is hoping to be enrolled this summer." (302_002_000004). During online conversations, Daoud told OCE2 that he planned to study at Madinah University in Saudi Arabia, and that he had "98%" of his paperwork completed.

> **d.    The Government Arguably Induced Daoud to Commit the Charged Crimes By Isolating Him, Persuading Him Through Pleas to His Religion, By Inflating His Naïve Perception of Himself as a Budding Islamic Scholar, and Providing All the Necessary Equipment that Daoud Would Not Have Been Able to Obtain if Left to His Own Devices.**

As discussed above, inducement exists when the government solicits the crime and "creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts." *Mayfield*, 771 F.3d at 434-35. Because it can readily be said that Daoud lacked the predisposition to commit the charged offenses, the inducement offered by the government need not be "extraordinary." The discussions above demonstrate how

the government, through the FBI's UCE and OCEs, induced the crime. Again, Daoud had no ability to construct a car bomb absent the assistance and direction of the government agents, which he admitted. On August 23, 2012, Daoud specifically told the UCE that he would just go overseas if he had never met the UCE. In other words, it is beyond the pale to think that Daoud was able to carry out a domestic attack on his own. By providing Daoud with the means and opportunity to do so—in the form of a car loaded with a fake 1,000-pound bomb, the government created an opportunity that went well beyond a mere "ordinary" opportunity.

> **i. The FBI Arguably Induced Daoud By Creating a Fake Islamic Imam Scholar, Which Impacted Daoud's Misunderstanding of His Religious Obligations.**

Moreover, the FBI's tactics in this case most certainly amount to the type of conduct that qualifies as inducement, such as repeated attempts at persuasion, fraudulent misrepresentations, coercive tactics, promises of reward beyond that inherent in the customary execution of the crime, pleas based on need, sympathy, friendship, and—most reprehensibly—feigned shared religious persuasion. The clearest example of this disturbing conduct is the FBI's invention of the fake "sheikh" to answer Daoud's legitimate religious concerns about the plot. The pleas to evoke Daoud's religious beliefs through fraudulent misrepresentations most certainly qualify as government inducement and, frankly, are strategies that one would not expect an agency as respected as the FBI, or the U.S. Attorney's Office for that matter, would be willing to stoop. Moreover, *the very premise of the operation was based on the core lie that the UCE somehow needed Daoud's help to carry out the plot.* Daoud added very little, if anything, to the UCE's plot and was in essence vestigial, except for his unknowingly being made the main actor in a play produced by the FBI and by the U.S. Attorney's Office. If, after viewing all the evidence,

the Court asks whether Daoud would, left to his own devices, ever construct a car bomb, the answer is immediately apparent: absolutely not.

        ii.      **The FBI Arguably Induced Daoud Through Repeated Attempts at Communication Through Multiple Sources and Elevated Daoud to the Level of an Amir, or Commander-in-Chief.**

Inducement, which again is discussed only for the purposes of §3553(a) factors, is also arguably shown in the government's repeated attempts at persuasion through the use of the two OCEs and the UCE, who were all used in a tactical manner. These individuals often isolated Daoud from others by commenting that other people simply do not understand Islam, or by specifically telling Daoud to not talk to other people, including by ignoring his own religious leaders. OCE2, Salah al-Hani portrayed himself to be a 17-year old seeking guidance and in very short order "nominated [Daoud] as [his] amir."[34] Iyad Hassan, OCE1, pretended to be a fighter located overseas who was struggling with his own family's rules. And the UCE claimed to be a fighter experienced in combat in Afghanistan, when he was not a travelling import/export salesperson. Daoud communicated with the two OCEs online for nearly two months before he met the UCE in person. It is apparent from the early communications that the OCEs were scripted to engage Daoud actively in online chatter. On many occasions, Daoud would forget who the OCEs were, or express confusion about what they were asking. The OCEs persisted, nevertheless.

---

[34] "Amir" (or "Emir") is an Arabic term meaning "lord" or "commander-in-chief." It was one of the titles given to the Prophet Muhammad. *See*, Emir, https://en.wikipedia.org/wiki/Emir. The psychological effect of this tactic on an already foolishly immature teenager is struggling with his religious beliefs should not be understated.

### iii. The FBI Arguably Induced Daoud By Providing Him With the Fake 1000-Pound Bomb as the Means to Commit the Charged Crime When He Had No Ability to Do So.

The FBI's creation of this doomsday plot should not be used to gauge the seriousness of the offense. The FBI could have accomplished the same purpose by convincing Daoud to send money overseas to al Qaeda, or to engage in a dramatically less serious and headline-grabbing offense. The FBI also provided the car, the fake bomb, and the means to commit the charged offenses. This was hardly an ordinary opportunity. Daoud, of course, had absolutely no ability to develop this weapon of mass destruction but for the FBI's intervention and direction. Daoud did not acquire the Jeep. He did not build the bomb. Nor did the FBI ever expect him to do either task. It did not think for a moment that Daoud could have ever built a 1000-pound bomb on his own. On September 14, 2012, the UCE even drove Daoud downtown the passenger seat of his car. They then found the fake-bomb laden Jeep that the FBI had already parked nearby the bar, so that Daoud would basically only have to drive it around the corner. The UCE directed Daoud where to walk and what to do on September 14, as illustrated in the following exchange from that night, in which Daoud continued to follow the UCE's instruction:

> DAOUD      Yeah. So we're gonna walk together.
>
> UCE      We're gonna, yeah, we're gonna go back one more time and I will...
>
> DAOUD      So we're gonna walk together to the Jeep?
>
> UCE      Yes. We're gonna, I'm gonna park the car next to the Jeep, we're gonna go inside the Jeep together...
>
> DAOUD      Okay. So where is this car going?
>
> UCE      Next I'm gonna park this...
>
> DAOUD      I'm a little slow.

UCE            I'm gonna park this car next to the Jeep.

DAOUD          And we're going to the Jeep now?

UCE            Yeah, we're going to the Jeep. I just wanted to show you
               the, the drive for a second.

DAOUD          Okay. So I'll walk with you?

UCE            Yes.

DAOUD          But I'm gonna walk, either you behind me or me behind
               you. Because I want us next to each other.

UCE            Okay.

DAOUD          So if it's...that could be a coincidence.  I walk behind
               people a lot.

UCE            Right.

DAOUD          You know. And maybe not like directly like this. Maybe
               like you're here, I'm here.

UCE            Right. Right.

DAOUD          You know.

UCE            Just a little bit off.

DAOUD          You know, I'm better at uh, following than leading.

UCE            Sure.

DAOUD          'Cuz I don't, I don't know where I'm going. So it's better
               you lead. But I'll, you'll be here. So you already know
               where you're going. Probably check like every thirty
               seconds that I'm behind you.

UCE            Sure, absolutely, I will check, brother.

DAOUD          Okay. 'Cuz I'm, I'm, I have a...

UCE            You'll be fine, brother.

DAOUD          Yeah. Insha Allah. You, you here, me here. And a whole

81

<table>
<tr><td></td><td>bunch of, probably a bunch of people here.</td></tr>
<tr><td>UCE</td><td>Right.</td></tr>
<tr><td>DAOUD</td><td>Then you only go to the Jeep, then you turn everything on, then you show me which is the direction box. (UI). (laughs) So, then you show me where to drive. Then I'll drive there and I'll park it right there. Insha Allah. Alhamduillah. I'm feeling more comfortable.</td></tr>
<tr><td>UCE</td><td>Insha Allah, Insha Allah we will be successful, brother.</td></tr>
</table>

(9.14.12 Tr., pp. 41-43). These instructions would continue until the final moment when Daoud pushed the button. If these directions seemed pre-planned, it is because they were. Indeed, and fully consistent with the sting operation, an "Operations Order Report" dated September 7, 2012—*one week* before the actual arrest—provides a detailed script for the "mission," which was for the FBI to "execute a probable cause arrest of ADEL DAOUD for violation of Title 18, United States Code, Section(s) 2332a(2)(D), 2339A, and 844(I), in the vicinity of the intersection of W. Van Buren Street, and S. Franklin Street, Chicago, Illinois." (302_002-000099).[35] The "Operations Order" then sets forth in very great detail the "Rehearsal," "Pre-Meeting," and "Operation" Phases of the sting. The "Operation" phase literally scripts out turn-by-turn instructions and what the UCE was supposed to instruct Daoud to do, which the UCE carried out according to plan. Interestingly, in the Officer Safety section of this "Operations Order" report, the FBI notes, "Although DAOUD's online activity is of a violent nature, he does not have a documented violent history. There is no indication that DAOUD will possess any weapons during the undercover meeting." (302_002-000108). The UCE and Daoud followed the script, although Daoud did not know he was playing a part. At the end, Daoud pushed the button. And

---

[35] A copy of this report will be submitted under seal as Exhibit F.

when he asked if he wanted to, he told the UCE, "I wanna press the button with you." (9.14.12, Tr., p. 47).

### 2. Case No. 13 CR 703

On September 14, 2012, the FBI sting operation went exactly according to plan when Daoud sprung the trap and created the staged disaster that the FBI claimed to have averted.[36] On October 26, 2012, after having already been placed with at least six different cellmates, Daoud was put into a cell with the jailhouse informant, Paschal, who was not only a violent criminal detained pretrial while charged with 34 violent felonies in the state court, a high-ranking Gangster Disciple, and all-around physically imposing and threatening figure (*see* Exhibit B, Paschal booking photo and Cook County Department of Corrections inmate information), but he was also a seasoned cooperator who had an ongoing relationship with Drake Carpenter, the special investigator from the Cook County Sheriff's Office.[37]

### a. Paschal, the Seasoned Jailhouse Snitch, Calls His Handler the Cook County Sheriff's Office Soon After Being Housed With Daoud at the Kankakee Jail and Immediately Plots to Get Out of Jail.

On November 1, 2012, within five days of being placed in the same cell as Daoud, Paschal called his handler and told him that his cellmate wanted him to kill the FBI agent. He also instructed his handler to contact prosecutors—immediately revealing his motivation and incentive to use Daoud to gain an advantage in his pending criminal cases. Indeed, on the

---

[36] That night was the first night he spent out of his Hillside house aside from family travel and sleepovers at his mosque. Barely able to socialize with his peers and bullied at high school, Daoud was completely adrift in jail, where he was surrounded by hardened criminals who saw him as a target because of his obvious immaturity and the nature of the terrorism charges, which made him a pariah and earned him the nickname of "Taliban."

[37] The prosecutors informed defense counsel that the FBI had represented to them that the recorded phone calls with Paschal only contained personal phone calls with his wife, when that was clearly incorrect. It is unbelievable how anyone, much less trained law enforcement, could review those recorded calls and make such a representation.

second phone call, Paschal's handler said he was going to contact the U.S. Attorney or State's Attorney, and Paschal responded, "I don't give a fuck, I just want to go home."  And on a November 17, 2012 phone call—which occurred after Paschal met with an AUSA and federal agents, but at least six days before he and Daoud were put in a cell with an actual surreptitious recording device—Paschal told his handler that he "got [Daoud] to say what I needed him to say":

| Paschal: | Yeah.  I had to do some maneuvering though, I maneuvered like a motherfucker, man. |
| Carpenter: | Yeah, well I figured that.  I didn't think it would be easy, but like I told you yesterday, I don't really think he really understands the whole game, but when you broke it down, he's going to be all right. |
| Paschal: | Yeah, I broke it down, man. I had to work my [unintelligible] but I got him to say what I needed him to say. |
| Carpenter: | Mmh Mmh. |
| Paschal: | Yeah. |
| Carpenter: | That's what's up. |
| Paschal: | Yeah, yeah. |
| Carpenter: | All, right.  [unintelligible] |

Why Paschal would have Daoud rehearse things that Daoud originally said in the first place a week before he would try to get Daoud to say those things on tape is a question that the defense cannot answer.  Just like it cannot fathom why Paschal was not polygraphed on the crucial question of who first brought up the topic before there were tape recordings.

Worse yet, these shady recorded conversations were not provided to the defense until months after Daoud entered his *Alford* plea.  The prosecutors also held on to Paschal's January 17, 2013, grand jury testimony for six years before producing it, again after Daoud entered his *Alford* plea.  The prosecutors also declined to inform defense counsel until shortly before the

84

scheduled November 2018 trial date that the FBI had in fact paid Paschal $15,000.00 that he used to pay his bond, and that was only after defense counsel provided documentary evidence suggesting that to be the fact.[38]   Counsel submit that these circumstances—Paschal's clear motivation to use Daoud to gain advantage in his pending criminal case, and the fact that the FBI paid him $15,000.00 that he used to bond out—are essential to understanding the nature and circumstances of the solicitation case.   More to the point, these facts, as well as others discussed below, are integral to considering the question of whether this additional case was an effort to make sure Daoud did not challenge the government's conduct in the first case or whether it can truly be said to reflect Daoud's inherent dangerousness, as opposed to being more evidence of his immaturity, mental instability, vulnerability, and susceptibility to influence and entrapment and coercion.

---

[38] Specifically, defense counsel obtained from the Markham courthouse a post-trial motion that Paschal filed in his Cook County criminal case, in which he challenged his conviction because, among other things:

> The trial court also erred in admitting evidence of the relationship between the law enforcement agencies and the FBI following the home invasion.  If permitted, Defendant would have testified that the continued work for the Federal Bureau of Investigation after the home invasion on a number of cases including a high profile case involving a terrorist.  Defendant would have further testified that the money he used to post his bond – some $15,000 – was given to him by the FBI after his relationship with the FBI was allegedly terminated following the home invasion.

*People v. Paschal*, Case No. 10CR19744 (Cook County), Defendant's Amended Motion to Vacate Conviction or in the Alternative for a New Trial (Oct. 5, 2016).   Previously tendered discovery reports noted that Paschal "requested assistance with [his] Illinois state criminal charges and requested assistance being released from incarceration."   Several reports state that Paschal asked agents if they could secure his release before Christmas, which at the time was just a month away, and the FBI agents simply said they could not make any assurances about helping Paschal.  Again, the prosecutors never disclosed that the FBI agents actually helped Paschal and gave him actually what he wanted--$15,000 for bond money—until undersigned counsel located Paschal's court file from the Markham courthouse.

**b. Informatively, Daoud Never Mentioned a Single Word About Wanting to Kill the UCE or Anyone Else to Any of Six Cellmates Prior to Paschal's Arrival.**

Indeed, as to the question of who actually came up with the plot, it is significant that Daoud did not propose this plot to kill the FBI agent to any of six prior cellmates that he had prior to Paschal. The FBI interviewed some of these cellmates and other inmates who had contact with Daoud at the Kankakee Jail. Unsurprisingly, none of those interviewed said that Daoud talked about his case, discussed his hostility towards America, or much less expressed any desire to kill the FBI agent and offering to pay money to accomplish that. *See, e.g.*, FD-302, 1.31.13, 302_003-000029 ("WILLIAMS spoke to DAOUD about Islam. Daoud never spoke about hating America or terrorism or any other negativity."); FD-302, 1.31.13, 302_003-000031 ("MEDINA had spoken to DAOUD. DAOUD did not tell MEDINA why DAOUD was incarcerated. … MEDINA stated that DAOUD kept to himself."); FD-302, 1.31.13, 302_003-000035 ("BATTISTE stated that DAOUD stayed in his cell reading books and was polite."). It was not until he was put in the same cell as this seasoned gang-banger cooperator that he supposedly readily confessed not only details of the fake bombing case, but also his desire to kill the FBI agent.

**c. The Nonsensical Agreement to Pay Paschal for the "Hit" Shows that the Plot May More Fairly Be Seen as Paschal's Plot to Have the FBI Pay His Bond.**

There are also fundamental questions as to the basic premise of the preposterous plot in the first instance. For example, Paschal first demanded $20,000.00 from Daoud to carry out the killing. Daoud, whom the agents and prosecutors knew to be a recent high school graduate who

never worked in his life, immediately said that he did not have that type of money.[39]   Setting

aside that major detail, Paschal would later tell the FBI that Daoud said his family had a house in

Egypt that he could go hide at after the FBI agent was killed.   Paschal would also propose that

someone on the outside would pay his bond and then Daoud would owe that other unnamed

person—notwithstanding the fact that Daoud still had no money and nothing to offer Paschal in

return for his murder-for-hire services.   On November 28, 2012, the jailhouse informant told

Defendant that he did not need to pay any money, but instead just needed to make a phone call:

| | |
|---|---|
| CHS: | Look, I have come up with these.  Now look.  Instead of all of that other shit that we talked about with paying the money shit and all that on the phone.  You ain't got to do that. |
| DAOUD: | I don't have to do any of that? |
| CHS: | Yeah you got to make a call though.  You don't have to pay none of that. |

Paschal then proceeded to tell Daoud exactly what he has to do—pick up the phone and ask:

"how is Uncle Mike doing."   In addition to showing that the arrangement involved no financial

consideration, counsel submits that it is clear from this excerpt how the jailhouse informant

directed Daoud what to do.

These facts highlight an indelible problem with the government's charge, in particular the

murder-for-hire charge, which requires proof that Daoud "promised or agreed to pay anything of

pecuniary value in consideration for the commission of the murder."   Govt. Amended Jury

Instructions, Dkt. #264, p. 29; 18 U.S.C. § 1958.   Based on the recent disclosures, we know that

these details did not matter to Paschal or, apparently, the FBI and the prosecutors.

---

[39] One can speculate that *if* Daoud had said he could raise the $20,000.00, then perhaps Paschal would have never contacted his handler, but would have instead simply set-up or extorted Daoud on his own in order to get the money to post bond.  Instead, as we now know, he had to use the FBI for the bond money.

In addition to those fundamental flaws, the solicitation case, as counsel have argued previously, rises to the level of entrapment (at this stage, imperfect entrapment) as well as coercion by Paschal. Again, counsel and Daoud recognize, consistent with *Alford*, that a fact-finder could find him guilty based on the evidence. But also consistent with *Alford*, there are strong defenses that deserve consideration, particularly insofar as they inform the key issues before the Court at sentencing, specifically the seriousness of the offense and the type of sentence that should be imposed to safeguard against recidivism and protect the public.

In considering the imperfect entrapment and coercion issues, it is important to recognize the timeline of Daoud's time at Kankakee and interactions with Paschal:

| | |
|---|---|
| September 14, 2012 | Daoud is arrested and shortly thereafter is transported to Kankakee Jail for pre-trial detention. |
| October 26, 2012 | Daoud is moved into Paschal's cell (Max A10). (302_003-000018) |
| November 12, 2012 | Paschal is interviewed by Illinois State Police Task Force Officer Special Agent Michael Banach, along with CCDOC Investigator Drake Carpenter at Kankakee Jail. AUSA Steven Grimes was also present for interview. (302_003-00019) |
| November 14, 2012 | Full investigation initiated for Kankakee Jail investigation, "Adel Daoud; Murder for Hire," with William Paschal and Daoud. (302_003-000003) |
| November 16, 2012 | FBI Agents interview Paschal at Kankakee. |
| November 17, 2012 | Paschal calls Carpenter and tells him that he "broke it down" for Daoud after Carpenter says Daoud may not have understood. Paschal says "I got him to say what I needed him to say." |

| November 19, 2012 | Paschal was re-opened by FBI as a CHS. |
| November 21, 2012 | FBI SA Rees calls Kankakee Jail and requests that Daoud and Paschal be put into cell KA5 together. (302_003-000007) |
| November 23, 2012 | Consensual monitoring begins in "Adel Daoud; Murder for Hire," Investigation. (302_003-000003) |
| November 28, 2012 | Daoud makes the "Uncle Mike" phone call from Kankakee Jail. |

This timeline highlights how the FBI depended on Paschal's version of events for all but November 23-28, which is when he was placed with Daoud in the cell with the recording device. The recently disclosed evidence, specifically the recorded phone calls between Paschal and his handler, as well as how the FBI supplied Paschal's bond money, reflect Paschal's clear bias and provide ample reasons to disbelieve any representations he made to the FBI about what Daoud supposedly said.

### d. Paschal, an Intimidating Figure With an Extensive Criminal History, Threatened Teenage Daoud Who Had Been in Jail for Barely Two Months.

With regard to the recorded conversations, counsel acknowledge that a fact-finder could find that the recorded statements evidence an intent to commit the charged offenses of solicitation, murder-for-hire, and obstruction of justice. Additionally, Daoud did make the "Uncle Mike" phone call. Yet, even the recorded conversations show a level of coercion and pressure by Paschal that supports Daoud's imperfect entrapment argument. Indeed, the recorded conversations—which reflect just five of the thirty-plus days the two were housed together— show how Paschal repeatedly threatened and verbally accosted Daoud. The following recorded comments made by Paschal exemplify his hostility and bullying:

- "I could kick your fuckin' ass." (Nov. 25, 2012, 1:46 pm

89

recording);

- "Stupid motherfucker. I should kill you." (Nov. 26, 2012, 7:05 pm recording);

- "I should kick your ass!... I should kick yo ass, man." (Nov. 26, 2012, 7:05 pm recording);

- "When you wake me up and I'll get up. I'm gonna kick your ass" (Nov. 27, 2012, 1:38 pm recording);

- "I told you already why I keep asking you stupid fucking homosexual." (Nov. 27, 2012, 1:38 pm);

- "You are as gay as the day is long . You're gay . You're the gayest fucking dude I ever met in my fricking life. And you're a fricking homosexual and you like boys." (Nov. 27, 2012, 5:11 pm recording);

- "Yeah, but you don't want to drink or have sex…..Cause you're a homosexual and you don' t like liquor." (Nov. 27, 2012, 5:11 pm recording);

- "Because you 're a homosexual and (U I )." (Nov. 27, 2012, 5:11 pm recording);

- "'Cause you been callin' friends. You're talkin' to your gay lover." (Nov. 29, 2012, 9:56 recording);

- "Don't do that again. That's gayer than you usually are." (Nov. 29, 2012, 6:18 pm recording);

- "And I told you wink wink is fuckin' gay." (Nov. 29, 2012, 6:18 pm recording);

- "Would you shut up you creepy homo (UI)" (Nov. 29, 2012, 9:56 recording);

- "You fuckin' stupid, man." (Nov. 23, 2012, 11:15 am recording);

- "Move, man. You stupid fuckin' jerk . (UI )." (Nov. 26, 2012, 7:05 pm recording);

- "You one dumb dude. So you said (clicking sound)." (Nov. 29, 2012, 6:18 pm recording);

- "But you stupid a dumbass. Stupid assed dude." (Nov. 30, 2012, 10:44 recording); and,

- "No, you all the way the fuck crazy. You need to be in a institution. They need to strap you in the bed, uh, put straight jacket on you. You fucked up in the head. And I just question your motives, right? And then you know I'm tryin' to make sure you're not bipolar and (UI ) to other mental conditions. You know what I mean?" (Nov. 27, 2012, 5:26 pm recording).

These excerpts show how Paschal consistently verbally abused and threatened Daoud when they were alone together in the jail cell. It is important to remember that these comments were made *after* the jailhouse recording equipment was put in place and Paschal knew they were being recorded.[40]

It is equally clear that the jailhouse informant was motivated to push this concocted, convoluted plot forward no matter how preposterous and unbelievable it became. And when the jailhouse informant's physical intimidation and numerous verbal threats are considered, Defendant's comment that he was "relieved" just as easily reflect, Defendant's relief that the jailhouse informant would now leave him alone—and not, as the prosecutors contend, that he was relieved that the UCE had been killed.

---

[40] One of the Kankakee Jail inmates interviewed by the FBI said that after Daoud and Paschal were moved into the same cell on KA block (i.e., into the cell with the recording device), "the block was locked down so that only half of the block was allowed to leave their cells at a time." (FD-302, January 31, 2013, 302_003-000037). That comment indicates that the Kankakee Jail, presumably in coordination with the FBI, intentionally put the block on lockdown in order to maximize the time that Daoud and Paschal were together in a locked room.

### 3. **Case No. 15 CR 487**

As with the first two cases, Daoud's mental health is directly relevant to the nature and circumstances of the MCC assault on May 23, 2015. Indeed, his mental health is perhaps the predominant concern, particularly because, unlike the first two cases, the MCC assault was not the product of a government agent's intervention. Rather, the incident occurred suddenly and unexpectedly, and under circumstances strongly suggestive that Daoud's mental state was severely disturbed. At the outset, and to be clear, neither counsel nor Daoud contend for a second that Hancock somehow deserved to be attacked by any stretch of the imagination for drawing the offensive cartoon.

Daoud's youth, immaturity, and religion set him apart from other inmates in jail, which is perhaps the last place where one wants to stand out. The high-profile charges also attracted unwanted attention from other inmates. As Paschal noted in his 2013 grand jury testimony, in jail Daoud is seen as "prey." It is no surprise that within days of being at Kankakee Jail, other inmates started calling Daoud "Taliban" instead of by his name. Daoud's strict observation of Islam gave inmates yet another reason to treat him differently and pick on him. These facts are reflected in the very statements of Justin Hancock, who in an interview with the FBI on May 27, 2015—just four days after the incident—said that he first met Daoud when Daoud first came to the unit and that he "noticed that DAOUD was a devout Muslim." (302_008-000001). Hancock further explained, "inmates, to include himself, would call DAOUD "Mad Bomber" and "Terrorist." (*Id*.).

In December 2014, Hancock said that "he drew a picture of a 'Afghan' soldier wearing a bomb [and] … that he wrote Muhammad under the picture and purposely misspelled the name Muhammad." (302_008-000001). At the time, as Hancock explained, "he had his own beliefs

regarding the Muslim religion and was uneducated regarding the religion." (*Id*.) Based on that statement, we can, of course, presume what Hancock's "beliefs' were about Islam. Hancock stated, "he showed the photo to other inmates to include DAOUD [and]… that DAOUD seemed upset and that DAOUD asked HANCOCK to stop." (*Id*.). After being shown the cartoon, Daoud left the area, came back and had a conversation with an inmate named "Hassan." Moments later, Daoud started yelling at and punching Hancock, which according to him, led to "some lumps on his head." (*Id*.). After this fight, both inmates were put in adjoining rooms in the SHU, where Hancock told the FBI that "he apologized to DAOUD for teasing him." (302_008-000002).

After several months, for some unknown reason, the MCC decided to put Daoud and Hancock back together on the same floor. In the beginning, there were no consequences to this decision. In fact, both Hancock and Daoud socialized with one another, and even talked about movies in Hancock's cell. Hancock continued to apologize to Daoud and they even cooked and shared food together. They also discussed various topics, including religion. In his FBI interview, Hancock described Daoud "as receptive" and that there "were no problems between them." (302_008-000002). On May 22, 2015, the night before the assault, Daoud and Hancock were talking about movies.

When the assault happened the following day, Hancock recalled asking Daoud "Why?" and Daoud responded, "I'm sorry." (302_008-000002). Several inmates pulled Daoud off Hancock, but not before Daoud bit both Hancock and one of the other inmates. In an interview with investigators at the MCC following the assault, Hancock said, "Someone must have gotten in his ear because we were friends, we had settled that." (MCC_001-00059). Other inmate witnesses made important observations about Daoud's affect. For instance, an inmate L.P. told

MCC investigators that "Daoud was in some sort of intense state of mind, 'Not there' and 'Zoned out.'" (MCC_001-000060). This witness also noted how the night before the assault Daoud heard a news report that mentioned attacks by Muslims on non-Muslims. (MCC_001-000060). Other witnesses noted that Daoud saw a news story about a contest for drawing a caricature of the prophet that agitated him.

For its part, the PSR keenly picks up on the mental health issues that cannot be ignored in this case, even if they do not rise to insanity. Specifically, the PSR notes how Daoud "did not identify any particular trigger to the May 2015 attack, but he indicated that he felt like a "hypocrite" for being friendly with a person he could not forgive." (PSR, p. 12, ¶36). However, Daoud also "believed he saw 'signs' that suggested his prior assault of Victim A in December 2014 was not sufficient." (*Id*.). Perhaps equally important—particularly in light of the paranoia issues that were prevalent at this time—the PSR notes how Daoud "stated that he heard rumors Victim A was planning retaliation and he had a vision of Victim A attacking him. The defendant reportedly felt anxious during the attack on Victim A."

During the August 2016 competency hearing, Daoud explained that he in fact experienced visual hallucinations after this incident. Daoud testified how he told Dr. DeMier in Springfield about three incidents "that [he] saw or heard something that wasn't there." (Tr. 8.19.16, p. 299). Daoud described one of the incidents as follows:

> And it was walls in the SHU after my third case. And I was in the SHU, and I thought I saw my masjid. And one of the reasons I thought I saw my masjid, I saw a similar chair outside. And I thought I saw my masjid outside. So I know that, yeah, I know I see my masjid, but it's not my masjid. So I got down and I looked, you know. So then it wasn't my masjid. So, you know, I was just making sure because I saw my masjid. It's not my masjid, though.

94

(Tr. 8.19.16, p. 300). Thus, it is clear that prior to, during, and after the offense, Daoud was suffering from a serious mental illness that ultimately resulted in the competency proceedings and the Court's ruling that he was not competent to stand trial and required restoration.

As a final point, the two incidents with Hancock are the only times that Daoud has been in a physical confrontation during the entire six-and-a-half year period of pretrial custody. During that extended time period, Daoud has had, by his count, seventy-two different cellmates. Thus, in addition to the undergirding mental health issues, one can reasonably argue that the charged assault on Hancock, while no doubt serious, is nevertheless aberrant.

### E. History and Characteristics of Defendant—§3553(a)(1)

In determining the sentence to be imposed, the Court must also consider the "history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). When considering the history and characteristics of Defendant, one is immediately struck by the tragic fact that Daoud was just 18 years old when he was arrested and since then he has been in custody, now for nearly seven years, close to one-quarter of his life. And, by counsel's estimate, over that time period Daoud has spent over two years in the SHU, which has drastically compounded the severity of his detention. The stark reality of the mere length of Daoud's pretrial detention is shocking.

The duration of Daoud's pretrial detention is, of course, due to many numerous intervening circumstances beyond the control of the Court and the parties that make this case unlike any other, most notably Daoud's ongoing mental health problems, including his incompetency and restoration. Those mental health issues are, of course also key factors to weigh when viewing Daoud's unique history and characteristics, and also for considering the issue of future dangerousness, particularly because Daoud has demonstrated compliance with the medication that BOP doctors have concluded he must take to remain competent. Indeed, as

should be plainly evident simply by comparing Daoud's letters and statements to the Court submitted prior to the competency hearing proceedings, Daoud is simply a different person that he was prior to the competency proceedings and, more importantly, during the time that the FBI encountered him in the spring and summer of 2012.

But, before Daoud was arrested in this case, and before the competency proceedings revealed his mental health diagnoses and need for psychotropic medication, he was a suburban teenager who was dedicated to his family and school. He had aspirations before the FBI inserted itself into his life. No doubt, the mental health issues were lingering under the surface, and manifested in behavior that his family, peers and teachers found to be odd, awkward, and sometimes even concerning. Thus, for the purposes of considering Daoud's history and characteristics under § 3553(a), it is essential to consider the voices of those who knew Daoud before the FBI.

1. **Daoud's Childhood Involved a Loving and Supportive Family, but He Also Faced Physical and Mental Challenges, and Led a Relatively Sheltered Existence.**

While Daoud grew up and continues to benefit from the support of a loving family, he still faced challenges, both physical and mental. As his parents write in their letter to the Court, these challenges began from the day he was born. (Ahmed and Mona Daoud Letter) ("Adel faces many physical and mental challenges from the day he was born had a difficult delivery I thought I would lose him but luckily he survived he had many pump on his head that we have been told after the x-ray clear it to keep our eyes on it."). His parents recall how Daoud was an "obsessive" child, beginning with the television show Barney. (Ahmed and Mona Daoud Letter). He also "struggled to communicate with everyone around him or even keep an eye contact." (Ahmed and Mona Daoud Letter). While is parents hoped that he would become

more communicative in preschool, they were saddened to see that preschool did not help and that "all kids were making fun of him, teachers complain he didn't understand direction and never finished the tasks they give him like coloring inside of pictures." (Ahmed and Mona Daoud Letter). As his parents explain, Daoud continued to have problems communicating in public to the extent that his parents stopped taking him to school because he would not talk. (Ahmed and Mona Daoud Letter). Daoud's sister recalls how he would talk, but only to her in private when he was five and she was four. (H. Daoud Letter ("He was always very sweet but quiet, so I would do most of the talking for him. I remember when he was 5 and I was 4, my parents were expressing their concerns on why he doesn't talk yet. I kept telling my mom, "mama, Adel talks to me when we are alone all the time, what do you mean?"").

He still would not talk in school when he began kindergarten at age six and was placed in speech therapy, which resulted in some improvements. But, as his parents recall, he had to catch up with others and "things was bad for him he had problem making friends." (Ahmed and Mona Daoud Letter). Daoud's parents recall other difficulties that their son had, such as tying shoes and putting on clothes. They knew he had special needs, but as they put it, "he was different but I didn't know why." Thus, the tone of isolation from peers due to impairments was sadly set at a very early age for Daoud.

As Daoud grew up, he led what can only be described as a very sheltered life. He basically had three poles in his life: family, school, and mosque. He engaged in no extra-curricular activities outside of the mosque. He played no sports due to various physical problems, according to his parents. (Ahmed and Mona Letter, "Along with his social and communication problems Adel had a lot of physical problems he weared [sic] glasses from kindergarten and he had lazy eye he had to patch one eye every day to school. kids made fun of

him called him pirate he also had asthma when he was eight and he had flat feet on both of his feet which made it hard for him to play any sports."). He had very few friends. As a peer from the mosque recalls: "He was a nice kid, a good Muslim, but just got lost. He deserved more friends. … But he was a good kid that just lost himself. He needed help and I really believe he needed more friends." (A. Sharif letter). He would often go straight home from school and not associate with others who found him odd. As his parents recall: "kids found him strange and they keep their distance from him, nothing worked which made him very sad. When he came home from school he was relive to be home he played with his sister and watch the barney show." (Ahmed and Mona Daoud letter).

Even at a young age, he lacked the basic experiences that many teenagers his age had, due both to his religious upbringing but also his social problems that kept him from having meaningful relationships with friends his age. His sister describes her brother's limited life experiences as follows: "When he was incarcerated he was young, just almost 19 the week he got arrested. He just graduated high school, he didn't even visit any colleges yet. Did not have a first kiss, a girlfriend , a fiancé, a wife, or get a chance to sight see and decide what he wants for his life going into adulthood. He did not even have a first job. How could he know things he did not experience?" (H. Daoud Letter).

Daoud's teacher and guidance counselor, whose video recorded character statements will be submitted to the Court, remember him fondly. Yet, they also suspect that he was most likely bullied by others at his high school. Moreover, his guidance counselor believes that Daoud may not have realized that he was actually being teased or bullied. (*See also* A. Sharif letter) ("Adel was a nice but goofy kid, when I first met him, he was funny, smart, and he used to read a lot. He didn't care what other people said about him, well that's how he seemed, maybe he did, but it

seemed he wouldn't let anything get to him.  He was kind and forgiving, awkward, but a good kid.").  His uncle, however, remembers one time when a classmate actually hit Daoud:  "I remember when Adel was in high school one of his classmates was bullying him and hit him.  Adel's response was crying, not retaliating."  (H. Dawed Letter).  One consequence of Daoud's inability to forge strong social relationships with his peers was the fact that he often gravitated toward people older than him.  Ms. Corso, who taught Daoud for several years, recalls how he would often show more interest in associating with adults when he was still a teenager.   His former guidance counselor also recalled how Daoud was compliant with people who were older than he was, in large part because he trusted them, perhaps naïvely.

### 2. Daoud Demonstrated a Care for Others and a Willingness to Help Them.

Despite the mental and physical challenges, Daoud always projected an amiable and gregarious attitude, no matter how others treated him.  (*See* O. Sharif Letter) ("Adel was very humble, nice, and approachable friendly person. Every morning he would approach me with the nicest greetings and smiling face. He never did anything wrong and made sure to always be the first person to make a greeting to the congregation.").  For people who knew him, his charges were extremely surprising, even shocking.  (M. Elemam Letter, "I was in extreme shock when I learned about Adel's criminal charges."); (A. Omar Letter, "Mr. Adel was a young high school student was very friendly, smiley, eager to learn, takes the initiative to help others, proud of his religion, respects time, and easy to get along with others.  He always wanted to be on time for his prayers.  It had never come to my mind; even for a split second; that he is a type of person that can or want to harm anybody in any shape or form."); (J. DeFalco Letter, "When hearing about the arrest and charges brought against Adel we were quite surprised.  From what I can remember about Adel he was a quiet and respectful kid."); (O. Sharif Letter, ("So when I heard what had

99

happened, I was instantly shocked and couldn't believe it. He was so attached to the five daily prayers with his father. I hope now hearing about who he really was, helps you understand Adel and his true character.") (E. Pappas Letter, "We never had any negative experiences and found ourselves in complete shock when we learned of his situation, which has painfully devastating his family.").

Indeed, the letters submitted on Daoud's behalf describe someone who was empathetic and would go out of his way to help others for matters big and small. His parents recalled how he would "jump to the chance to help our elder neighbor shovel the snow or cut the grass." (Ahmed and Mona Daoud Letter); see also (J. DeFalco Letter, "Once in a while he'd ask if he could help me or the neighbor when he saw us doing chores out in the front yard. He knew he could make a few extra bucks helping out."); (H. Dawed Letter, "I've known Adel from birth. Adel has always been a very polite, very helpful, very sensitive and obedient person.").

A family friend who joined Daoud and his father on the Hajj, the Muslim religious pilgrimage to Mecca, Saudi Arabia, in November 2011—just six months before the FBI would open its full international investigation into Daoud—recalled how Daoud "was the youngest amongst all of us" and "he used to make sure that we (as elders) are well taken care of." Daoud would "serve [them] food and water [and] he used to make sure that [their] sleeping arrangements were best suited for [their] age." (M. Elemam Letter). He also remembers how quick Daoud "was to offer help and services to any of us in need." (Id.).

Daoud's eagerness to help others evidences inherent pro-social traits that are positive attributes. However, it must be observed that, in the past, Daoud's willingness to help combined with his naiveté and immaturity pose risks when other seek to take advantage of him. In a normal setting, there is little cause for concern. For example, A. Sharif wrote in his letter to the

Court as follows: "This might seem silly, but I once told him that I liked the flavored waters he used to drink, like the regular Dasani waters infused with cherry or lemon or something, but after I told him just one time, he would keep bringing it for me." Daoud' sister described another situation when Daoud gave a homeless person all the money in his wallet, to his own detriment: "I feel I have been older than Adel a lot too. Once we were going out to put gas in the car and he sees someone homeless in the street, opens his wallet and gives them all our gas money. Oh my goodness, I wanted to throw something at him he made me so mad lol. He said they need it more than us which was great but, we went home on E." It is quite easy to see how Daoud could be manipulated by someone seeking to take advantage of his kindness, immaturity, and willingness to please others, a fact that is confirmed by his former teacher and guidance counselor.

### 3. Daoud Was Naïve, Immature, and Susceptible to Influence Both Prior to and After His Incarceration.

There can be little argument that Daoud was naïve, immature, and susceptible to influence prior to his arrest, and also continuing into his incarceration until the medication prescribed at FMC Butner in 2017 began helping him. Indeed, in the September 22, 2017, competency report from FMC Butner, a psychiatrist who examined Daoud at the facility stated that his "initial impression is Mr. Daoud has a vulnerability to being easily influenced and swayed by information to which he is inclined to believe is true, which he then incorporates as if it were true." (Butner Report, p. 7). That observation is consistent with the lay opinions offered in the character letters. *See* (H. Daoud Letter, "Adel is selfless, but as a result his sweet soul is naïve like a child. He trusted anyone and that's just how he always was. It was me who was the fire to his ice, and if I saw someone trying to take advantage of him I would yell at them in front of everyone while Adel tried to calm me down telling me I am too harsh"); (H. Dawed Letter, "I know Adel as a very good nephew, good son who has no interest in doing anything out of line, or

bad behavior as some teenagers do.  He is just simple, pure, naïve child, who likes to read and play games and always seemed a little behind his age level in his maturity and decision making ability."); (A.Omar Letter, "At the time and the age when got [sic] in trouble, I can say that he may not have been as mature, wise and experienced in life in making the right judgment and decisions as it should be."); (J. DeFalco Letter, "My final thoughts about Adel is he was a young impressionable young man caught up by some of the horrible and misguided information available on TV and over the internet.").  It is, of course, no coincidence that may people describe Daoud as "naïve."  That much is clear to anyone who meets him, and most certainly would have been obvious to the FBI in 2012 when Daoud was much younger and much more immature.

Indeed, Daoud's former guidance counselor recalls in her video statement how he could not pick on various verbal cues, and how he often failed to understand the context of things conveyed to him during social interactions, even if he was very book-smart, or at least book-studious.  She even believed that he could have fallen somewhere on the autism spectrum, based on her observations of him over several years.  Daoud's inability to pick up on cues is plainly obvious in the transcripts and communications with the FBI's OCEs and UCE, which again should have given the government pause in its pause in its investigation.

For instance, while OCE1's online communications focused on fighting overseas, he also interjected the idea of a domestic attack on June 1, 2012, when he wrote as follows:  "I will make du'a for you, brother that you will find your way too, if you didn't make your plans already, and I'm wondering if someday the Qadar of Allah will bring us together in Syria, Yemen, Somalia, or Afghanistan, or even in America where you live."  Despite having conversed online with OCE1 for approximately two weeks, Defendant responded as follows:

insha'Allah that would an amazing occurance if I met up with you. What's your name again I'm sorry? My name if you don't remember is aadel. I'm light skinned, I have glasses, I have plentiful black hair, im Palestinian and Egyptian, I come from Chicago, IL, and so far I have been trying to wear more Islamic wear so right now im wearing a black thobe and black turb. I smile a lot, I talk loud (I admit it), I usually wear short sleeves rolle up my sleeves (with the exception to maybe Friday). I usually do not wear white unless it's Friday. I kind have a big nose (not too big) and my ears don't stick out. If you need a picture I can email you. Just in case we ever meet Allah alim. I hope that you kill Bashar and have his blood all over your hands and that you kil him and his worshipers and that you will be feared by all of the hypocrites and kuffaar.

In response, OCE1 wrote: "So now if I see you I can tell by what you described of yourself even if you are among million people!!...I feel you are a 'terrorist' like me, hahahaha!. Tell me brother Aadel, do you have friends in America and do they support jihad too? So, how the kuffar treat you there in America?" Daoud's response is preposterous on its face, but the OCE persisted in escalating the conversation. Daoud's susceptibility to influence and vulnerability to persuasion is discussed in greater detail above in the context of the imperfect entrapment elements that are set forth in the nature and circumstances of the offense.

### 4. Daoud's Youth at the Time of the Offenses Should be Seen as a Mitigating Factor

In addition to his immature and naiveté, it is important to remember that Daoud was only 18 years at the time of his arrest. Even if he did not have the social, mental health and cognitive problems that, according to his family, appear to have been present from a very early age, Daoud's youth should be seen as a mitigating factor.

Indeed, Congress and the Sentencing Commission have identified youth as a mitigating factor that often warrants a reduced sentence. Ongoing research and scholarship concerning brain development in young adults provides further reasons to temper the punishment imposed on young offenders. All of these issues are highly relevant for the Court's consideration, and

together they provide strong support for a sentence well below the guidelines, particularly given Daoud's lack of criminal history prior to his arrest in September 2012.

Federal statute and the sentencing guidelines express concern for the fair treatment of youthful offenders. First, in outlining the duties of the Sentencing Commission, Congress specifically instructed as follows:

> The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence *other than imprisonment* in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense, and the general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury.

28 U.S.C. § 994(j) (emphasis added). Second, in 2010, the Sentencing Commission amended its policy statement on age to expressly state that departures may be based on age and youth. Specifically, U.S.S.G. § 5H1.1, titled "Age (Policy Statement)," provides as follows: "Age (including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." That language replaced the prior policy statement language: "Age (including youth) is not ordinarily relevant in determining whether a departure is warranted." (Appendix C—Volume III, November 1, 2010 (amendment 739)). Thus, the commission has updated its view of youth as being "not ordinarily relevant" to finding that it "may be relevant." Pursuant to § 3553(a)(5), the Court should consider this Sentencing policy statement, and particularly the

shift in the policy, from considering youth "not ordinarily relevant" to noting that it "may be relevant" for a departure.[41]

The policy shift appears to reflect the research and scholarship that has focused on brain development and cognitive matters that often lead "youthful offenders" to commit crimes, and the corollary issue of how to punish those individuals. Indeed, in a 2017 report, the United States Sentencing Commission presented information regarding "youthful offenders" (defined as persons under age 25). *See* United States Sentencing Commission, *Youthful Offenders in the Federal System* (May 2017) (available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf). At the outset of its report, the Sentencing Commission observed as follows:

> Recent studies on brain development and age, coupled with recent Supreme Court decisions recognizing differences in offender culpability due to age, have led some policymakers to reconsider how youthful offenders should be punished. This report reviews those studies and provides an overview of youthful federal offenders, including their demographic characteristics, what type of offenses they were sentenced for, how they were sentenced, and the extent of their criminal histories.1 The report also discusses the intersection of neuroscience and law, and how this intersection has influenced the treatment of youthful offenders in the criminal justice system.

*Id.*, p. 1. The report discusses how the studies on age and brain development, specifically regarding the frontal lobe that is essential for executive decision-making, found that "maturation is completed in the mid-20s." *Id.*, p. 7. Another study compared frontal lobe contributions to cognitive control in children and adults and found "clear differences in the ways and extent to which the frontal lobe was used in decision making." *Id.* And yet another cited study noted the

---

[41] The Commission explained that it "adopted this departure standard after reviewing recent federal sentencing data, trial and appellate court case law, scholarly literature, public comment and testimony, and feedback in various forms from federal judges." (Appendix C—Volume III, November 1, 2010 (amendment 739), "Reason for Amendment," p. 1193 of 2016 Edition).

"the confounding effect of marijuana and alcohol use on the adolescent brain and its development, with results indicating further delays in brain development among youth and young adults with substance use histories." *Id*. The Commission noted that there was general agreement on the following four points:

> First, researchers agree that the prefrontal cortex is not complete by the age of 18, which is the legal age of majority in most state jurisdictions and in the federal system. Second, researchers agree that development continues into the 20s. Third, most researchers reference 25 as the average age at which full development has taken place, but note there will be significant variation from person to person. Finally, researchers caution against the over-generalization of brain science.

*Id.* (footnotes omitted).

Relatively recent statements from the Department of Justice echo the Commission's concerns regarding young offenders, and also point to growing trend of considering alternatives to incarceration. In 2015, then Attorney General Lynch offered opening remarks at a "Panel Discussion on Justice-Involved Young Adults," during which she acknowledged the neurobiological and developmental research confirms brain development continues well into a person's twenties:

> Research indicates that as young adults age through their late teens and early 20s, they experience a period of rapid and profound brain development. In addition to providing insight into why young adults act the way they do, brain science also indicates that we may have a significant opportunity, even after the teenage years, to exert a positive influence and reduce future criminality through appropriate interventions. It raises the possibility that considering these unique stages of development within the criminal justice setting, we could reduce the likelihood of recidivism and create important benefits for public safety. And it offers a chance to consider new and innovative ways to augment our criminal justice approach.

Attorney General Loretta E. Lynch Delivers Opening Remarks at an Office of Justice Programs Panel Discussion on Justice-Involved Young Adults (Sept. 8, 2015), available at https://www.justice.gov/opa/speech/attorney-general-loretta-e-lynch-delivers-opening-remarks-

office-justice-programs-panel (last accessed Sept. 12, 2017). Lynch linked prevailing brain science to the Justice Department's commitment to developing effective means for reducing recidivism in youthful offenders. The science behind Lynch's remarks is particularly important in Daoud's case, because it indicates a very real hope that he has a "significant opportunity" to move beyond his conviction in this case, and the poor decision-making that led to his involvement in this offense, so that he may live a productive, law-abiding life.

No doubt, the Court could have always considered Daoud's youth under § 3553(a). *See Gall*, 552 U.S. at 58 (holding that "it was not unreasonable for the District Judge to view Gall's immaturity at the time of the offense as a mitigating factor…. Indeed, his consideration of that factor finds support in our cases."). However, recent scientific studies, reflected in the amendment to § 5H1.1, as well as in the Sentencing Commission's reports, the statements of former Attorney General Lynch, and other sources show, on balance, that there are numerous reasons to see youth as a powerful mitigating factor.

While counsel has not found case law that substantively discusses when youth is present "to an unusual degree and distinguish the case from the typical cases covered by the guidelines" (U.S.S.G. § 5H1.1),[42] counsel respectfully submits that the totality of factors in this case distinguish it from typical cases, and warrant a sentence that reflects what would have been a "departure" under the Guidelines.

---

[42] Cases addressing this question typically do so in a fairly conclusory manner. *See, e.g.*, *United States v. Gonzalez-Lopez*, 2012 U.S. Dist. LEXIS 107852, *22-23, 2012 WL 3150350 (D.N.M. July 27, 2012) (refusing to award a departure and stating "The Court sees many young defendants who appear before it and acknowledges that younger people are more likely to commit crimes than older individuals. Our prisons, unfortunately, contain many young men who have made mistakes, including mistakes far more serious than those Gonzalez-Lopez' has made."); *United States v. Medina*, 2017 U.S. Dist. LEXIS 79850, *10 (E.D.N.Y. May 16, 2017) ("First, '[a]ge (including youth) may be relevant in determining whether a departure is warranted,' but only in cases where 'considerations based on age ... are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines.' USSG § 5H1.1. In the context of this case, the Court does not consider Defendant's relative youth—he is 19 years of age as of the date of his sentence—to create circumstances so unusual as to warrant a departure.").

107

### 5. Daoud's Mental Health Problems Mitigate the Seriousness of the Offenses and Also Deserve Meaningful Treatment.

Daoud's mental health issues are, of course, central issues when considering his history and characteristics. Those issues are discussed throughout this memorandum, including in the detailed procedural history of the case discussed above, as well as in the context of the 18 U.S.C. § 3553(a)(2)(D) analysis set forth below. They are also explored in great detail in the competency reports that are submitted with the PSR, as well as Dr. Xenakis' most recent report, which affirms the diagnoses of: Other Specified Schizophrenia Spectrum and Psychotic Disorder (improved); Delusional Disorder (improved); and Major Depressive Disorder, moderate (improved). As such, the main points about Daoud's mental health concerns are not reiterated here. However, several issues still deserve emphasis.

First, issues regarding Daoud's mental health should have been obvious to the FBI during the course of its investigation. Simply reviewing his online communications provides strong indications of disorganized thought and irrational behavior that would at least give one reason to pause and consider if the subject has mental health problems, even undiagnosed issues. But when the UCE met Daoud in person, it is quite difficult to fathom how it would have been possible not to seriously question Daoud's mental capacity. The audio recordings of the six meetings with the UCE demonstrate how Daoud would laugh loudly at inappropriate times during the conversations. He also met with the UCE in public places while wearing a full black thobe and a black turban in the middle of the summer. His affect and appearance aside, when his first "proposal" for an attack was the use of "flying cars," we must seriously question why the FBI did not choose an alternative to its sting operation. Perhaps it was too late, or perhaps the irrational, unhinged, and illogical statements are precisely what the FBI looks for when investigating Islamic radicals. If true, that would of course prove counsels' point.

108

In any event, the FBI did weakly probe whether Daoud whether he had a mental illness during the September 5 and 13, 2012 in-person meetings with the UCE. On September 5 the UCE asked whether Daoud was prescribed any medications. (Tr., Sept. 5, 2012, p. 17, lines 1-2) ("You don't take medicine for like depression[?]"). And on September 13—the day before the elaborate sting operation was concluded—the UCE asked Daoud, "A couple times you said it, you said that you're crazy. I mean what do you mean you're crazy?" (Tr., Sept. 13, 2012, p. 63, lines 20-22). One can, of course, legitimately question the effectiveness of asking a crazy man if he is crazy. Yet still, these questions also prove counsels' point.

Second, it is important to view Daoud's mental health issues in context of the family's experience with his older brother Amr who, like Daoud, was adjudicated unfit to stand trial in a criminal case. Amr is three years older than Daoud and began experiencing mental health and also substance abuse problems as a teenager when he was about the same age as Daoud when the FBI initiated contact with him. Counsel have obtained medical records for Amr showing that he was admitted to Linden Oaks Behavioral Health Services at Edward-Elmhurst Hospital in December 2008 after overdosing on Corricidin (cough medicine) and marijuana. At the time, Amr was 17 years old. The records reflect how Amr already had substance abuse problems, evidenced by self-reported abuse of alcohol, marijuana, hashish, heroin, Oxycontin, PCP, mushrooms, Corricidin and Robitussin. The intake report notes diagnoses of "mood disorder, not otherwise specified, attention-deficit disorder, cannabis abuse, and polysubstance abuse." Prior to that hospitalization, Amr was also hospitalized at Hinsdale Hospital, Stream Wood Behavioral Health, and Elmhurst Hospital due to overdoses and mental health issues. Staff noted Amr's depressed demeanor and an impaired ability to concentrate, and prescribed antidepressant and attention-deficit disorder medication.

Amr's substance abuse and mental health problems also contributed to legal problems, including felony convictions in DuPage County for possession of controlled substances (Case No. 12CF2155) and Burglary (Case No. 13CF1108). More significantly, on February 19, 2014, Amr was admitted to the Forensic Treatment Program of the Elgin Mental Health Center after he was adjudicated unfit to stand trial for the Burglary charge. Reports indicate that Amr was discharged from Elgin on April 18, 2014. The treatment records from Elgin for Amr are quite telling.

During a psychological evaluation on December 18, 2013, Amr reported "having had symptoms of psychosis such as auditory and visual hallucinations beginning at the age of 17 and an episode of mania." He reported three prior suicide attempts, two by overdose. The reports further indicate how Amr said he had "'a lot of voices in [his] head' which were contributing to his suicidal thoughts." Quite significantly, the Elgin reports reflect how Amr "referred to the voices as 'Djinn' and stated that he heard this voice 'different every time … why suffer any longer ... gonna die anytime.'" The Court will recall that on December 29, 2015, when Daoud was quite likely in a heightened state of mental distress after having been placed in the SHU for many months after the assault incident, he to referred to a "Jinn." (*See* Dkt. #200).

Amr's experiences are important for several reasons. First, Amr's mental health problems provide additional support, as if it were needed, for Daoud's own mental health issues. Both developed serious mental health at around the same time as young men, which is common. The fact that both were found unfit to stand trial also demonstrates the severity of their mental health issues.

Second, it is quite understandable why Daoud's parents would see him in a starkly different light from Amr. Before Amr graduated from high school, he was abusing drugs and

had multiple hospitalizations due to drug overdoses and suicide attempts. He had various encounters with law enforcement and was an all-around problem for the family. Daoud, on the other hand, was devoted to his classes and his religion. He attended prayers five times per day with his father. He went out of his way to help his neighbors. While he was socially awkward, there were not gross manifestations of mental illness, such as the suicide attempts that Amr experienced. Thus, one can see why Daoud's parents would not perceive that he needed immediate mental health treatment, even when they recognized that he had problems.

Most importantly, Daoud recognizes the benefits of the medication that he is currently taking. He is also committed to continuing to take it as long as it is prescribed, and complying with any further conditions, specifically therapy with mental health professionals. The medication has also helped Daoud meaningfully reflect on his conduct.

### 6. Daoud has Spent Over Two Years of Pretrial Detention in the Harsh Conditions of the Segregated Housing Units, Which Included Witnessing the Suicide of a Cellmate at the MCC in January 2013.

Since September 14, 2012, Daoud has spent over six-and-a-half years in pretrial detention, spread across the Kankakee Jail, the MCC in Chicago, FMC Springfield, and FMC Butner. Of that time, Daoud has spent over two years in the SHU. The largest sustained period of time was after the May 23, 2015, assault at the MCC, which resulted in Daoud being housed in the SHU for over seven months. While it is easy to cite institutional security concerns for this extended confinement in the SHU, the fact of the matter is that Daoud's mental condition—which was already in a precarious state—deteriorated severely during this time period. The letters that Daoud submitted to the Court through November 2015 to February 2016 (*see* Dkt. #200, 206), as well as counsels' emergency motion for a competency hearing in December 2015 prove as much.

111

Compounding Daoud's own mental struggles is the fact that on January 3, 2016, his cellmate named Alex Gilbert committed suicide in the SHU. The FBI interviewed Daoud the day of this tragedy. (302_011-000001-1). As reflected in that interview report, Daoud explained how he was with Gilbert just moments before the suicide. Daoud had come to know Gilbert and got along with him. The death profoundly impacted Daoud, particularly because of his own mental health struggles, which he had to continue to endure in the SHU following Gilbert's suicide.

As the Court will surely recall, one month after the suicide, in February 2016, Daoud wrote to the Court and bizarrely accused it of having Gilbert killed. The Court will also recall Daoud's testimony and demeanor during the August 2016 competency hearing when he discussed Gilbert's death. During that testimony, Daoud recalled how Gilbert was his 49th cellmate. (Tr. 8.19.16, p. 280). Daoud also testified that Gilbert's death was "kind of like a signal" that Daoud himself could be "executed" as a consequence of the case. (Tr. 8.19.16, p. 290). When asked to explain that paranoid and illogical conclusion, Daoud explained that he believed that Gilbert was "potentially given drugs to push him to kill himself, and it was a way of execution." (*Id.*). He also said that he believed that the Court ordered Gilbert's death because the Court "said his name after he said hello for me. After I—[the Court] talked about him saying hello for me." (Tr. 8.19.16, p. 291).

Solitary confinement has been roundly condemned and criticized for the deleterious psychological and physical affects that detainees who endure it suffer. Indeed, extended periods of isolation in solitary confinement can have severe consequences on inmates' physical and mental health. *See United States v. Bout*, 860 F. Supp. 2d 303, 308 (S.D.N.Y. 2012) ("[I]t is well documented that long periods of solitary confinement can have devastating effects on the mental

well-being of a detainee." (citing *United States v. Basciano*, 369 F.Supp.2d 344, 352-53 (E.D.N.Y. 2005) & Craig Haney & Mona Lynch, Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement, 23 N.Y.U. Rev. L. & Soc. Change 477, 531 (1997)).  *See also Davis v. Ayala*, 135 S. Ct. 2187, 2209, 192 L. Ed. 2d 323 (2015) ("One hundred and twenty-five years ago, this Court recognized that, even for prisoners sentenced to death, solitary confinement bears "a further terror and peculiar mark of infamy" (citing *In re Medley*, 134 U.S. 160, 170, 10 S.Ct. 384, 33 L.Ed. 835 (1890)).  *See also* Dr. Stuart Grassian, *Prison Reform: Commission on Safety and Abuse in America's Prisons: Psychiatric Effects of Solitary Confinemen*t, 22 WASH. U. J.L. & POL'Y 325, 327 (2006) ("Solitary confinement - that is the confinement of a prisoner alone in a cell for all, or nearly all, of the day with minimal environmental stimulation and minimal opportunity for social interaction - can cause severe psychiatric harm.").  Solitary confinement has particularly negative consequences for young detainees.  Tamar R. Birckhead, *Children in Isolation:  The Solitary Confinement of Youth*, 50 WAKE FOREST L. REV. 1, 10 (2015) ("Although there is limited research on the effects of isolation on incarcerated youth, the existing studies have found that it is correlated with high rates of suicide as well as with post-traumatic stress disorder ('PTSD'), depression, and future criminal activity.").[43]

---

[43] Testimony of Professor Craig Haney, Senate Judiciary Subcommittee on the Constitution, Civil Rights, and Human Rights Hearing on Solitary Confinement, June 19, 2012, available at: https://www.judiciary.senate.gov/imo/media/doc/12-6-19HaneyTestimony.pdf (last visited Apr. 24, 2019), p. 17 note 20 ("Persons under the age of 18 and those who suffer from serious mental illness are singularly unsuited for long-term solitary confinement and they should be absolutely excluded from being housed there. In fact, persons with serious mental illnesses are categorically excluded from solitary confinement in a number of states (e.g., California, Wisconsin, Ohio), but not all. Moreover, the ABA Standards on the Treatment of Prisoners (at section 23-2.8(a)) require this.").

Due to the unique circumstances presented in this case, the Court would be well within its sound discretion to take into stock the extended time that Daoud has spent in the SHU and the harsh conditions that entailed. But it is not simply the lack of social visits, the isolation, and the stringent restrictions that made Daoud's time in the SHU particularly harsh. Rather, the Court should also consider how those already difficult conditions affected Daoud in light of his youth and mental health problems, which all together create unique and unusual circumstances. *United States v. Pressley*, 345 F.3d 1205, 1218 (11th Cir. 2003) ("The district court was correct in holding that HN18 conditions of confinement could provide a basis for departure, since this factor was apparently not taken into account by the Sentencing Commission and could be unusual enough to take a case out of the heartland of the applicable guideline."). These conditions—over two years in the SHU while suffering mental illness—are far more harsh and severe than other circumstances that the Seventh Circuit found to not justify a reduced sentence. *See*, *e.g.*, *United States v. Ramirez-Gutierrez*, 503 F.3d 643, 645 (7th Cir. 2007) (finding that conditions were not "unusually harsh" in Kankakee County Detention Center, where defendant was confined for 2 ½ months, was denied care for a toothache, had poor ventilation, and could not exercise.

### 7. Daoud Has Maintained Close Ties With His Family During This Extraordinarily Difficult Period.

As the Court is aware, Daoud has an extremely strong family support system. For the past six-plus years, his parents have come to virtually every single court date. Their few absences are due to the rare occasion when one or both have had to travel, usually to visit a sick relative overseas, or when they themselves are unable to attend due to personal medical reasons.

Due to the family's closeness, the family has been particularly impacted by Daoud's arrest, multiple charges, extended pre-trial detention, mental health problems, and numerous

custodial issues and difficulties, such as extended periods in the SHU.  (H. Daoud Letter)"Adel held everything together with everyone. At home too. Without him there was no home. His incarceration affected everyone, but I feel for me it hit the hardest. It felt like every part of my chest crumbled and I died. I don't know how else to describe it. I didn't see it coming. It all happened a few weeks before my senior year in high school, and for the first time I walked into a first day of school by myself. Without Adel I feel empty and lost. I spent all my time alone.").  Sadly, the stress of the case has taken a tremendous toll on the family.  Mr. Daoud has had multiple coronary problems, including another heart attack that required hospitalization as recently as April 25, 2019.[44]

Members of the community have recognized the toll that has been taken.  (Naim letter) ("I see Adel's father at the mosque and I can see and feel the pain he is going through for his son, and he told one time that he loves Adel so much and Adel is his favorite child and piece of his heart. Judge Coleman, this family is devastated because of what happened to their son Adel, it looks like the whole family parents and children all are incarcerated in jail with Adel.").  Notwithstanding the difficult and stress of the past six-plus years, Daoud's family stands by him.

Daoud is extremely close with his sister who is younger by just one year.  In her letter, Daoud's sister describes the close bond the siblings shared growing up.  (H. Daoud Letter "Adel and I have a bond that we know what the other is going through without the other person saying anything, and usually knew how to make it better.").  Daoud was also genuinely kind to his baby sister, who has now become a middle-school student in his absence.  (Ahmed and Mona Daoud Letter, "After twelve years of having my daughter I had another baby girl she was and still the joy of our heart. Adel loved her so much from the start he helped me feed her he sit with her and

---

[44] Counsel learned of Mr. Daoud's heart attack shortly after it happened on April 25, 2019.  As of writing, counsel are still monitoring the situation and speaking with the Daoud family.

told her stories he could never bear to hear her cry. I never trust anyone to babysit her more than

him he was kind and gentle that she will sleep on his shoulder for hours while he would stay still

so she won't wake up he adored her."); (A. Omar Letter, "I have seen Mr. Adel as a responsible

person helping his family by taking care of driving his sister to school freeing his parents to go

about their business.").

While Daoud's family support is visible on every court date, it of course extends far

beyond that. Indeed, the family is genuinely looking forward to his eventual release and they

remain committed to supporting his needs outside of prison. They have optimistically kept their

son's room almost as it was on the day he was arrested. They know that he will genuinely need

all of their support and help, particularly with strict conditions of supervised release. (Ahmed

and Mona Daoud Letter, "I loved my son more than anything and I will always do because I

know he will always need me."). His parents confirm their dedication to his rehabilitation as

such:

> My son life has strayed off the path that we had dreamed and hoped for him, but
> we remain convinced that he has the desire and the determination to learn from
> this experience and move in a positive direction of his life. My son will always
> have a large support system in us and his entire family. We will always be there
> for him no matter what but if he gets out as we hoped and dreamed for the last six
> years we will do everything in our power to give him the mental help that he
> desperately needs to help him achieve his goals of being a positive part of the
> society.

(Ahmed and Mona Daoud Letter). Similarly, Daoud's sister describes in her letter how she will

be there to support him upon his release:

> I believe now that he's older and experienced this entire situation; he sees how the
> world really is. Everyone is not your friend, and everyone does not have your best
> interest. At the same time you have to be able to distinguish between what's right
> and wrong too. It just takes him time to see things. Adel is a smart and ambitious
> person and can contribute to society in a beautiful way. He has goals now. Adel
> wants to get a good job, go to college maybe, and get his life to something worth
> living. He's only 25, just a year older than me. At 24 I support myself. I have my

own apartment and my own car; I work and go to school full time. Adel can have a chance to do those things and he deserves one.  When we were kids he helped me. Now as adults he can learn from me. He is still young enough to make a life for himself worth living, but old enough to know how to live in an acceptable way.

(H. Daoud Letter).

### F.  A Sentence Well Below the Advisory Guidelines Addresses the Factors Set Forth in § 3553(a)(2).

In fashioning its sentence, the Court also takes into account the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; to afford adequate deterrence (general deterrence) and protect the public from further crimes of defendant (specific deterrence); and to provide the defendant with needed educational or vocational training, medical care, or correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2)(A)-(D).

### 1.  General Deterrence.

Counsel do not dispute that general deterrence carries weight in this case, even with the arguable imperfect entrapment issues.  Yet, given the unique and individualized issues—particularly the mental health issues—counsel must also question the significance of that weight. Due to those individualized issues, this is a case where concerns of specific deterrence outweigh those of general deterrence.  *See United States v. Henshaw*, No. 16-CR-30049-SMY, 2018 WL 3240982, at *9 (S.D. Ill. July 3, 2018) (finding that in some cases,  "imprisonment would actually be detrimental to the rehabilitation process … [and could] serve to derail much of the progress [a defendant] has made," and supporting a downward departure where "the general deterrent impact of a significant prison sentence is outweighed by considerations of specific deterrence, just punishment and rehabilitation"); *United States v. Miranda*, 505 F.3d 785, 793–94 (7th Cir.2007) (explaining that a heavy sentence for a person of diminished mental capacity—

117

here, Schizoaffective Disorder—may reduce the need for deterrence, make incapacitation by imprisonment less appropriate, or render him less deserving of punishment).

Moreover, research has shown that "increases in the *certainty* of punishment, as opposed to the *severity* of punishment, are more likely to produce deterrent benefits." Valerie Wright, Ph.D., *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, p. 1, The Sentencing Project, Nov. 2010, *available at*: http://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf (emphasis in original). Echoing that observation, Judge Weinstein of the Eastern District of New York analyzed the general deterrence argument in a recent sentencing opinion and concluded: "Degree of certainty —as opposed to the length and severity—of punishment provides the strongest general deterrence effect." *United States v. Lawrence*, 254 F. Supp. 3d 441, 445 (E.D.N.Y. May 23, 2017). Moreover, while § 3553(a) requires the Court to address the issue of general deterrence, the statute "does not require the goal of general deterrence be met through a period of incarceration." *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010). Ultimately, it is difficult, if not impossible to quantify how much general deterrence is achieved by a specific sentence. In any event, if there is a deterrent message to be sent, it is conveyed in Defendant's arrest, indictment, prosecution, guilty plea, and the certainty that he will be sentenced and will further suffer the collateral consequences of being a federal convict.

## 2. Specific Deterrence /Protecting the Public

Specific deterrence, and the related issue of protecting the public are no doubt significant factors in this case. Yet, the precise question before the Court should be how to best ensure and monitor Daoud's rehabilitation—whether through an extended period of incarceration, or through strict monitoring on supervised release that includes mental health conditions. Counsel

would submit that the latter is the far more appropriate and humane method for protecting against recidivism and thus protecting the public. It is important to remember, of course, that the fake-bombing cases and solicitation cases were arguably not crime that Daoud conjured up *and* carried out on his own. In both instances, government agents played important roles in advancing the crimes.

Specific deterrence may thus be best addressed by the agreed upon strict conditions of supervised release that probation recommended, including monitoring of individuals with whom Daoud interacts, so as to ensure that he maintains pro-social and positive behavior. These conditions safeguard against recidivism more than warehousing. Indeed, Daoud's problems can in very large part be attributed to his unmonitored activity online. He met Letowski online (and obtained invitations to websites and chat rooms, and also copies of *Inspire* from him), accessed numerous videos, downloaded books, and posted many troubling comments online. He also met the OCEs online, which led him to meet the UCE. The intensive computer monitoring proposed by Probation is quite effective for these purposes.

Additionally, Daoud has already spent close to seven years in prison, with two of those years spent in the SHU. The personal impact on Daoud and his family has been severe. Daoud recognizes the severe hardship that he has caused to his family, as even third parties acknowledge. (A. Omar letter, "But I think after all the years he has been incarcerated and the hardship the family has been going through from financial burden, to stressful times, to losing years from building a bright future that the family is expecting from him, he has learned a lesson to be more careful in making the right judgment and the correct decisions that will only lead him to be a good citizen and productive person in the community. All these hardships he has gone and going through during his incarceration will teach him a lesson and will also have him covey

[sic] his bad experience and the sufferings to others."). Daoud has missed his younger sister grow up, and has had to watch his father's health deteriorate, no doubt largely from the stress and effects of this case.

### 3. Providing Educational or Vocational Training and Medical Care and Correctional Treatment in the Most Effective Manner Militates in Favor of a Sentence that Does not Unnecessarily Prolong Daoud's Release from Custody and Focuses on Mental Health Treatment While on Strict Supervised Release.

A sentence that is significantly below the guidelines would help "provide the defendant with needed educational or vocational training, medical care, or correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). Put simply, a sentence that is anywhere close to what the government will likely seek will be counterproductive; and will only succeed in warehousing Daoud.

The predominate concern should be Daoud's access to medical care "in the most effective manner." Unfortunately, the BOP cannot reliably be counted on to provide the caliber of mental health care that Daoud needs. Research undertaken by the Department of Justice demonstrates that only 15.1% of BOP inmates with mental health problems receive professional treatment while incarcerated. *Mental Health Problems of Prison and Jail Inmates*, p. 3, Table 14, Sept. 2006, Bureau of Justice Statistics Special Report (available at https://www.bjs.gov/content/pub/pdf/mhppji.pdf); Alan Ellis and Mark Allenbaugh, *Mental Health Care in the Bureau of Prisons*, National Trial Lawyers, Apr. 13, 2017, (available at http://alanellis.com/wp-content/uploads/2017/04/mental-health-care-in-bureau-of-prisons.pdf) (noting that despite the fact that one in four inmates in the BOP suffers from a mental health disorder, outside of certain formal programs, "rarely will an inmate receive any meaningful treatment for underlying disorders such as PTSD, Major Depressive Disorder, Bi-Polar Disorder,

and the like, as all treatment modalities are not offered, for example, EMDR (Eye Movement Desensitization and Reprocessing) for treatment of PTSD.").

Daoud's family is committed to supporting his mental health needs and his continued improvement. In their letter, his parents state as follows: "IF you decide to send Adel home we promise to get him the best help possible for his autism and with any other mental illness he develop when he was in jail but he can do it when he is around the people who love him and care for him." Given Daoud's documented mental illness, as well as his commitment to taking his medication, following the recommendations of mental health professionals, and engaging in pro-social behavior such as going to school and starting a family, an extended warehouse sentence that unnecessarily prolongs his incarceration and inability to participate in those pro-social activities is greater than necessary. *See United States v. Bannister*, 786 F.Supp.2d 617, 656–67 (E.D.N.Y. 2011) (Weinstein, J.) (acknowledging a growing recognition that treating mentally ill criminal defendants rather than imprisoning them better serves both the defendants and society); *United States v. Myers*, 503 F.3d 676, 687 (8th Cir. 2007) ("The district court did not abuse its discretion in finding that a shorter period of incarceration, with mental health treatment and supervised release, is the most effective sentence."). The reports of Dr. Xenakis, including his most recent report, emphasize the need for medication, treatment, supervision, not extended incarceration that could only undermine the progress that Daoud has made.

## V.   CONCLUSION

For the foregoing reasons, as well as those that will be adduced at the sentencing hearing, counsel respectfully request that the Court impose a sentence that would be no longer than necessary to ensure that the appropriate personalized mental health treatment program and

strictest possible conditions of supervised release are in place, and that would hopefully allow

Daoud to have the option to begin school, hopefully in the Fall of 2021.

Respectfully submitted,

/s/ Thomas Anthony Durkin
**THOMAS ANTHONY DURKIN,**

/s/Joshua G. Herman
**JOSHUA G. HERMAN,**

/s/ Andrea D. Lyon
**ANDREA D. LYON**
*Attorneys for the Defendant.*

**DURKIN & ROBERTS**
2446 N. Clark Street
Chicago, IL 60614
(312) 913-9300

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 457
Chicago, IL 60604
(312) 909-0434

**LYON LAW**
53 W. Jackson, Blvd., Suite 1650
Chicago, IL 60604
(312) 622-0736

## CERTIFICATE OF SERVICE

Joshua G. Herman Attorney at Law, hereby certifies that Defendant Adel Daoud's Sentencing Memorandum was served on April 26, 2019, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s/ Joshua G. Herman
**JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 457
Chicago, IL 60604
(312) 909-0434